IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

UNITED STATES OF AMERICA

                                    CRIMINAL NO.

  v.                          GLR 13-374

REDDY VIJAY ANNAPPAREDDY

                Defendant        September 1, 2016

_____/

TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE GEORGE LEVI RUSSELL, III

UNITED STATES DISTRICT JUDGE

APPEARANCES:

On behalf of the United States:

Sandra Wilkinson, AUSA

Catherine Pascale, Esquire


On behalf of the defendant:

Mark E. Schamel, Esquire

Joshua Greenberg, Esquire


Reported By:

Jacqueline Sovich, RPR, CM, CRR

Official Court Reporter

(PROCEEDINGS)

THE COURT:  All right.  Good morning, everyone. Why don't you call the case?  You can have a seat.

MS. WILKINSON:  Good morning, Judge Russell.  Calling the matter of United States of America versus Reddy V. Annappareddy, Criminal Number GLR 13-374.  Sandra Wilkinson and Catherine Pascale on behalf of the U.S. Attorney's office.

With me at counsel table in the well of the courtroom is Special Agent Mara Lating, Federal Bureau of Investigation.

THE COURT:  Of course.

MS. WILKINSON:  And Special Agent James Ryan from DIS.  And we're here today for a variety of different defense motions.

THE COURT:  Right.

MR. SCHAMEL:  Good morning.  Mark Schamel and Josh Greenberg, and Mr. Annappareddy's present before the Court. And I checked with Your Honor's courtroom deputy to make sure it's okay if Mr. Hinger our paralegal --

THE COURT:  That's fine.

MR. SCHAMEL:  -- if he may sit in the well, he's not seated with us.

THE COURT:  That's perfect.  Good morning, everyone.

MR. SCHAMEL:  Thank you.

THE COURT:  And I'm a little concerned, it was five of ten, and nobody was here from the defense, but all right.

As indicated, we are here for the purposes of a motions hearing in this case.  There's been a flurry of activity over the course of the past 24 to 48 hours.  The Court has done the best it can to try to keep up with the pleadings that have taken place and that have been filed.

I have had the opportunity to review the thoroughly briefed initial motion to dismiss the superseding indictment, as well as the supplements in this case.

I've also had the opportunity to review the motion to dismiss as a result of the destruction of what is supposed to be exculpatory evidence, and I've also read the motion to dismiss based upon alleged false testimony that was presented by the agent about a response from Mr. Annappareddy to a July 25th, 2012 e-mail.

The government has not had the opportunity to respond to that yet --

MS. WILKINSON:  That's correct, Your Honor.

THE COURT:  -- in writing, but I'm going to hear from the government on those points a little bit later on in the proceeding shortly.

First, I wanted to discuss and hear from counsel regarding the destruction of the evidence in this case.  Based upon the procedural history of this matter, there was currently a pending motion for new trial, and the government seized documents and other items that the government believed to be

evidence at the time that they seized it.  So the Court considers those documents and other items evidence.

And it's my understanding that the sole reason why the government decided to destroy the non prescription drug evidence absent a court order was because of space issues.

Miss Wilkinson; is that correct?

MS. WILKINSON:  No, Your Honor.  That's not correct. That's why I started the dialogue with defense counsel about the materials, because of space issues and because a lot of materials had just been -- I don't know how to explain it, Your Honor, just so much of it had been originally abandoned at Washington Boulevard, and then eventually some of the boxes brought here where defense counsel and government counsel went through them, I believed I had consent to get rid of them.

THE COURT:  Well, you didn't.

MS. WILKINSON:  I --

THE COURT:  You didn't, because, in fact, the defense -- the defendant indicated in this Court, the last correspondence by his lawyer that he intended on having a friend pick those things up January 27th.  And so there was no consent.  You couldn't reasonably have construed consent.

In fact, what are we talking about?  Are we talking about this courtroom sized fill with boxes?

MS. WILKINSON:  No.  No, not that much, Your Honor.

THE COURT:  And how about the jury box size filled

with boxes?

MS. WILKINSON:  Possibly.

THE COURT:  Great.  You mean to tell me the federal government couldn't find space in either U.S. Attorney's office, an area that's located in this building, or in vacant office space at the U.S. Attorney's office, or any other government building to house this evidence?

MS. WILKINSON:  No.  Of course, I'm not saying that, Your Honor.

THE COURT:  Right.

MS. WILKINSON:  Of course, I'm not.

THE COURT:  And so on top of that, this evidence, my understanding, contained signature logs, which would confirm the receipt or non receipt of certain prescription medication that was filled.  Defendant's counsel very well could have gone back and had the opportunity to review that information and pull whatever information out.  But we're at a motion for new trial.  The defendant is supposed to be placed on the same footing that he was before the new trial.

The motion for new trial was eventually conceded, because the government realized the flaws, substantial flaws, in its damage case that were significant.  And it kept going down and down and down to the point where it was demonstrated there was a surplus.

And now we've got an issue where these prescription

drug logs, the delivery notes, which identify patients and doctors who prescribed, is now forever lost to the defendant.

Were you able to duplicate it?

MS. WILKINSON:  No.

THE COURT:  Well --

MS. WILKINSON:  No, Your Honor.  In my -- I simply provided the materials in terms of my contacts with Mr. Bonsib and Miss Coleman, not knowing obviously what was going on behind the scenes.  And the timing, of course, is unfortunate for me personally, but when I sent that last e-mail in February, and indicated a communication with Mr. Bonsib, I had understood, and this just goes to my lack of bad faith, Your Honor, whether I'm right or wrong, I'll leave to the Court, but I did not do this in bad faith.  I believed in my heart that I had consent.

And I knew that the defense had been through these documents many, many times, as we did, and none of them were used.  And when I -- you know, I don't want to go to the Supreme Court case in Arizona, but I would just tell the Court that I -- you know, defense counsel have made --

THE COURT:  The problem --

MS. WILKINSON:  -- a number of different mistakes, and I obviously feel very strongly about this one, and I'm --

THE COURT:  I appreciate it.

MS. WILKINSON:  And --

THE COURT:  At the same time, this documentation could be -- I mean, this is the heart of the case.  And much of this 2011, 2012 logs, patient logs in receipt of the medication goes directly to the heart of the case, because the government's whole case, theory of the case at least, at that point in time, was regarding reversals.

And there is a possibility, and there was always a possibility of a new trial.  I don't understand why during the pendency of a motion for new trial evidence isn't preserved.  I don't know why there was an effort to -- I don't know why the thought was even crossed, other than, as I indicated in the papers, the owners of the facility, which is a government facility, said you can't keep them here.

MS. WILKINSON:  Well, that's with regard to the pills and the other items, obviously, Your Honor.  This stuff was stuff that had been left at this corporate headquarters in Washington Boulevard, the one where I indicated through the e-mail from Mr. Bonsib that items at some point were going to be abandoned there, and we did go and grab some of them and store them, as the Court noted.

THE COURT:  And you grabbed them, because they were evidence.  You thought they were evidence.

MS. WILKINSON:  We grabbed them so everybody could look through them, Your Honor.  And we grabbed them, so, in that year time period, that we had them, everybody did look

through them many, many times.

And not one of them that I know of, and we have gone back, and because we've gone through all the documents, particularly the agents in this case, and where there was a relevant document from one of those many boxes, they would indicate on the back right -hand corner, the Court might remember this from trial, what box it came from, and I had been unable to show whether any of those materials came from those four boxes.

And while I'm embarrassed, Your Honor, I put this information before the Court, because I wanted the Court to understand just my mind set about it, because it was almost storing it as, Your Honor -- I don't want to overstate this, but the Washington Boulevard stuff was a problem from day one for everybody.

The government's concerns about the defense having stuff and the defense concerns about what to do with all of this stuff, it was a building where, when we went in there, and all attorneys did, you know, there was no electricity.  The building was beeping all constantly from the fire alarm being off.  There was no running water.

And we would all go in and just look at things and we -- I mean, we left thousands, thousands of prescriptions there, Your Honor, that we could not maintain and hold onto.

And literally, and I just want the Court to

understand, these to me were sua generous documents. They weren't the same as the others, and I apologize for that. I'm embarrassed by it, obviously, but I did in my heart have no idea this was happening.

Mr. Bonsib and Miss Coleman had filed the motion for new trial, but I was also conferring with them. And by February -- I don't have the e-mail right in front of me right now, I indicated that I had communicated with them, and they had no objection to this process.

And I believed --

THE COURT: No. But the last correspondence from -- the last correspondence --

MS. WILKINSON: The one in January, that's correct.

THE COURT: The last correspondence was he wants it.

MS. WILKINSON: That was on January 27th.

THE COURT: Yes. The last correspondence was he wants them. I don't want to belabor it, but the government should have gotten direct confirmation. If his lawyer had written you back and said, fine, no problem, he doesn't want them anymore, then we're not even having this discussion.

But what was left was you took his silence as a waiver or no objection to the destruction. And it wasn't there.

MS. WILKINSON: And the timeframe that had gone by, Your Honor, because --

THE COURT:  Two weeks.

MS. WILKINSON:  No, no.

THE COURT:  January 27th.

MS. WILKINSON:  And March 11th is when I destroyed them.

THE COURT:  Well, February you sent him a notice, and you didn't hear anything back.  What's from stopping you from picking up the phone?

MS. WILKINSON:  But I think -- I mean, I don't recall, Your Honor, if we go back and look at the e-mail that I sent to Mr. Bonsib, it does indicate a communication that I had with Mr. Bonsib.

THE COURT:  Miss Coleman.

MS. WILKINSON:  But again, I mean, I don't recall, but if I look at the e-mails, if I could grab it first, I think, Your Honor.

THE COURT:  This is belaboring the point.

MS. WILKINSON:  It is.

THE COURT:  And it's belaboring the point.  He wanted them.  You assumed incorrectly that he had no objection to them being destroyed, and they were these documents, which the government felt well of it enough to take from the warehouse and store, were destroyed.

MS. WILKINSON:  Now, I would go -- yes, that is exactly what happened, Your Honor.  And I would -- I'd note for

the Court that the law is if the Court finds lack of bad faith and what could be potentially useful information, we don't know that they're exculpatory, I believe if they were exculpatory, they would have been used in the first trial.

THE COURT:  Not necessarily.  Mr. Bonsib didn't hire a forensic expert.

MS. WILKINSON:  I understand that, Your Honor.

THE COURT:  You know, Mr. Bonsib didn't do a whole lot of things that this trial team did, that eviscerated the government's damage claim.  Eviscerated it.  It wouldn't have been close.

The government's internal auditor, had she been armed, had defense counsel been armed with the information they discovered, would have eviscerated the damage claim under the theory that the government proposed.

MS. WILKINSON:  The theory that we presented at trial for sure, Your Honor.

THE COURT:  Right.

MS. WILKINSON:  Because of the million dollar drugs that were purchased in the fall, no doubt about that.

THE COURT:  Okay.

MS. WILKINSON:  That is the case we presented to the jury.  You know I am here --

THE COURT:  What I'm going to do, I'll reserve ruling on that particular ground.

All right.  The next one was there, the next motion that was filed, that I did receive a response to, was whether or not the case agent testified falsely related to a review of billing records about a phone call from Jigar Patel, or from Mr. Annappareddy to Mr. Patel, subsequent to an e-mail that allegedly confirms Mr. Annappareddy's desire to not reverse high dollar medications on July 25th.

MS. WILKINSON:  Well, what we know from the trial record, Your Honor, is that Mr. Annappareddy did not address this during his direct examination.

And at trial, the government, prior to Mr. Annappareddy's testimony, had put on Agent Lating.  Ironically, the government had subpoenaed a number of phone records in this case.  The Court heard a number of summaries of Agent Lating's related to a variety of different contacts at different times. And most of those phone records that had been subpoenaed had been uploaded into the system that Federal Bureau of Investigation maintains.  And on that system is a record of what is kept.

And I didn't bring it with me today, because I intended to file a written response, Your Honor, but there is a printout that comes from and indicates what has been uploaded and has toll records for the two critical phone numbers, Mr. Annappareddy's and Mr. Patel's, at the timeframe.

THE COURT:  Well, four numbers, because they each had

two numbers associated with each.

MS. WILKINSON:  I think it's two.  Mr. Annappareddy, 1100 number that counsel has raised.

THE COURT:  Right.

MS. WILKINSON:  But the ones at trial, the ones that we had believed we had at the time were the 6500 number, which was Mr. Annappareddy's, and --

THE COURT:  That ends in 1100.

MS. WILKINSON:  Not the 1100.

THE COURT:  But didn't you subpoena the 1100 records? But you only subpoenaed them from January 2011 to December of 2011.

MS. WILKINSON:  That's the 6500, Your Honor.  The 1100 is not that one, I don't have it in front of me.

THE COURT:  Which number shows the contacts with Mr. Patel's phone, which number was that?

MS. WILKINSON:  Pardon me, Your Honor?

THE COURT:  Which number was it?  Oh, (443) 616-6500 was the number?

MS. WILKINSON:  That's the number we believed that Mr. Annappareddy, that we believed to be his cell phone during the time.

THE COURT:  Right.  And those records were subpoenaed pretrial, correct?

MS. WILKINSON:  Yes.

THE COURT:  Okay.  But they were subpoenaed for January of 2011 through December of 2011, correct?

MS. WILKINSON:  That's one subpoena that was sent. We had also sent a subpoena for the entire timeframe through March of 2013, which was the date of the subpoena for the 6500.

The problem is, as we now know, we sent it to the wrong service provider.  And so the ones where the gap comes in, this is what we know now, is the ones that were missing, that timeframe, Your Honor.

THE COURT:  Right.  Well, the Sprint service provider came back and said that the phone hadn't been activated since February of 2013.

MS. WILKINSON:  Correct.

THE COURT:  So you knew at that point in time that the records that you had in your possession didn't cover the timeframe that you were seeking, right?

MS. WILKINSON:  Yes, technically, yes.

THE COURT:  Technically.  They didn't -- it was nothing technical about it.  You got the records back, and the exact timeframe that you were looking for wasn't contained in those records.  And then eventually, I guess nobody did anything about it at that point in time?

MS. WILKINSON:  Didn't observe it, correct.

THE COURT:  And then the case agent gets on the stand and testifies that she looked through the records and didn't

see any contacts at that time.

MS. WILKINSON:  What the case agent did was go to her system where everything had been loaded up and put in the two phone numbers and didn't see a contact.

And Your Honor's correct, she didn't see a contact, because we now know because they weren't in there.

THE COURT:  But she didn't look at the records for that timeframe.

MS. WILKINSON:  She didn't look at the actual records, correct.

THE COURT:  Right.

MS. WILKINSON:  She looked at what had been uploaded.

THE COURT:  She didn't look at any records for that timeframe.

MS. WILKINSON:  She looked at the computer system where all the records had been uploaded.

THE COURT:  She didn't look at any records for July 2012, July 25th, 2012.

MS. WILKINSON:  You're correct.

THE COURT:  She didn't look at them.  So that the testimony that she gave, that she reviewed them, is false.

MS. WILKINSON:  It is incorrect, that is correct, Your Honor.

THE COURT:  It's false.  It's not incorrect.  It's false.  Whether or not it was intentional or otherwise, it's

false, right?

MS. WILKINSON:  I hear Your Honor, yes.

THE COURT:  So--

MS. WILKINSON:  I think, again --

THE COURT:  And then when --

MS. WILKINSON:  When we looked at in terms of records --

THE COURT:  I'm not saying that what she did was intentional.

MS. WILKINSON:  I know that.

THE COURT:  I'm not saying the government suborned perjury.  I'm not saying Agent Lating perjured herself.

What I'm saying is false testimony was put before this jury.  The government made hay of that testimony.  In fact, highlighted it.  In fact, requested that I instruct this jury on the fact in there was no response, and that should be constituted as an admission.  Highlighted it in both closing and rebuttal, and again looked and pointed to this evidence, like the loss evidence, as significant evidence, right?

MS. WILKINSON:  Yes, Your Honor.  May I explain one thing?

THE COURT:  Sure.

MS. WILKINSON:  It's somewhat of an irony, but just so the record is clear, when the July 25th e-mail was uncovered and in conversations with the different defense attorneys,

because it was very damaging, as we all know, that Mr. Patel had sent -- ironically, the issue the government was dealing with at the time was that Mr. Annappareddy I believe was out of the country.  And the comments back to us from counsel were how are you going to prove he even received it?  Right?  How are you going to prove that?  It's just an e-mail.

Well, we're going to see if we see any response to it or see if we see any phone records.  So ironically, we wanted to find the phone contact between Mr. Annappareddy and Mr. Patel.

And when Agent Lating looked up in her phone system and believed in her heart that the toll records had been loaded up, even though they weren't, absolutely.

THE COURT:  So nobody looked, there was never any search for July 25th, 2012?

MS. WILKINSON:  She believed they had been loaded up, correct.

THE COURT:  Right.

MS. WILKINSON:  There's records.

THE COURT:  But when she was looking for those records, she's looking for that date specifically.

MS. WILKINSON:  Absolutely.

THE COURT:  She's got it in mind, because, as you said, we needed to find out whether or not there was a response.

MS. WILKINSON:  Right.

THE COURT:  So --

MS. WILKINSON:  We wanted to know they knew, we believed there should be a contact between them.

THE COURT:  So she's looking at phone records, and she's -- the date that she's honed in on is July 25th, 2012?

MS. WILKINSON:  Absolutely, Your Honor.

THE COURT:  And --

MS. WILKINSON:  She's looking on a secondary source, no doubt about it.  She's looking at the records from --

THE COURT:  And she didn't find it.

MS. WILKINSON:  She didn't find any.

THE COURT:  Then she didn't go to the primary source, either.

MS. WILKINSON:  No, she did not.

THE COURT:  And those records were available, right?  The hard copies that were received were available?

MS. WILKINSON:  We didn't have them.  That's the point.  We never got them, because we subpoenaed the wrong service provider.  We did not have the July 2012 tolls at the time.

THE COURT:  I mean, she just dropped the ball, because she thought it was peculiar that there were no phone records prior to February 2013 with a phone associated with Mr. Annappareddy.

MS. WILKINSON:  She's doing searches of two numbers on a day, and it comes up negative and, in her mind, believing that they had been uploaded.  Wrong.  Correct.  That's exactly what happened, Your Honor.

So she looked at a secondary source, from her mind, because, again, Your Honor, just seeing the breadth of -- I mean, Agent Lating is one of the hardest working agents that I know.  She's been around --

THE COURT:  It's not personal vouching.

MS. WILKINSON:  I'm not vouching, Your Honor.

THE COURT:  You are vouching.  You are vouching.  Hey, you know, I'm not interested in vouching.  I'm interested in the facts.  I'm interested in the facts.

MS. WILKINSON:  The facts are we did not have the record.

THE COURT:  But I'm interested in the facts.  There's some significant evidence that was put before this jury that this gentleman was convicted under, if it weren't for the resistance of the government in the motion for new trial that, because of that resistance, if I let it go, he'd be in prison right now.  He would be in prison.  And the Court would have sentenced him to prison.

But actually, he shouldn't be in prison, because his constitutional due process rights were violated, and they were violated by mistakes the government made.

Okay.  I think I've ferreted those two issues out.

The second issue is with regard to the MEDIC data, I do have a question about that.  The MEDIC data of 1997 related to the government's previous experts related to loss.  It's my understanding that, originally, they came out, and they came out with what the government believed to be high loss figures.  But for whatever reason, maybe it was because of the formulation or otherwise, the government didn't like the way the MEDIC experts were formatting that data, but they came up with a loss figure.

The government decided that they wanted to have an internal auditor, and so Miss Hammond steps in.  Data's provided, evidence of loss is determined.  It's sent over to Mr. Bonsib.

At some point in time, the government determined that the loss figures that were being promoted by Miss Hammond in the trial of $4.5 million, approximately, was substantially higher than the MEDIC data losses that the experts had indicated earlier, correct?

MS. WILKINSON:  It's not like that, Your Honor.  It's comparing apples and oranges.

THE COURT:  No.  But the MEDIC folks came up with a loss figure, right?

MS. WILKINSON:  The MEDIC folks came up with a loss figure based on -- their methodology is different, because they

looked at it from Medicare's point of view.

So, for example, Your Honor, if a drug wasn't reimbursed by Medicare, say a drug wasn't reimbursed by Medicare, but is by Medicaid, which with a lot of drugs that can be the case, that they will not look at that drug, because they will only look at it in the eyes of Medicare.

They will not look at cross-pollination between pharmacies when we know that's exactly what happened here. They were having trouble with the D.C. Medicare.

THE COURT:  Cross-pollination between pharmacies, what we're talking about is transfer of pills between the individual pharmacies?

MS. WILKINSON:  Exactly.

THE COURT:  Their data said we're going to look at Old Emmorton, Plumtree, and see what went in those facilities, was in those facilities, and what was actually --

MS. WILKINSON:  The view of all of the evidence they were transferring inventory, constitute, like Mr. Guruvareddy testified, sometimes it was stored in the office.

THE COURT:  Got you.

MS. WILKINSON:  So there were all these different issues, and that's eventually -- I forget what the Court's question was.  But, yes, there was a different methodology that MEDIC was using.

THE COURT:  My point is their bottom line loss number

was different than what was promoted and testified to by the internal auditor.

MS. WILKINSON:  Different because you come to it --

THE COURT:  But they were different.

MS. WILKINSON:  Right.

THE COURT:  It was less, right?

MS. WILKINSON:  Well, I don't want to say that it was less.  I don't have it in front of me, but the MEDIC, when you total up everything together, I -- it is -- I don't remember what the two figures are, Your Honor, but I don't remember them being distinctly different from one another.  But I'll let the Court's recollection --

THE COURT:  But loss is loss.  And whether or not, under one formulation, the MEDIC formulation compared to the internal auditor's analysis, that MEDIC formulation was actually helpful to the defense --

MS. WILKINSON:  Well, I disagree with that.

THE COURT:  -- because it's less.

MS. WILKINSON:  Well, I disagree with that, Your Honor, because it's still substantial and material through the whole thing.

My understanding of the MEDIC analysis is that that -- the losses were very significant as of March of 2014.  And --

THE COURT:  But I think the comparable was something,

if I recall the figures correctly, it was 100, it was like a 130 some thousand dollar loss, which is 10% of the $1.3 million that Miss Hammond testified to.

MS. WILKINSON:  The methodologies were no doubt different, Your Honor.

THE COURT:  I understand the methodology.  I understand the methodology is different.  I understand that MEDIC came up with a loss amount using another methodology that's different, that's different.  And you came up with an in-and-out methodology that is different but terribly flawed.

And that methodology, if the defense had it, then they would have been able to cross-examine Miss Hammond on the discrepancy.

MS. WILKINSON:  Your Honor, may I just --

THE COURT:  Yes.

MS. WILKINSON:  I feel the need to -- I do not want to argue with the Court in terms of the falsity of what happened in front of the jury.  But it is so important to remember, because now looking back at it in hindsight, there's no doubt this was a disaster, no doubt.  I see that.  Right.

I didn't feel it when I was doing, but it definitely feels like it now, having that looked at, and I know it sounds very ironic, Your Honor, but the government truly was trying to give Mr. Annappareddy the benefit of every doubt.  And it's the double-counting and the lack of ADAP that really caused the

problems.  Let me finish this.

THE COURT:  Which everyone knew.  You know there was always a risk of double-counting with the MEDIC folks.  That's what they told you could happen.  And sure enough, it happened.

MS. WILKINSON:  And Your Honor, let me just go back to my point about why we're still seeing in Miss Hammond's this much less shortage that nobody disputes was wrong when it was presented to the jury was false, when it was presented to the jury.

However, Your Honor, it made a basic assumption to the benefit of Mr. Annappareddy that cannot go unnoticed here, because there is still a problem in his shortages.  And again, putting the loss figures aside, through the pill shortages, as the Court has noted, what we're talking about here, Miss Hammond's analysis assumed, in October of 2012, when she stopped her analysis, that that million dollars' worth of drugs that came in January -- in -- strike that, in September and October, the ones that we had testimony about at trial, that million dollars' worth of drugs, that she -- her analysis assumed that that million dollars' worth of drugs was available to take -- to account for the claims that happened in 2007.

So she's giving a total number of all six numbers at the end.

THE COURT:  As opposed to going to month to month.

MS. WILKINSON:  As opposed to going month to month.

The reason why that is so significant, Your Honor, is because those drugs could not -- yes, the jury heard this, too, but we didn't make the same argument to them, because we were -- just gave them the bottom line number, but that's --

THE COURT:  You didn't have to, because the loss was -- you didn't have to, because the representations regarding you can't sell what you don't have were so powerful.

MS. WILKINSON:  And they still are, because if you go month by month by what Miss Kelly sees, now you see from 2008, 2009, 2010, the shortages gradually were adding together, and by that time of August 31st, when we know Mr. Annappareddy knew about the investigation, and then bought that million dollars' worth of drugs, we now know it canceled out that bottom line that Miss Hammond showed.

But if you go to Miss Kelly's analysis, which perhaps we should have done in the first place, Your Honor, go back and done it month by month, I'm not an accountant, didn't understand it, but you cannot use those million dollars' worth of drugs and cancel out all the claims that happened before when they didn't account for the ones that happened in the two months when we had the drugs on hand.

And yes, we did not make that argument to the jury, and we were I guess satisfied with what Miss Hammond had to say, because we believed in our heart it was correct.

And we thought it was conservative, which is just the

irony in all of this.  We thought was we were giving Mr. Annappareddy the benefit of that, Miss Hammond said that.  And it was still wrong.

But it was if you correct the data and you look at it the way a pharmacy would look at it, which is now frankly the way MEDIC, only they will do it from the eyes of Medicare, not Medicaid, where a lot of these drugs were from, you still see the hundred thousand short, whatever short that Miss Kelly shows, which is still quite substantial and ironically is close to what we now know to be whatever they knew would be the pill shortage in this case.

But you know, can I go back and fix that?  I can't, Your Honor.  I cannot go back and next that.  It's done.

And my whole point at the end of the day, yes, these attorneys have been very zealous in finding every error the that we made, every one of us have made an error.  We've talked about how I've made an error, Agent Lating's made an error, Miss Pascale's made an error, Agent Ryan, Agent Mosely, we've all made mistakes in this massive, massive case that we had.

And we tried very hard through the whole thing.  I'm not vouching, I'm just talking about the sheer volume of everything we had and our relationship with counsel to try to present the fairest picture that we can.

It is what it is, as they say.  And I don't envy the Court.  But you know by the time I truly understood -- and I

know the Court has concerns about this, I'll just say it like it is. When Miss -- when this whole issue about the dispensing fee, we were told by DCDOH submitted an affidavit that the dispensing fees could be accounted for by other things.

When we first got the Medicaid warehouse records in that flurry of activity during the trial, they did not account for all of the dispensing fees.

It wasn't until counsel found a third-party contractor that had -- that still don't have all the records that justify all those dispensing fees, but we give, I know it sounds ironic in hindsight, but of course we give them credit for that, but we did not understand that as it was evolving.

And in hindsight, do I wish that as soon as I got the punch in the gut I knew there was a double-counting from Miss Hammond that stopped it right then? But I didn't understand it until I could go back. We've invested a lot of time and effort in this case, had huge amount of evidence in Mr. Annappareddy's fraudulent conduct outside of this.

THE COURT: But that was the most -- but their argument would be --

MS. WILKINSON: I hear you.

THE COURT: -- he's a sloppy businessman.

MS. WILKINSON: I understand that.

THE COURT: He had sloppy business practices.

MS. WILKINSON: That wasn't his defense, but yes.

THE COURT:  Well, it could have been.  You know, you brought in a handful of prescription drugs --

MS. WILKINSON:  The defense that was presented was a completely different defense than these ones, I get that, Your Honor.  And you know, this is just about whether or not we can overcome these mistakes and go forward.  And you know that's a decision the Judge has to make, obviously.

THE COURT:  Right.

MS. WILKINSON:  The evidence was otherwise powerful.  The government, you know, submits that we would still be able to maintain our burden of proof.  But do I look back on this every day, every minute, and account for it?  I'm a government prosecutor.  I care about the process.  I care about it.

And you know, I don't know what to say.

THE COURT:  This case has occupied the better portion of my two months as well.

MS. WILKINSON:  Of course it has, and defense counsel, too.

THE COURT:  Yes.

MS. WILKINSON:  I get that.  I'm not suggesting or, you know, for all of that, I see what happened here.  And you know, human error and we make mistakes, and I don't know how to --

THE COURT:  I got you.  All right.

Who's handling this, Mr. Schamel or Mr. Greenberg?

MR. SCHAMEL:  I guess a question first, I'd like to make a point, something Miss Wilkinson said, just so Your Honor's not misunderstanding.  Mr. Annappareddy was not in India on the 25 of July.  He left on the 29th or 30th of July. The phone records bear that out we provided to the Court.  We can produce travel records, if that's necessary.

What would Your Honor like to hear?

THE COURT:  Whether or not you have any response to government's counsel's response to my inquiry.

MR. SCHAMEL:  I'll let Mr. Greenberg answer one of the --

THE COURT:  I just want to make sure I'm clear for the record, that I'm not unclear regarding any of the facts in this case as part of the supplemental motions, the initial motions and supplement motion.

I understand that there are other grounds that the defense is asking that the second superseding of the indictment be dismissed under, but I'm specifically looking at the ones that I've mentioned here already here.

MR. SCHAMEL:  And those I mean we still intend to file a reply to what the government filed yesterday on the issue of, you know, there's still briefing to be done here, so I would ask if Your Honor's inclined not to disavow or deny these motions, that we'd be given that opportunity to finish up the record.

THE COURT:  Mr. Greenberg?

MR. GREENBERG:  May I walk over to the podium?

THE COURT:  Sure.

MR. GREENBERG:  Your Honor, we are going to file replies in support of the motions regarding the five phone calls from Mr. Annappareddy to Jigar Patel on July 25th, 2012 and on the intentional destruction of documents while a new trial motion was pending without notice to the Court or Mr. Annappareddy.  Those replies will address the statements that were made by the government today.

THE COURT:  Well, the government, I don't know what you're going to put in a reply that would be any more persuasive than what you've already indicated.  The government's indicated that, I don't know why you're expending the resources to do that.

I mean, the government's indicated that there was evidence that was destroyed, that I've already found that Mr. Annappareddy didn't give consent to it, in fact, objected to, sought out, if not objected, sought out the documents, so what is in dispute that you're seeking a reply to?

MR. GREENBERG:  Your Honor, there are multiple statements in the government's response yesterday that are not factually accurate.

THE COURT:  Let me sort it out.  Let's go.

MR. GREENBERG:  Could I just grab the response?

THE COURT:  Yes, I mean, that's fine.  The government has admitted that the evidence that was put forward by the witness relating to the phone call was false.  It was material.  It was significant.

(Defense counsel conferring with defendant.)

MR. GREENBERG:  Your Honor, I think the issue is that we would like to have a chance to brief, and we'll do it expeditiously, we would like to have the issue about whether the phone call issue and whether the destruction of documents were done in good faith.

And I will point out, Your Honor, that as Your Honor very correctly noted, signature logs and refill log books are at the heart of this case.  They were apparently exculpatory, because they show deliveries of medications, that was the key issue in the case.

Your Honor could dismiss the case right now on the ground, without finding bad faith, that they were apparently exculpatory, they covered years, and that now Mr. Annappareddy can never have a fair trial.

If the Court is not inclined to do that, however, we would ask a chance to fully brief the matter and respond to the issues that the government has raised.  We'd also like -- or rather statements in the government's response.

And there are also facts we don't know yet we've asked the government for answers, they haven't answered, such

as how many box of documents they have destroyed.  They have not answered that question.

THE COURT:  How many boxes of documents, four, four paper boxes?

MS. WILKINSON:  I think we did answer that.

THE COURT:  So there are four paper boxes.

MS. WILKINSON:  They're --

THE COURT:  The kind of boxes the sides that you would put reams of paper in?

MR. SCHAMEL:  I think they're called bankers boxes.

THE COURT:  Bankers boxes, yes.

MS. WILKINSON:  I don't recall the size of the boxes.

THE COURT:  Somebody knows.

MS. WILKINSON:  They were boxes, that most of everything that we got was in the size of banker boxes.

THE COURT:  Okay.  Okay.

MR. GREENBERG:  Your Honor.  And we would like an opportunity to fully respond in writing to the statements about the communications with Mr. Bonsib, the lack of responses by Mr. Bonsib, the selective intentional destruction, covertly without notice to anyone, of four boxes of apparently exculpatory documents.

Unless the Court is inclined to dismiss today on the ground that because they are apparently exculpatory and because they cover years, we don't need to proceed any further, and the

Court can certainly do that.

THE COURT:  All right.

MR. GREENBERG:  But certainly, we would ask respectfully for a chance to brief the issues on the loss calculations.

It's undisputed that the prosecutors were personally involved in the preparation of the false loss calculations, that they closely supervised the preparation of those false calculations, and that the calculations were prepared in the U.S. Attorney's office.

The documents the government produced on October 13th, 2015, show that the prosecutors were reckless in presenting their false loss calculations to the jury.

The government does not dispute that those documents show the following three things:  First, Exhibits 23 and 26 of the motion, which are docs 430-25 and 430-28, those documents show that the prosecutors knew that they needed to look for and remove duplicate claims, because the same claims appear in multiple claims files.

They have not disputed that point, and they can't dispute it.

Second, Your Honor, Exhibits 24 and 26 to the motion, which are 430-26 and 430-28, those documents show that the prosecutors knew that a substantial and unjustified risk existed that the first auditor's loss calculations were

artificially inflated by double-counting errors.

Third, Exhibit 33 to the motion, Docket Number 430-35, that's a document that the first auditor prepared in July 2014, many months before the trial, right around the time that the government announced it was abandoning MEDIC and switching to the lead auditor.  That comparison is stunning.

It shows that for 18 of the 28 medications for which the first auditor found shortages, including seven of the most -- eight of the most expensive medications, the shortages she found are much larger than those that MEDIC found.

And the prosecutors knew that MEDIC didn't count pills that were transferred among stores.  They knew that MEDIC data excluded duplicate claims and the data the first auditor used did not.  And they knew that the first auditor counted transfers.

It is undisputed that, knowing all three of those things, the prosecutors did nothing to look for or remove duplicate claims.  Instead, the prosecutor --

THE COURT:  Well, but there is evidence that even within the notes themselves that they wanted to scrub the data for double-counting errors.  That cuts both ways.  You can say that they knew about the double-counting errors, but then there's evidence that they tried to scrub the double-counting errors.  And they knew that could potentially be a problem.

Now, did they think they did what they were

supposed to do in getting rid of the problem?  Maybe.  I don't know.  But the problem existed.

There was a double-counting issue that existed.  They knew it, and I think there's specific notes in there from the prosecution team saying, hey, guys, we need to make sure that we scrub this data for double-counting.  I'm concerned about that.  They were concerned about it.

So you know to say that they ignored it, I don't think is accurate.

MR. GREENBERG:  Well, Your Honor, the record shows that document prepared in the U.S. Attorney's office that specifically expressed and identified the need to scrub the data and look for double-counting errors, that was never followed up on is not in dispute.  We raised the issue.  They responded.  They haven't denied that they did nothing for looking for double-counting errors.  That's reckless.

THE COURT:  Other than saying that they would.

MR. GREENBERG:  Other than saying that they would and didn't.

THE COURT:  I don't think, I don't read the documents in a way that says they didn't do it.  I don't read it like that at all.

MR. GREENBERG:  Maybe Your Honor should ask them if they did it?

THE COURT:  No.  Not right now.  Not at this stage.

MR. GREENBERG:  Well, Your Honor, this is not just about one exhibit with only one mistake.  This is about seven exhibits with false loss calculations the prosecutors presented to the jury with respect to claims that Pharmacare submitted to Medicaid and other government insurance programs.  That was the heart of the prosecutor's case.

It's about Government Exhibit S 1, the false loss calculation for all stores.  It's about Government Exhibit S 19, the false loss calculation for all stores broken down by drug strength with information about the payment for each pill. That shows the level of detail that these prosecutors wanted in their exhibits and how focused they were on these exhibits.

THE COURT:  Excuse me one moment.

(Pause.)

THE COURT:  Excuse me very much, Mr. Greenberg, sorry about that.

(Defense counsel conferring with defendant.)

THE COURT:  I'm sorry to interrupt you, Mr. Greenberg.

MR. GREENBERG:  Your Honor, I won't go through all of the government exhibits, but there are seven government exhibits with false loss calculations that were presented to the jury, as Your Honor knows.

If all seven of these exhibits were just a mistake, the prosecutors would not have resisted producing internal

documents revealing that the exhibits are false.

If this were all just a mistake, they would have voluntarily produced all of those documents long before the trial began.

The prosecutors didn't do that.  They withheld internal documents prepared by their own experts and their own auditor that directly contradict the false loss calculations they presented to the jury.

The prosecutors produced some of those internal documents only after we filed the motion to compel.  They produced others only after the Court had granted the motion to compel in October 6th, 2015.

The documents that the government produced after the Court granted the motion to compel, the ones they produced on October 13th, 2015, include the key documents showing why dismissal with prejudice is warranted.  And those key documents are the four specific exhibits that I identified earlier.

And Your Honor, it is undisputed that those documents were withheld.  Those documents directly contradict the false loss calculations, loss calculations that were presented to the jury.

As Your Honor pointed out earlier, had they been produced, they could have been used to eviscerate the government's case at trial, and the result might have been different.

And the fact that the prosecutors waited until after the Court granted our motion to compel, produced the key documents underlying our motion to dismiss, can't be reconciled with the notion that this is all just one mistake by one auditor about one note.

We don't have a single new declaration explaining what happened.  We have documents showing they knew about the risk of double-counting errors.  We argued and showed the documents they did nothing to look for double-counting errors.

They had a full chance to respond.  They submitted a brief.  They have never maintained they did anything to look for double-counting errors.

It's undisputed in the record they did not look for double-counting errors.  The government has not answered any of the core facts underlying this motion to dismiss.

All we have are declarations from 2015 that, with all respect, are less than a hundred percent accurate, and they don't address any of the documents that were produced on October 13th, 2015.

The facts showing that the prosecutors were reckless in presenting false loss calculations to the jury stand uncontested.

THE COURT:  They are contested, Mr. Greenberg.  I don't know whether or not you're reading from a script, but we've gone through this.

I mean, they are contesting.  They are saying they didn't, they didn't engage in this, in bad faith.  They are contesting that.  It is not uncontested.  That's precisely what they're doing, saying, look, these are mistakes that ended up happening.  They're embarrassed by them.  They shouldn't have happened.  Had they had things to do all over again, they would do things differently, but they're adamant about lack of bad faith here, so it is contested.

MR. GREENBERG:  Your Honor, they don't contest the point about whether they were reckless, but the actual facts and the documents about what they knew and when they did, what they did and didn't do, those facts are uncontested.

It's also undisputed that a second trial would substantially prejudice Mr. Annappareddy by unfairly allowing the government to profit from having presented false evidence to the jury.

Not only have the prosecutors failed to dispute this point, they have actually embraced it and conceded it.  In their response to the motion to limit evidence, the prosecutors admit that they would use evidence in the second trial to fix the significant problems in their case that we had to bring to the Court's attention and to the prosecutor's attention when we litigated the motion for a new trial.

The prosecutors openly stated they may adapt their trial strategy based on information they learned during the

first trial and may call witnesses who did not testify at the first trial.  The prosecutors' own words prove that a second trial would substantially prejudice Mr. Annappareddy.

Allowing a second trial under the extraordinary circumstances here would allow the government to profit from the prosecutors recklessly presenting false evidence on material issues of the first trial.  That would reward the prosecutors for what happened in violation of the Fifth Amendment due process clause.  The Court should not allow that result to happen.

And Your Honor, the documents that we have show that this is more than mistake.  Another document produced on October 13th, 2015 shows that, as of December 1st, 2014, during the trial, the prosecutors had in their hands an analysis showing that the D.C. Department Of Health supplied 90,099 pills to Pharmacare.

That internal analysis, which was prepared in the U.S. Attorney's office, is Exhibit 15 to the motion at Docket Number 430-17.

Despite having that analysis in their hands, the prosecutors affirmatively represented to this Court in a filing on October 9th, 2015, that the DCDOH supplied only 15,750 pills to Pharmacare.  Then four days later, the prosecutors produced the analysis that they had withheld since December 1, 2014, in response to the Court granting the motion to compel.

THE COURT: Yes, I do have a question about that. Can somebody test the accuracy of that representation? In other words, the representations in the papers, and I noted that there were before me, and then as it turns out, this document pops up that maybe the government knew that there was the --

MS. WILKINSON: The Court will recall what happened, when Miss Hammond was cross-examined the first time, Mr. Bonsib raised the issue of the ADAP, and very much exploited her lack of knowledge about it.

She went back and saw from the pamphlet, because she had never done this before, there were dispensing fees. Then there was a flurry of activity to get the actual records of what had been produced to Pharmacare.

And that's where that figure comes in, Your Honor. It's from the actual records from the warehouse showing what had been given to Pharmacare. That's all we had for a long time period.

And then DCDOH, admittedly a very difficult agency to deal with in D.C., told, you know, the affidavit for Mr. Ansari that we had introduced was that there was another explanation, told me there was another explanation about these dispensing fees, because we didn't have the actual records showing that they had been replenished.

I don't know, maybe it's an issue of when the

replenishment happened later.  We just didn't have them.

We tried hard to find them with D.C., just like Mr. Bonsib and Miss Coleman did at that time, and we did later all the way up until I don't remember the timeframe, when counsel, I can't remember the name, counsel can probably help me, a third-party contractor that had additional records of what went on to Pharmacare, D.C. Medicaid never told us about that.

THE COURT:  No.  He's saying you had in your possession evidence about the replenishment program and the 90,000 pills and then represented in the papers to the Court that there was still a 90,000 pill deficit.

MS. WILKINSON:  The dispensing fee and the actual records showing what was dispensed and replenished are two different things, in our mind.  We didn't know enough about the program, because we missed a big one.  And that's when we first started, what are these?

And it's that night, and I don't have Miss Hammond here to explain it, but again, Your Honor, this was an evolving education of the U.S. Attorney's office, Miss Hammond, and everybody else, about what this replenishment program was.  And it wasn't until counsel found the third-party contractor's name, and we saw the records, which frankly, Your Honor, still don't account for all of the dispensing fee money that was there, but were all agreeing now that's what it is, because we feel like the records are just lacking.

THE COURT:  After you saw the records, did you still -- did you still contest?

MS. WILKINSON:  No.  That's when we eventually said you got it.  Right.  That's my recollection of it.  I am not disputing for one moment that this wasn't an evolving education on our behalf, because we were floored.  We were floored by the double errors.  Right, Your Honor.  Floored by it.  And just trying to understand what happened.

And it requires a lot of moving parts and a lot of deliberation with my office, and --

THE COURT:  Okay.

MS. WILKINSON:  I don't know how much more rollover.

THE COURT:  Okay.  I'm sorry, Mr. Greenberg.  I cut you off, because I needed to get an answer to the question.

MR. GREENBERG:  No problem, none whatsoever.  I think the timeline here is very important, and it shows that this was not done in good faith.  This was the intentional suppression of exculpatory information that directly contradicted the representations by the government to the Court.

Even after producing the analysis that was, as far as we know, last modified in December 1st, 2014, showing 90,099 pills, first of all, why wasn't that analysis produced during the trial?

Second of all, and after they produced that analysis on October 13th, 2015, many months went by before they

corrected their false affirmative representation to the Court that only 15,750 pills were replenished.  They didn't correct that misrepresentation to the Court until May 23rd, 2016.

That's not good faith.

And even then, in the same filing, on May 23rd, 2016, they obfuscated.  They attached Exhibit H, which shows many fewer pills than 90,099 were replenished, and they tried to still fudge on the numbers.

Your Honor, there's another document that was withheld intentionally that I think is very significant.  On September 29th, 2015, the prosecutors had an internal document prepared at the U.S. Attorney's office finding that the D.C. store Pharmacare had a surplus of 14,162 pills.  We didn't receive that document until this summer.  And we received it apparently by mistake, because we got it when a vendor scanned the government's trial exhibits September 29th, Your Honor, 2015, that's two days before the government stood up and told this Court to exclude the D.C. store from the loss calculation analysis.

At the same time, the prosecutors were suppressing an exculpatory document in their own office showing that the D.C. store had a surplus, they told the Court to ignore that store.

And as Your Honor has pointed out, the expert's findings and MEDIC in 1997 directly contradict the false loss calculation in Government's Exhibit S 23, which is absolutely

critical, because that was the exhibit that told the jury and this Court that when Mr. Annappareddy was the pharmacist at Old Emmorton, there were massive losses.  That exhibit was false. And if it were false in good faith, they wouldn't have withheld a document showing the opposite.

THE COURT:  I want to say a little bit about Lisa Ridolfi and the Ryan --

THE COURT:  I don't want to hear.

MR. GREENBERG:  Sorry.

THE COURT:  I don't need to hear about it.

MR. GREENBERG:  Okay.  Does Your Honor have any questions on the loss calculation issues?

THE COURT:  No.

MR. GREENBERG:  Thank you, Your Honor.

We would ask, to the extent that the Court is not inclined to dismiss based on the motion to dismiss that we filed on August 1st, that the Court then please respectfully we'd request consider all of the motions to dismiss collectively.

THE COURT:  We've got a couple, we've got today, and we've got the 8th, the 9th as well, if we need to, with regard to anything, anything additional.

Miss Wilkinson, any brief reply or anything on these issues?

MS. WILKINSON:  Can I confer?

THE COURT:  Sure.

(Pause)

MR. GREENBERG:  If I could just add one more point?  To the extent that the Court is not yet sure that it wants to dismiss this case, we respectfully ask not only that it rule on all the motions to dismiss collectively, but also to disqualify the prosecution team, compel the government --

THE COURT:  I know.  You've got all your pending motions.  I know that.  They're not going anywhere.  I mean, they're filed.  I'm taking it in discrete parts.  There's stuff, there are motions that haven't been responded to yet, because they were filed yesterday afternoon.

MR. GREENBERG:  Very well.

THE COURT:  Anything else, Miss Wilkinson?

MS. WILKINSON:  One second, Your Honor.

MR. SCHAMEL:  Your Honor, may I ask a scheduling question while Miss Wilkinson's conferring?

Before our last phone hearing, we raised the issue whether Your Honor needed the two days on 8th and the 9th.  I had found myself in a pretty uncomfortable conflict on the 8th, I have a trial in Virginia, it got scheduled because my wife had baby, I was in the hospital the day of the trial, my half day of paternity leave, I'm not sure what Your Honor's intentions are, I know Miss Wilkinson responded to chambers, we thought we could get everything done just on the 9th.

So I would ask Your Honor to consider --

THE COURT: I'm not certain. I'm the one that has to decide it. I'm not certain, because you know I have to take a hard look at it.

All right. Miss Wilkinson, anything else?

MS. WILKINSON: Just one second, Your Honor.

(Pause.)

MS. WILKINSON: Your Honor, the only comment I want to make is about the Old Emmorton stuff that came in later, when we were making the decision to transfer. And at the time, and I'm looking at one of my own notes here, or an e-mail, I believed that we requested MEDIC to conduct a review of only Pharmacare at Old Emmorton for the time period 1/3/2007 through 1/6/2012 with a breakdown by year.

We were focusing on the theory that there was fraud or shortages prior to Miss Ridolfi's arrival, hired, I put that in our papers that we wanted to see if there was shortages, which we now know there were, prior to 2010. And not solely while she was employed at Pharmacare, after her hire. That was the purpose of the final review.

When we looked at it, the review of those that prior to Lisa being hired on 1/20/11, there was a loss of $490,954, shortage of 24 out of 68 drugs. And during her employment, a loss of 93,000.

And to me, that reflected, when I read the Old

Emmorton analysis, again, my understanding of it was that showed the fraud was going on long before Miss Ridolfi was hired.

And I only make that comment, because, again, going to our state of mind, when we reviewed Old Emmorton, the part they did, when we were transitioning, it wasn't because we thought MEDIC was bad for us.  It was because we were having trouble working with them and understanding them.  And it's not their fault, either, just a natural evolution of what we thought would be more convenient.

And the last thing I want to notice, Your Honor, had we intended to conceal or disguise any strategy of Miss Hammond before this Court, which I think the Court can take into consideration and has her affidavit, we would not have permitted and allowed and encouraged and invited counsel to come with defense counsel in July 2014, with all of her files in front of her, and ask her any questions they wanted to.

I don't know other attorneys that do that, come talk to my expert.  Talk to her.  Sit down.  She'll answer any question you have.

And I appreciate that sometimes attorneys don't want to do that, because it might reveal their trial strategy, but again when it goes to our good faith in a very challenging, massive case, which only got more massive after we arrested Mr. Annappareddy, because of the Washington Boulevard documents,

and because of the search warrant at Eloise Lane, which took months for Agent Ryan to try to inventory, and the pressures of the trial schedule, and everybody trying to review the discovery that this happened.

We concede. I can see it now with benefit of hindsight and attorneys that have been -- I don't say ruthless in a bad way, but ruthless in trying to ferret out the government errors, and they have, and here they are.

But again, those are the last comments I would make.

THE COURT: Okay. Here's what I'm going to do, I'm going to take into consideration everything I've heard so far this morning, as well as the written submissions, and I'll be prepared to rule at noon today.

MS. WILKINSON: Thank you, Your Honor.

(Recess.)

THE COURT: All right. You can be seated.

Pending before the Court is defendant Reddy Annapparedy's motion to dismiss the second superseding indictment, Counts 1 and 2, with prejudice, that would be ECF 430. The motion is fully briefed.

The defendant seeks to have the indictment dismissed on several grounds including, but not limited to, the government's failure to turn over evidence favorable to him in violation of the government's discovery obligations under Rule 16 of the Federal Rules of Criminal Procedure. Specifically,

the defendant asserts that the government committed several *Brady* violations in that the government had, in its possession, evidence favorable to the defendant related to loss amounts determined by the government's first expert witnesses; that the evidence was material and significant; and that the evidence was not disclosed to the defendant; and that the defendant was not aware of its existence.

The defendant has also filed a supplement to the motion to dismiss on the grounds that a government witness presented false testimony related to contact the defendant had with a co-defendant subsequent to an e-mail from Mr. Jigar Patel to Mr. Annappareddy confirming Mr. Annappareddy did not want to have high-dollar medications reversed.

The government argued before the jury that the defendant's failure to contact Mr. Patel should be construed as an admission. The government repeatedly pointed out the lack of response by the defendant in their closing arguments and asked for and received a special instruction that his silence constituted an admission. This evidence, designed as further support of Mr. Annappareddy's intent to defraud, was material and significant. That is ECF Number 483.

The government did not have a chance to brief the issue in writing but was questioned by the Court in today's hearing. The defendant has filed another last motion to dismiss based upon the government's destruction of allegedly

exculpatory evidence during pendency of a motion for new trial, ECF 485.  The government has responded to this motion.

Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.  A reasonable probability is a probability sufficient to undermine the confidence of the outcome.

The mandates found in *Brady* do not stop at the prosecutor's door.  The knowledge of some who are part of the investigative team is imputed upon the prosecutor regardless of the prosecutor's actual awareness.  A showing that there is evidence that merely impeaches those who do not testify lacks relevance, much less materiality.  *Brady* materials must be requested by the defendant, and the request must be made with sufficient specificity to identify the materials.  A *Brady* violation does not show what exculpatory information is not only available to the defendant, but also lies in a source where a reasonable defendant would have looked.

On September 4th, 2013, the government produced preliminary information related to losses to the government insurance programs from the alleged fraud by the defendant.  These loss calculations were created by a team of individuals hereinafter called the MEDIC team, who specialize in the analysis of the healthcare claims made by pharmacies and were familiar with reimbursement procedures related to healthcare

claims.

The government intended to call this team at trial to testify as to the loss amounts in the inventory of pills Pharmacare possessed versus the amount of pills prescribed by the defendant and those working under him.

On January 13, 2014, the government identified the names of these individuals.  On July 16th, 2014, the government announced that this team would be replaced by an internal auditor at the U.S. Attorney's office.  The government represented that the previous witnesses were unable to summarize and analyze the data in the way the government requested.  The government failed to disclose specific information regarding the opinions of these individual witnesses as to the loss amounts or surpluses at any individual pharmacy within the Pharmacare chain.

The government did provide information from its new internal auditor as to the loss amounts.  The evidence presented at trial and was represented by the government as the most significant evidence supporting the defendant's intent.

The Court agrees.  Initially, the loss amounts were projected at $4.5 million.  However, at the end of the presentation of the government's case, the government conceded that an error had been made, and those amounts were reduced to a little over $2 million.

Nevertheless, based upon the numbers presented to the

jury, the government was correct, and this Court finds, that the evidence of loss amounts was significant, material evidence of the defendant's criminal intent. To be certain, there was other evidence of fraud as well.

After a continuance of the trial date due to delayed discovery related to the production of loss figures by the government, a jury trial commenced. Subsequent to the defendant's conviction on December 15th, 2014, the defendant filed a timely motion for new trial, ECF No. 176.

The government provided notice to the defendant of their intent to destroy certain evidence. The defendant sought additional time to collect the evidence and indicated that he would be having a friend pick up the evidence by the end of January 2015.

On February 5th, 2015, after having not heard from the defendant or counsel, the government provided notice of their intent to destroy certain items seized during the previous search warrants. The government indicated in the notice that the defendant did not object to the destruction of this evidence.

On March 12th, 2015, the destruction of non drug items commenced. Among the items destroyed were delivery signature logs, delivery master logs, and UPS delivery logs that confirmed the patients received their medications, and identified doctors who wrote the prescriptions.

The defendant subsequently discharged his counsel and hired present counsel.  Present counsel requested a lengthy extension to supplement the motion for new trial.  The government strongly resisted this request.  The Court granted the defendant's extension, and the parties engaged in extensive discovery and investigation related to loss amounts and other matters.

The defendant, during this time, sought via subpoena documents and information related to the analysis conducted by the MEDIC team of experts identified early on as witnesses who would testify as to loss amounts suffered by the government programs.  The government filed a motion to quash the subpoena, which was denied by the Court.

Once this information was received, according to the defendant, the government had in its possession pretrial evidence that the loss amounts were lower than those presented by the government's internal auditor at trial.  Further, documents revealed that the Old Emmorton location at Pharmacare at which Mr. Annappareddy conducted most of this alleged fraudulent activity, according to the government, had a surplus.

Further, documents revealed that the MEDIC team could not conduct the loss calculations according to the needs of the government because of a risk of double-counting errors.  In fact, additional documents reveal that the government was well

aware of double-counting error possibility.

The possibility of double-counting errors or accounting errors was never disclosed to the defense.  Had the MEDIC loss figures and the Old Emmorton surplus and other inventory records been revealed, counsel for the defendant would have known or could have discovered the loss amounts were not nearly as great as portrayed by the government.  In fact, this analysis would have revealed, as has been demonstrated post-trial, that the government's loss theory and calculations were completely wrong.

The government suggests that the analysis should have been conducted on a month to month inventory.  The government's original analysis did not take this into account, but analyzed the inventory over a lengthy period of time.  While this may be true, the government, in this Court's opinion, failed to disclose *Brady* material possessed by their MEDIC experts including, but not limited, to MEDIC 1997 inventory analysis at Old Emmorton store and the D.C. pharmacy in violation of Rule 16.

The Court also finds that the MEDIC witness opinions of losses, which were not as great as those testified to by the government's internal auditor, should have been turned over in discovery immediately after the disparity was discovered by the government.

Although the losses may have been calculated using a

different formula, they nevertheless were losses that were less than those presented to the jury and therefore should have been turned over.

Armed with this information, a reasonable trial lawyer knowing of the discrepancy in losses very well would have employed an expert to analyze the damage and loss. Further, an attorney could have used this information to cross-examine the internal auditor regarding the accuracy of her loss calculations.

Finally, being armed with this information would have provided the defendants with notice of the inconsistencies and provided them with a basis for subpoenaing the relevant parties from the MEDIC team to testify as to what they believe the loss calculations were and/or the risk of proceeding with a formula or evaluation system like the one used by the internal auditor.

As indicated earlier, the loss was the most significant evidence supporting the defendant's fraudulent intent. As indicated by the government, you can't sell what you don't have. This point was emphasized both in the opening closings and rebuttal.

Had this information been turned over, it would have likely been used, and there would have been a strong possibility that it could have changed the outcome of the case based upon the fraud theory promoted by the government during the course of trial.

Recently, the Court has become aware of additional false testimony promoted by the government related to the July 25th e-mail by Jigar Patel.  The government emphasized this false testimony to the jury and asked for silence as an admission instruction.  This false testimony was significant and material and was highlighted by the government.  The government represented to the jury through the case agent that the defendant never responded to the e-mail.  Specifically, the agent testified she reviewed phone records of both Mr. Patel and the defendant and saw no phone contacts between them during the relevant timeframe.

This testimony was false.  In fact, the records recently subpoenaed by the government reveal that there were several contacts between the defendant's phone and Mr. Patel's phone within minutes of the e-mail being sent.  The Court makes no finding at this time whether the testimony constitutes perjury and, if so, whether the testimony was knowingly used by the prosecution.  Nevertheless, the Court is very troubled by the second incident of false testimony promoted by the government and most importantly government agents.

The Court makes no determination at this point related to intent or willfulness, but it was sloppy and at least negligent.

The conduct of the government related to the promotion of the latest false testimony and the false loss

evidence previously exposed was improper.  The evidence was significant, relevant, and material.  The evidence misled the jury and was highlighted for supporting the defendant's criminal intent.  The evidence contributed, in this Court's opinion, to the defendant's conviction.  Accurate testimony and proper disclosures would have significantly weakened the government's case according to the fraud theory presented at trial.  This is not to say that it made the government's case impossible, but only that it would have made it more difficult.

The Court is also troubled by the destruction of evidence by the government during the pendency of a motion for new trial.  I find the defendant never consented to the destruction.  In fact, the government was aware of the defendant's desire to retrieve the non drug items proposed to be destroyed.  The government should have at the very least received actual consent or a court order.  Caution should have prevailed and the evidence preserved.  The evidence destroyed could have proven what and how many medications were received by patients and how they were ordered and filled.

Assessing value to these items is not the government's call.  The value should have been left up to the defendant.  The excuse of not having space to store the items is incredible.  The federal government could have found a place to store the items, and it was irresponsible not to do so, especially during the pendency of a motion for new trial that

the government eventually conceded.

Although the Court recognizes the government may not have realized the significant flaws in its case at the time of the destruction, the defendant and his new counsel is not and cannot be put in the same position he was in at the time of the original trial.

What further compounds the issues before the Court is that the motions to dismiss and the post-trial discovery reveal that the government knew of the possibility of accounting errors with their loss formula pretrial. The defendant did not. Even assuming the defendant possessed all of the raw data related to the losses, he operated at a disadvantage and was not on equal footing with the government.

One of several keys to his defense were, I guess to use an analogy, in a huge haystack, but he wasn't told that there were even keys or if he was told where to look for them, which the government was obligated to do, as those keys were favorable to the defense.

The failure to disclosure is in violation of *Brady*, the history of late disclosures and the promotion of false significant testimony in this case does shock the conscience of this Court.

Mr. Annappareddy has been charged and has charges pending against him since 2013. The Court makes no determination as to Mr. Annappareddy's guilt or innocence

related to the pending charges.  The Court certainly recognizes that there was evidence presented of fraud that is not included in the tainted evidence that was presented.

Furthermore, the Court is very hesitant to invade the province of the Executive Branch of government.  However, the Court finds that the violations of Rule 16 and the defendant's Fifth Amendment Constitutional right to due process due to the aforementioned conduct of the government including its witnesses at trial is sufficient to require the Court to enter an order dismissing both Counts 1 and 2 of the second superseding indictment with prejudice.

In the event that my record is not clear or exercise of my discretion too broad, this Court will conduct an extensive time-consuming and costly hearing as to these matters and the other grounds supporting the motion to dismiss and other motions which have already been filed.  To that end, the balance of all other motions in this case are denied as moot.

Any questions?

MR. SCHAMEL:  I do, Your Honor, an unrelated matter if I may?

THE COURT:  Yes.

MR. SCHAMEL:  It's sort of strange place to wade into.  I've been talking to Mr. Patel's immigration lawyer at some length about the filings that have been made by both parties.  He's languishing.  He's sitting in a holding cell in

a prison in York, Pennsylvania. He's now apparently had his hearing continued until December to determine whether or not he's going to be removed. And it was continued because of the hearing that -- I'm told by his immigration lawyer that the only questions were asked were not about his actual asylum claim, but actually about this case, which she describes to be being unorthodoxed.

I don't know other than what she has told me, you have our pleadings and our opinions, our documentation from our investigator from our meetings with him letters he sent us.

I personally believe he's innocent. I personally believe he pled guilty, because he was afraid of the loss calculations here, and I personally believe that the only reason he pled guilty was because of that fear, and he intended to file a motion to withdraw.

I don't know what power Your Honor has, but I would ask Your Honor, and I believe if you ordered him down here to this district as opposed to being held up there in immigration, if Your Honor ordered him here on his case, Your Honor would have the power to give him bond until such time as his immigration issue could be heard.

THE COURT: At this point in time, you don't represent him.

MR. SCHAMEL: I don't, Your Honor.

THE COURT: So I'm not going to entertain it.

MR. SCHAMEL:  I understand, Your Honor.  I just told the immigration attorney I would raise it.

THE COURT:  Anything from the government?

MS. WILKINSON:  No, sir.

THE COURT:  All right.  Thank you.

(Proceedings adjourned.)

I, Jacqueline Sovich, RPR, RMR, CRR, Official Court Reporter, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____

Jacqueline Sovich                    DATE
Official Court Reporter

## - - -

**-HAND** [1] 8:6

## - 1 -

**13-374** [2] 1:6; 2:6
**14,162** [1] 44:13
**15,750** [2] 40:22; 44:2

## - 4 -

**430-17** [1] 40:19
**430-25** [1] 33:16
**430-26** [1] 33:23
**430-28** [2] 33:16, 23
**430-35** [1] 34:3
**490,954** [1] 47:22

## - 6 -

**616-6500** [1] 13:18

## - 9 -

**90,099** [1] 40:15
**90,000** [2] 42:10, 11
**90,099** [2] 43:21; 44:7
**93,000** [1] 47:24

## - A -

**ABANDONED** [2] 4:11; 7:19

**ABANDONING** [1] 34:5
**ABOUT** [56] 3:13; 4:8, 22, 23, 25; 6:23; 8:12, 16, 17; 11:20; 12:4; 14:19, 22; 18:10; 20:3; 21:11; 24:6, 14, 18; 25:12; 26:17, 21; 27:1, 2; 28:5, 13; 31:8; 32:18; 34:22; 35:6, 7; 36:2, 7, 8, 10, 16; 38:5, 7; 39:7, 10, 11; 41:1, 10, 22; 42:7, 9, 14, 20; 45:6, 10; 47:9; 60:24; 61:5, 6
**ABOVE-ENTITLED** [1] 62:11
**ABSENT** [1] 4:5
**ABSOLUTELY** [4] 17:13, 22; 18:7; 44:25
**ACCORDING** [4] 54:14, 20, 23; 58:7
**ACCOUNT** [6] 24:21; 25:20; 27:6; 28:12; 42:23; 55:13
**ACCOUNTANT** [1] 25:17
**ACCOUNTED** [1] 27:4
**ACCOUNTING** [2] 55:3; 59:9
**ACCURACY** [2] 41:2; 56:8
**ACCURATE** [4] 30:23; 35:9; 38:17; 58:5
**ACTIVATED** [1] 14:11

**ACTIVITY** [4] 3:3; 27:6; 41:13; 54:20
**ACTUAL** [9] 15:9; 39:10; 41:13, 16, 23; 42:12; 51:11; 58:16; 61:5
**ACTUALLY** [5] 19:23; 21:16; 22:16; 39:18; 61:6
**ADAMANT** [1] 39:7
**ADAPT** [1] 39:24
**ADDING** [1] 25:10
**ADDITIONAL** [5] 42:6; 45:22; 53:12; 54:25; 57:1
**ADDRESS** [3] 12:9; 30:9; 38:18
**ADJOURNED** [1] 62:6
**ADMISSION** [4] 16:17; 50:16, 19; 57:5
**ADMIT** [1] 39:20
**ADMITTED** [1] 31:2
**ADMITTEDLY** [1] 41:19
**AFFIDAVIT** [3] 27:3; 41:20; 48:14
**AFFIRMATIVE** [1] 44:1
**AFFIRMATIVELY** [1] 40:21
**AFOREMENTIONED** [1] 60:8
**AFRAID** [1] 61:12
**AFTER** [12] 37:10, 11, 13; 38:1; 43:1, 20,

24; 47:19; 48:24; 53:5, 15; 55:23
**AFTERNOON** [1] 46:12
**AGAIN** [11] 10:14; 16:4, 18; 19:6; 24:12; 39:6; 42:18; 48:1, 4, 23; 49:9
**AGAINST** [1] 59:24
**AGENCY** [1] 41:19
**AGENT** [17] 2:9, 11; 3:13; 12:3, 12, 14; 14:24; 15:2; 16:12; 17:11; 19:7; 26:17, 18; 49:2; 57:7, 9
**AGENTS** [3] 8:4; 19:7; 57:20
**AGREEING** [1] 42:24
**AGREES** [1] 52:20
**ALARM** [1] 8:20
**ALLEGED** [3] 3:12; 51:21; 54:19
**ALLEGEDLY** [2] 12:6; 50:25
**ALLOW** [2] 40:5, 9
**ALLOWED** [1] 48:15
**ALLOWING** [2] 39:14; 40:4
**ALMOST** [1] 8:12
**ALREADY** [4] 29:19; 30:13, 17; 60:16
**ALTHOUGH** [2] 55:25; 59:2
**ALWAYS** [2] 7:7; 24:3

**AMENDMENT** [2] 40:9; 60:7

**AMERICA** [2] 1:4; 2:5

**AMONG** [2] 34:12; 53:22

**AMOUNT** [3] 23:8; 27:17; 52:4

**AMOUNTS** [11] 50:3; 52:3, 14, 17, 20, 23; 53:2; 54:6, 11, 16; 55:6

**ANALOGY** [1] 59:15

**ANALYSIS** [21] 22:15, 22; 24:15, 16, 19; 25:15; 40:14, 17, 20, 24; 43:20, 22, 24; 44:19; 48:1; 51:24; 54:9; 55:8, 11, 13, 17

**ANALYZE** [2] 52:11; 56:6

**ANALYZED** [1] 55:13

**ANNAPPAREDD Y** [27] 1:7; 2:6; 3:13; 12:5; 13:2, 21; 17:3, 9; 18:25; 23:24; 24:11; 25:11; 26:2; 29:3; 30:6, 18; 31:18; 39:14; 40:3; 45:2; 48:25; 50:12; 54:19; 59:23

**ANNAPPAREDD Y'S** [8] 2:16; 12:6, 12, 24; 13:7; 27:17; 50:20; 59:25

**ANNAPPAREDY' S** [1] 49:18

**ANNOUNCED** [2] 34:5; 52:8

**ANOTHER** [7] 22:11; 23:8; 40:12; 41:21, 22; 44:9; 50:24

**ANSARI** [1] 41:20

**ANSWER** [4] 29:10; 32:5; 43:14; 48:19

**ANSWERED** [3] 31:25; 32:2; 38:14

**ANSWERS** [1] 31:25

**ANYMORE** [1] 9:20

**ANYONE** [1] 32:21

**ANYTHING** [9] 10:7; 14:22; 38:11; 45:22, 23; 46:14; 47:5; 62:3

**ANYWHERE** [1] 46:9

**APOLOGIZE** [1] 9:2

**APPARENTLY** [6] 31:13, 17; 32:21, 24; 44:15; 61:1

**APPEAR** [1] 33:18

**APPEARANCES** [1] 1:14

**APPLES** [1] 20:21

**APPRECIATE** [2] 6:24; 48:21

**APPROXIMATEL Y** [1] 20:17

**ARGUE** [1] 23:17

**ARGUED** [2] 38:8; 50:14

**ARGUMENT** [3] 25:3, 22; 27:20

**ARGUMENTS** [1] 50:17

**ARIZONA** [1] 6:19

**ARMED** [4] 11:13; 56:4, 10

**AROUND** [2] 19:8; 34:4

**ARRESTED** [1] 48:24

**ARRIVAL** [1] 47:16

**ARTIFICIALLY** [1] 34:1

**ASIDE** [1] 24:13

**ASKED** [4] 31:25; 50:18; 57:4; 61:5

**ASKING** [1] 29:17

**ASSERTS** [1] 50:1

**ASSESSING** [1] 58:20

**ASSOCIATED** [2] 13:1; 18:24

**ASSUMED** [3] 10:20; 24:15, 20

**ASSUMING** [1] 59:11

**ASSUMPTION** [1] 24:10

**ASYLUM** [1] 61:5

**ATTACHED** [1] 44:6

**ATTENTION** [2] 39:22

**ATTORNEY** [2] 56:7; 62:2

**ATTORNEY'S** [9] 2:7; 5:4, 6; 33:10; 35:11; 40:18; 42:19; 44:12; 52:9

**ATTORNEYS** [6] 8:19; 16:25; 26:15; 48:18, 21; 49:6

**AUDITOR** [16] 11:12; 20:12;

22:2; 34:3, 6, 8, 13, 14; 37:7; 38:5; 52:9, 17; 54:17; 55:22; 56:8, 15

**AUDITOR'S** [2] 22:15; 33:25

**AUGUST** [2] 25:11; 45:17

**AVAILABLE** [4] 18:16, 17; 24:20; 51:17

**AWARE** [4] 50:7; 55:1; 57:1; 58:13

**AWARENESS** [1] 51:11

- B -

**BALANCE** [1] 60:17

**BANKER** [1] 32:15

**BANKERS** [2] 32:10, 11

**BASED** [8] 3:12, 22; 20:25; 39:25; 45:16; 50:25; 52:25; 56:24

**BASIC** [1] 24:10

**BASIS** [1] 56:12

**BECAUSE** [62] 4:5, 9, 17; 5:21; 7:4, 21; 8:3, 11, 12; 9:25; 11:19; 12:20, 25; 15:6; 17:1, 23; 18:19, 23; 19:6, 20, 23; 20:7, 25; 21:5; 22:3, 18, 20; 23:19; 24:12; 25:1, 3, 5, 6, 8, 24; 31:14; 32:24; 33:18; 41:11, 23; 42:15, 24; 43:6, 14; 44:15;

45:1; 46:12, 21; 47:3; 48:4, 6, 7, 22, 25; 49:1; 54:24; 61:3, 12, 14

**BECOME** [1] 57:1

**BEEPING** [1] 8:20

**BEFORE** [19] 1:12; 2:16; 5:19; 8:11; 16:13; 19:17; 25:19; 34:4; 37:3; 41:4, 12; 43:25; 44:17; 46:18; 48:2, 13; 49:17; 50:14; 59:7

**BEGAN** [1] 37:4

**BEHALF** [4] 1:15, 19; 2:7; 43:6

**BEHIND** [1] 6:9

**BEING** [9] 8:20; 10:21; 20:16; 22:11; 47:22; 56:10; 57:15; 61:7, 18

**BELABOR** [1] 9:17

**BELABORING** [2] 10:17, 19

**BELIEVE** [7] 11:3; 17:3; 56:13; 61:11, 12, 13, 17

**BELIEVED** [13] 3:25; 4:14; 6:14; 9:10; 13:6, 20, 21; 17:12, 16; 18:4; 20:6; 25:24; 47:12

**BELIEVING** [1] 19:2

**BENEFIT** [4] 23:24; 24:11; 26:2; 49:5

**BETTER** [1] 28:15

**BETWEEN** [7] 17:9; 18:4; 21:7, 10, 11; 57:10, 14

**BILLING** [1] 12:4

**BONSIB** [13] 6:7, 11; 7:18; 9:5; 10:11, 12; 11:5, 8; 20:14; 32:19, 20; 41:8; 42:3

**BOOKS** [1] 31:12

**BOTTOM** [3] 21:25; 25:4, 13

**BOUGHT** [1] 25:12

**BOULEVARD** [4] 4:12; 7:17; 8:14; 48:25

**BOXES** [15] 4:12, 23; 5:1; 8:5, 9; 32:3, 4, 6, 8, 10, 11, 12, 14, 15, 21

**BRADY** [6] 50:2; 51:8, 13, 15; 55:16; 59:19

**BRANCH** [1] 60:5

**BREADTH** [1] 19:6

**BREAKDOWN** [1] 47:14

**BRIEF** [6] 31:7, 21; 33:4; 38:11; 45:23; 50:22

**BRIEFED** [2] 3:7; 49:20

**BRIEFING** [1] 29:22

**BRING** [2] 12:20; 39:21

**BROAD** [1] 60:13

**BROKEN** [1] 36:9

**BROUGHT** [2] 4:13; 28:2

**BUILDING** [4] 5:5, 7; 8:18, 20

**BURDEN** [1] 28:11

**BUREAU** [2] 2:9; 12:17

**BUSINESS** [1] 27:24

**BUSINESSMAN** [1] 27:22

────────────

- C -

────────────

**CALCULATED** [1] 55:25

**CALCULATION** [5] 36:8, 9; 44:18, 25; 45:12

**CALCULATIONS** [18] 33:5, 7, 9, 13, 25; 36:3, 22; 37:7, 20; 38:21; 51:22; 54:23; 55:9; 56:9, 14; 61:13

**CALLED** [2] 32:10; 51:23

**CALLING** [1] 2:4

**CALLS** [1] 30:6

**CAN'T** [7] 7:13; 25:7; 26:12; 33:20; 38:3; 42:5; 56:18

**CANCEL** [1] 25:19

**CANCELED** [1] 25:13

**CANNOT** [4] 24:11; 25:18; 26:13; 59:5

**CATHERINE** [2] 1:17; 2:7

**CAUSED** [1] 23:25

**CAUTION** [1] 58:16

**CERTAIN** [6] 5:14; 47:2, 3; 53:3, 11, 17

**CERTAINLY** [3] 33:1, 3; 60:1

**CERTIFY** [1] 62:10

**CHAIN** [1] 52:15

**CHALLENGING** [1] 48:23

**CHAMBERS** [1] 46:24

**CHANCE** [5] 31:7, 21; 33:4; 38:10; 50:22

**CHANGED** [1] 56:23

**CHARGED** [1] 59:23

**CHARGES** [2] 59:23; 60:1

**CHECKED** [1] 2:17

**CIRCUMSTANCES** [1] 40:5

**CLAIM** [3] 11:10, 14; 61:6

**CLAIMS** [10] 24:21; 25:19; 33:18, 19; 34:13, 18; 36:4; 51:24; 52:1

**CLAUSE** [1] 40:9

**CLEAR** [3] 16:24; 29:12; 60:12

**CLOSE** [2] 11:11; 26:9

**CLOSELY** [1] 33:8

**CLOSING** [2] 16:17; 50:17

**CLOSINGS** [1] 56:20

**CO-DEFENDANT** [1] 50:11

COLEMAN [4] 6:8; 9:5; 10:13; 42:3
COLLECT [1] 53:12
COLLECTIVELY [2] 45:19; 46:6
COMES [4] 12:22; 14:7; 19:2; 41:15
COMMENCED [2] 53:7, 22
COMMENT [2] 47:8; 48:4
COMMENTS [2] 17:4; 49:9
COMMITTED [1] 50:1
COMMUNICATED [1] 9:8
COMMUNICATION [2] 6:11; 10:11
COMMUNICATIONS [1] 32:19
COMPARABLE [1] 22:25
COMPARED [1] 22:14
COMPARING [1] 20:21
COMPARISON [1] 34:6
COMPEL [6] 37:10, 12, 14; 38:2; 40:25; 46:7
COMPLETELY [2] 28:4; 55:10
COMPOUNDS [1] 59:7
COMPUTER [1] 15:15
CONCEAL [1] 48:12
CONCEDE [1] 49:5
CONCEDED [4] 5:20; 39:18; 52:22; 59:1

CONCERNED [3] 2:24; 35:6, 7
CONCERNS [3] 8:16, 17; 27:1
CONDUCT [6] 27:18; 47:12; 54:23; 57:24; 60:8, 13
CONDUCTED [3] 54:9, 19; 55:12
CONFER [1] 45:25
CONFERRING [4] 9:6; 31:5; 36:17; 46:17
CONFIDENCE [1] 51:7
CONFIRM [1] 5:13
CONFIRMATION [1] 9:18
CONFIRMED [1] 53:24
CONFIRMING [1] 50:12
CONFIRMS [1] 12:6
CONFLICT [1] 46:20
CONSCIENCE [1] 59:21
CONSENT [6] 4:14, 21; 6:15; 30:18; 58:16
CONSENTED [1] 58:12
CONSERVATIVE [1] 25:25
CONSIDER [2] 45:18; 47:1
CONSIDERATION [2] 48:14; 49:11
CONSIDERS [1] 4:2
CONSTANTLY [1] 8:20
CONSTITUTE [1] 21:18

CONSTITUTED [2] 16:17; 50:19
CONSTITUTES [1] 57:16
CONSTITUTIONAL [2] 19:24; 60:7
CONSTRUED [2] 4:21; 50:15
CONTACT [6] 15:4, 5; 17:9; 18:4; 50:10, 15
CONTACTS [6] 6:7; 12:15; 13:15; 15:1; 57:10, 14
CONTAINED [2] 5:13; 14:20
CONTEST [2] 39:9; 43:2
CONTESTED [2] 38:23; 39:8
CONTESTING [2] 39:1, 3
CONTINUANCE [1] 53:5
CONTINUED [2] 61:2, 3
CONTRACTOR [2] 27:9; 42:6
CONTRACTOR'S [1] 42:21
CONTRADICT [3] 37:7, 19; 44:24
CONTRADICTED [1] 43:18
CONTRIBUTED [1] 58:4
CONVENIENT [1] 48:10
CONVERSATIONS [1] 16:25
CONVICTED [1] 19:18
CONVICTION [2] 53:8; 58:5
COPIES [1] 18:17

CORNER [1] 8:6
CORPORATE [1] 7:16
CORRECT [20] 3:17; 4:6, 7; 9:13; 13:24; 14:2, 13, 23; 15:5, 10, 19, 22; 17:17; 19:3; 20:19; 25:24; 26:4; 44:2; 53:1; 62:10
CORRECTED [1] 44:1
CORRECTLY [2] 23:1; 31:12
CORRESPONDENCE [5] 4:19; 9:11, 12, 14, 16
COSTLY [1] 60:14
COULD [24] 5:15; 7:2, 23; 8:24; 10:15; 11:2; 24:4; 25:2; 27:4, 16; 28:1; 30:25; 31:16; 34:24; 37:23; 46:3, 25; 54:22; 55:6; 56:7, 23; 58:18, 23; 61:21
COULDN'T [2] 4:21; 5:4
COUNSEL [26] 2:8; 3:21; 4:8, 13; 5:15; 6:20; 11:13; 13:3; 17:4; 26:22; 27:8; 28:18; 31:5; 36:17; 42:4, 5, 21; 48:15, 16; 53:16; 54:1, 2; 55:5; 59:4
COUNSEL'S [1] 29:9
COUNT [1] 34:11

COUNTED [1] 34:14

COUNTRY [1] 17:4

COUNTS [2] 49:19; 60:10

COUPLE [1] 45:20

COURSE [8] 2:10; 3:3; 5:8, 11; 6:9; 27:11; 28:17; 56:25

COURT [205] 1:1, 25; 2:2, 10, 14, 16, 19, 22, 24; 3:3, 18; 4:1, 5, 15, 17, 18, 25; 5:3, 10, 12; 6:5, 13, 19, 21, 24; 7:1, 20, 21; 8:6, 11, 25; 9:11, 14, 16; 10:1, 3, 6, 13, 17, 19; 11:1, 5, 8, 18, 21, 24; 12:14, 25; 13:4, 8, 10, 15, 18, 23; 14:1, 10, 14, 18, 24; 15:7, 11, 13, 17, 20, 24; 16:3, 5, 8, 11, 22; 17:14, 18, 20, 23; 18:2, 5, 8, 11, 13, 16, 22; 19:9, 11, 16, 21; 20:22; 21:10, 14, 20, 25; 22:4, 6, 13, 18, 25; 23:6, 15, 17; 24:2, 14, 24; 25:5; 26:25; 27:1, 19, 22, 24; 28:1, 8, 15, 19, 24; 29:5, 8, 12; 30:1, 3, 8, 11, 24; 31:1, 20; 32:3, 6, 8, 11, 13, 16, 23;

33:1, 2; 34:19; 35:17, 20, 25; 36:13, 15, 18; 37:11, 14; 38:2, 23; 40:9, 21, 25; 41:1, 7; 42:8, 10; 43:1, 11, 13, 19; 44:1, 3, 18, 22; 45:2, 8, 10, 13, 15, 17, 20; 46:1, 4, 8, 14; 47:2; 48:13; 49:10, 16, 17; 50:23; 52:20; 53:1; 54:4, 13; 55:20; 57:1, 15, 18, 21; 58:10, 16; 59:2, 7, 22, 24; 60:1, 4, 6, 9, 13, 21; 61:22, 25; 62:3, 5, 9, 14

COURT'S [5] 21:22; 22:12; 39:22; 55:15; 58:4

COURTROOM [3] 2:8, 17; 4:23

COVER [2] 14:15; 32:25

COVERED [1] 31:18

COVERTLY [1] 32:20

CREATED [1] 51:22

CREDIT [1] 27:11

CRIMINAL [5] 1:5; 2:6; 49:25; 53:3; 58:4

CRITICAL [2] 12:23; 45:1

CROSS-EXAMIN E [2] 23:12; 56:8

CROSS-EXAMIN ED [1] 41:8

CROSS-POLLIN ATION [2] 21:7, 10

CROSSED [1] 7:11

CURRENTLY [1] 3:23

---

- D -

---

DAMAGE [4] 5:22; 11:10, 14; 56:6

DAMAGING [1] 17:1

DATA'S [1] 20:12

DCDOH [3] 27:3; 40:22; 41:19

DEALING [1] 17:2

DECEMBER [7] 13:11; 14:2; 40:13, 24; 43:21; 53:8; 61:2

DECIDE [1] 47:3

DECIDED [2] 4:4; 20:11

DECISION [2] 28:7; 47:10

DECLARATION [1] 38:6

DECLARATIONS [1] 38:16

DEFENDANT [38] 1:9, 19; 4:18; 5:18; 6:2; 31:5; 36:17; 49:17, 21; 50:1, 3, 6, 8, 10, 17, 24; 51:14, 17, 18, 21; 52:5; 53:8, 10, 11, 16, 19; 54:1, 8, 15; 55:5; 57:8, 10; 58:12, 22; 59:4, 10, 11

DEFENDANT'S [12] 5:15; 50:15; 52:19; 53:3, 8; 54:5; 56:17; 57:14; 58:3, 5, 14; 60:6

DEFENDANTS [1] 56:11

DEFENSE [25] 2:12, 25; 4:8, 13, 17; 6:16, 20; 8:16, 17; 11:13; 16:25; 22:16; 23:11; 27:25; 28:3, 4, 17; 29:17; 31:5; 36:17; 48:16; 51:5; 55:3; 59:14, 18

DEFICIT [1] 42:11

DEFINITELY [1] 23:21

DEFRAUD [1] 50:20

DELAYED [1] 53:5

DELIBERATION [1] 43:10

DELIVERIES [1] 31:14

DELIVERY [4] 6:1; 53:22, 23

DEMONSTRATE D [2] 5:23; 55:8

DENIED [3] 35:15; 54:13; 60:17

DEPARTMENT [1] 40:15

DEPUTY [1] 2:17

DESCRIBES [1] 61:6

DESIGNED [1] 50:19

DESIRE [2] 12:6; 58:14

DESPITE [1] 40:20

DESTROY [3] 4:4; 53:11, 17

DESTROYED [8] 10:4, 21, 23; 30:17; 32:1; 53:22; 58:15, 17

DESTRUCTION [12] 3:10, 22; 9:22; 30:7; 31:9; 32:20; 50:25; 53:19, 21; 58:10, 13; 59:4

DETAIL [1] 36:11

DETERMINATIO N [2] 57:21; 59:25

DETERMINE [1] 61:2

DETERMINED [3] 20:13, 15; 50:4

DIALOGUE [1] 4:8

DIDN'T [43] 4:15, 17; 10:7; 11:5, 8; 12:20; 13:10; 14:15, 18, 23, 25; 15:4, 5, 7, 9, 13, 17, 20; 18:11, 12, 13, 18; 20:8; 23:21; 25:3, 6, 17, 20; 27:15; 30:18; 34:11; 35:19, 21; 37:5; 39:2, 12; 41:23; 42:1, 14; 44:2, 13

DIFFERENT [22] 2:12; 6:22; 12:15; 16:25; 20:25; 21:21, 23; 22:1, 3, 4, 11; 23:5, 7, 9,

10; 28:4; 37:25; 42:14; 51:6; 56:1

DIFFERENTLY [1] 39:7

DIFFICULT [2] 41:19; 58:9

DIRECT [2] 9:18; 12:10

DIRECTLY [5] 7:4; 37:7, 19; 43:18; 44:24

DISADVANTAGE [1] 59:12

DISAGREE [2] 22:17, 19

DISASTER [1] 23:20

DISAVOW [1] 29:23

DISCHARGED [1] 54:1

DISCLOSE [2] 52:12; 55:16

DISCLOSED [3] 50:6; 51:4; 55:3

DISCLOSURE [1] 59:19

DISCLOSURES [2] 58:6; 59:20

DISCOVERED [3] 11:14; 55:6, 23

DISCOVERY [6] 49:4, 24; 53:6; 54:6; 55:23; 59:8

DISCREPANCY [2] 23:13; 56:5

DISCRETE [1] 46:10

DISCRETION [1] 60:13

DISCUSS [1] 3:21

DISCUSSION [1] 9:20

DISGUISE [1] 48:12

DISMISS [17] 3:7, 10, 12; 31:16; 32:23; 38:3, 15; 45:16, 18; 46:5, 6; 49:18; 50:9, 25; 59:8; 60:15

DISMISSAL [1] 37:16

DISMISSED [2] 29:18; 49:21

DISMISSING [1] 60:10

DISPARITY [1] 55:23

DISPENSED [1] 42:13

DISPENSING [8] 27:2, 4, 7, 10; 41:12, 22; 42:12, 23

DISPUTE [5] 30:20; 33:14, 21; 35:14; 39:17

DISPUTED [1] 33:20

DISPUTES [1] 24:7

DISPUTING [1] 43:5

DISQUALIFY [1] 46:6

DISTINCTLY [1] 22:11

DISTRICT [4] 1:1, 2, 13; 61:18

DIVISION [1] 1:2

DOCKET [2] 34:2; 40:18

DOCTORS [2] 6:2; 53:25

DOCUMENT [10] 8:5; 34:3; 35:11; 40:12; 41:5; 44:9, 11, 14, 21; 45:5

DOCUMENTATIO N [2] 7:1; 61:9

DOCUMENTS [37] 3:25; 4:2; 6:17; 8:3; 9:1; 10:21; 30:7, 19; 31:9; 32:1, 3, 22; 33:11, 14, 16, 23; 35:20; 37:1, 3, 6, 10, 13, 15, 16, 18, 19; 38:3, 7, 9, 18; 39:11; 40:11; 48:25; 54:9, 18, 22, 25

DOESN'T [1] 9:19

DOING [3] 19:1; 23:21; 39:4

DOLLAR [3] 11:19; 12:7; 23:2

DOLLARS [5] 24:16, 19, 20; 25:12, 18

DOUBLE [1] 43:7

DOUBLE-COUNT ING [18] 23:25; 24:3; 27:14; 34:1, 21, 22, 23; 35:3, 6, 13, 16; 38:8, 9, 12, 14; 54:24; 55:1, 2

DOUBT [6] 11:20; 18:10; 23:4, 20, 24

DROPPED [1] 18:22

DRUGS [12] 11:19; 21:4; 24:16, 19, 20; 25:2, 13, 19, 21; 26:7; 28:2; 47:23

DUPLICATE [4] 6:3; 33:18; 34:13, 18

DURING [15] 7:8; 12:10;

13:21; 27:6; 39:25; 40:13; 43:22; 47:23; 51:1; 53:17; 54:8; 56:24; 57:10; 58:11, 25

- E -

E-MAIL [13] 3:14; 6:10; 7:18; 9:7; 10:10; 12:5; 16:24; 17:6; 47:11; 50:11; 57:3, 8, 15

E-MAILS [1] 10:15

EARLIER [4] 20:19; 37:17, 22; 56:16

EARLY [1] 54:10

EDUCATION [2] 42:19; 43:5

EFFORT [2] 7:10; 27:16

EIGHT [1] 34:9

EITHER [3] 5:4; 18:14; 48:9

ELECTRICITY [1] 8:19

ELOISE [1] 49:1

EMBARRASSED [3] 8:10; 9:3; 39:5

EMBRACED [1] 39:18

EMMORTON [9] 21:15; 45:3; 47:9, 13; 48:1, 5; 54:18; 55:4, 18

EMPHASIZED [2] 56:19; 57:3

EMPLOYED [2] 47:19; 56:6

EMPLOYMENT [1] 47:23

ENCOURAGED [1] 48:15

ENDED [1] 39:4

ENGAGE [1] 39:2

ENGAGED [1] 54:5

ENOUGH [3] 10:22; 24:4; 42:14

ENTER [1] 60:9

ENTERTAIN [1] 61:25

ENTIRE [1] 14:4

EQUAL [1] 59:13

ERROR [8] 26:15, 16, 17, 18; 28:22; 52:23; 55:1

ERRORS [16] 34:1, 21, 22, 24; 35:13, 16; 38:8, 9, 12, 14; 43:7; 49:8; 54:24; 55:2; 59:10

ESPECIALLY [1] 58:25

ESQUIRE [3] 1:17, 20, 21

EVALUATION [1] 56:15

EVENT [1] 60:12

EVENTUALLY [6] 4:12; 5:20; 14:21; 21:22; 43:3; 59:1

EVERY [5] 23:24; 26:15, 16; 28:12

EVERYBODY [5] 7:23, 25; 8:15; 42:20; 49:3

EVERYONE [3] 2:2, 22; 24:2

EVERYTHING [6] 15:3; 22:9; 26:22; 32:15; 46:25; 49:11

EVIDENCE [56] 3:11, 22; 4:1, 2, 5; 5:7, 12; 7:9, 22; 16:18, 19; 19:17; 20:13; 21:17; 27:17; 28:9; 30:17; 31:2; 34:19, 23; 39:15, 19, 20; 40:6; 42:9; 49:23; 50:3, 5, 19; 51:1, 3, 4, 12; 52:17, 19; 53:2, 11, 12, 13, 20; 54:16; 56:17; 58:1, 2, 4, 11, 17; 60:2, 3

EVISCERATE [1] 37:23

EVISCERATED [3] 11:9, 10, 14

EVOLUTION [1] 48:9

EVOLVING [3] 27:12; 42:18; 43:5

EXACT [1] 14:20

EXACTLY [4] 10:25; 19:3; 21:8, 13

EXAMINATION [1] 12:10

EXAMPLE [1] 21:2

EXCLUDE [1] 44:18

EXCLUDED [1] 34:13

EXCULPATORY [11] 3:11; 11:3; 31:13, 18; 32:22, 24; 43:18; 44:21; 51:1, 16

EXCUSE [3] 36:13, 15; 58:22

EXECUTIVE [1] 60:5

EXERCISE [1] 60:12

EXHIBIT [9] 34:2; 36:2, 7, 8; 40:18; 44:6, 25; 45:1, 3

EXHIBITS [11] 33:15, 22; 36:3, 12, 21, 22, 24; 37:1, 17; 44:16

EXISTED [3] 33:25; 35:2, 3

EXISTENCE [1] 50:7

EXPEDITIOUSLY [1] 31:8

EXPENDING [1] 30:14

EXPENSIVE [1] 34:9

EXPERT [4] 11:6; 48:19; 50:4; 56:6

EXPERT'S [1] 44:23

EXPERTS [6] 20:4, 9, 18; 37:6; 54:10; 55:16

EXPLAIN [3] 4:10; 16:20; 42:18

EXPLAINING [1] 38:6

EXPLANATION [2] 41:21, 22

EXPLOITED [1] 41:9

EXPOSED [1] 58:1

EXPRESSED [1] 35:12

EXTENSION [2] 54:3, 5

EXTENSIVE [2] 54:5; 60:14

EXTENT [2] 45:15; 46:4

EXTRAORDINARY [1] 40:4

- F -

FACILITIES [2] 21:15, 16
FACILITY [2] 7:12, 13
FACTS [10] 19:13, 14, 16; 29:13; 31:24; 38:15, 20; 39:10, 12
FACTUALLY [1] 30:23
FAILED [3] 39:17; 52:12; 55:15
FAILURE [3] 49:23; 50:15; 59:19
FAIREST [1] 26:23
FAITH [11] 6:12, 14; 11:1; 31:10, 17; 39:2, 8; 43:17; 44:4; 45:4; 48:23
FALSE [34] 3:12; 15:21, 24, 25; 16:1, 13; 24:8; 31:3; 33:7, 8, 13; 36:3, 7, 9, 22; 37:1, 7, 19; 38:21; 39:15; 40:6; 44:1, 24; 45:3, 4; 50:10; 57:2, 4, 5, 12, 19, 25; 59:20
FALSELY [1] 12:3
FALSITY [1] 23:17
FAMILIAR [1] 51:25
FAULT [1] 48:9

FAVORABLE [3] 49:23; 50:3; 59:18
FEBRUARY [6] 6:11; 9:7; 10:6; 14:12; 18:24; 53:15
FEDERAL [5] 2:9; 5:3; 12:17; 49:25; 58:23
FEELS [1] 23:22
FERRET [1] 49:7
FERRETED [1] 20:1
FEWER [1] 44:7
FIFTH [2] 40:8; 60:7
FIGURE [4] 20:10, 23, 25; 41:15
FIGURES [7] 20:6, 16; 22:10; 23:1; 24:13; 53:6; 55:4
FILED [13] 3:5; 9:5; 12:2; 29:21; 37:10; 45:17; 46:10, 12; 50:8, 24; 53:9; 54:12; 60:16
FILES [2] 33:19; 48:16
FILING [2] 40:21; 44:5
FILINGS [1] 60:24
FILLED [3] 4:25; 5:15; 58:19
FINAL [1] 47:20
FINALLY [1] 56:10
FINDING [4] 26:15; 31:17; 44:12; 57:16
FINDINGS [1] 44:24

FINDS [4] 11:1; 53:1; 55:20; 60:6
FINISH [2] 24:1; 29:24
FIRST [19] 3:21; 10:15; 11:4; 25:16; 27:5; 29:1; 33:15, 25; 34:3, 8, 13, 14; 40:1, 2, 7; 41:8; 42:15; 43:22; 50:4
FLAWED [1] 23:10
FLAWS [3] 5:21; 59:3
FLOORED [3] 43:6, 7
FLURRY [3] 3:2; 27:6; 41:13
FOCUSED [1] 36:12
FOCUSING [1] 47:15
FOLKS [3] 20:22, 24; 24:3
FOLLOWED [1] 35:14
FOLLOWING [1] 33:15
FOOTING [2] 5:19; 59:13
FOREGOING [1] 62:10
FORENSIC [1] 11:6
FOREVER [1] 6:2
FORGET [1] 21:22
FORMATTING [1] 20:9
FORMULA [3] 56:1, 14; 59:10
FORMULATION [4] 20:8; 22:14, 15

FORWARD [2] 28:6; 31:2
FOUND [9] 27:8; 30:17; 34:8, 10; 42:21; 46:20; 51:8; 58:23
FRANKLY [2] 26:5; 42:22
FRAUD [7] 47:15; 48:2; 51:21; 53:4; 56:24; 58:7; 60:2
FRAUDULENT [3] 27:18; 54:20; 56:17
FRIEND [2] 4:20; 53:13
FRONT [5] 9:7; 13:14; 22:8; 23:18; 48:17
FUDGE [1] 44:8
FULLY [3] 31:21; 32:18; 49:20
FURTHER [6] 32:25; 50:19; 54:17, 22; 56:7; 59:7
FURTHERMORE [1] 60:4

- G -

GENEROUS [1] 9:1
GENTLEMAN [1] 19:18
GEORGE [1] 1:12
GETTING [1] 35:1
GIVEN [2] 29:24; 41:17
GIVING [2] 24:22; 26:1
GOING [20] 3:18; 5:22; 6:8; 7:18; 11:24;

17:5, 6, 7; 21:14; 24:24, 25; 30:4, 12; 46:9; 48:2, 4; 49:10, 11; 61:3, 25

**GOTTEN** [1] 9:18

**GOVERNMENT** [106] 3:15, 19, 24, 25; 4:4, 13; 5:4, 7, 21; 7:12; 9:17; 10:22; 11:15; 12:11, 13; 16:11, 14; 17:2; 19:19, 25; 20:6, 8, 11, 15; 23:23; 28:10, 12; 29:21; 30:10, 11; 31:1, 22, 25; 33:11, 14; 34:5; 36:5, 7, 8, 21; 37:13; 38:14; 39:15; 40:5; 41:5; 43:19; 44:17; 46:7; 49:8; 50:1, 2, 9, 14, 16, 22; 51:2, 19, 20; 52:2, 6, 7, 9, 11, 12, 16, 18, 22; 53:1, 7, 10, 16, 18; 54:4, 11, 12, 15, 20, 24, 25; 55:7, 11, 15, 24; 56:18, 24; 57:2, 3, 6, 7, 13, 20, 24; 58:11, 13, 15, 23; 59:1, 2, 9, 13, 17; 60:5, 8; 62:3

**GOVERNMENT'S** [25] 7:5; 8:16; 11:10, 12; 20:4; 29:9; 30:14, 16, 22; 31:23; 37:24; 44:16, 25; 49:23, 24; 50:4, 25; 52:22;

54:17; 55:9, 12, 22; 58:7, 21

**GRABBED** [3] 7:21, 23, 24

**GRADUALLY** [1] 25:10

**GRANTED** [4] 37:11, 14; 38:2; 54:4

**GRANTING** [1] 40:25

**GREAT** [3] 5:3; 55:7, 21

**GREENBERG** [28] 1:21; 2:16; 28:25; 29:10; 30:1, 2, 4, 21, 25; 31:6; 32:17; 33:3; 35:10, 18, 23; 36:1, 15, 19, 20; 38:23; 39:9; 43:13, 15; 45:9, 11, 14; 46:3, 13

**GROUND** [3] 11:25; 31:17; 32:24

**GROUNDS** [4] 29:16; 49:22; 50:9; 60:15

**GUESS** [4] 14:21; 25:23; 29:1; 59:14

**GUILT** [1] 59:25

**GUILTY** [2] 61:12, 14

**GURUVAREDDY** [1] 21:18

─────────────
- H -
─────────────

**HADN'T** [1] 14:11

**HAMMOND** [12] 20:12, 16; 23:3, 12; 25:14, 23; 26:2; 27:15; 41:8; 42:17, 19; 48:12

**HAMMOND'S** [2] 24:6, 15

**HANDFUL** [1] 28:2

**HANDLING** [1] 28:25

**HANDS** [2] 40:14, 20

**HAPPEN** [2] 24:4; 40:10

**HAPPENED** [16] 10:25; 19:4; 21:8; 23:18; 24:4, 21; 25:19, 20; 28:21; 38:7; 39:6; 40:8; 41:7; 42:1; 43:8; 49:4

**HAPPENING** [2] 9:4; 39:5

**HARDEST** [1] 19:7

**HAVEN'T** [3] 31:25; 35:15; 46:11

**HAVING** [11] 4:19; 8:16; 9:20; 21:9; 23:22; 39:15; 40:20; 48:7; 53:13, 15; 58:22

**HAYSTACK** [1] 59:15

**HEADQUARTERS** [1] 7:16

**HEALTH** [1] 40:15

**HEALTHCARE** [2] 51:24, 25

**HEARD** [5] 12:14; 25:2; 49:11; 53:15; 61:21

**HEARING** [7] 1:11; 3:2; 46:18; 50:24; 60:14; 61:2, 4

**HEART** [8] 6:14; 7:2, 4; 9:3; 17:12; 25:24; 31:13; 36:6

**HELPFUL** [1] 22:16

**HERE'S** [1] 49:10

**HEREBY** [1] 62:10

**HEREINAFTER** [1] 51:23

**HERSELF** [1] 16:12

**HESITANT** [1] 60:4

**HIGH-DOLLAR** [1] 50:13

**HIGHER** [1] 20:18

**HIGHLIGHTED** [4] 16:15, 17; 57:6; 58:3

**HINDSIGHT** [4] 23:19; 27:11, 13; 49:6

**HINGER** [1] 2:18

**HIRED** [4] 47:16, 22; 48:3; 54:2

**HISTORY** [2] 3:23; 59:20

**HOLDING** [1] 60:25

**HONED** [1] 18:6

**HONOR** [85] 3:17; 4:7, 11, 24; 5:9; 6:6, 13; 7:15, 24; 8:10, 13, 24; 9:25; 10:10, 16, 25; 11:7, 17; 12:9, 21; 13:13, 17; 14:9; 15:23; 16:2, 20; 18:7; 19:4, 6, 10; 20:20; 21:2; 22:10, 20; 23:5, 14, 23;

24:5, 10; 25:1, 16; 26:13; 28:5; 29:7; 30:4, 21; 31:6, 11, 16; 32:17; 33:22; 35:10, 23; 36:1, 20, 23; 37:18, 22; 39:9; 40:11; 41:15; 42:18, 22; 43:7; 44:9, 23; 45:11, 14; 46:15, 16, 19; 47:1, 6, 8; 48:11; 49:14; 60:19; 61:16, 17, 19, 24; 62:1

**HONOR'S** [5] 2:17; 15:5; 29:3, 23; 46:23

**HONORABLE** [1] 1:12

**HOSPITAL** [1] 46:22

**HOURS** [1] 3:3

**HOUSE** [1] 5:7

**HOWEVER** [4] 24:10; 31:20; 52:21; 60:5

**HUMAN** [1] 28:22

**HUNDRED** [2] 26:8; 38:17

------------

- I -

**IDENTIFIED** [5] 35:12; 37:17; 52:6; 53:25; 54:10

**IDENTIFY** [2] 6:1; 51:15

**IGNORE** [1] 44:22

**IGNORED** [1] 35:8

**IMMEDIATELY** [1] 55:23

**IMMIGRATION** [5] 60:23; 61:4, 18, 21; 62:2

**IMPEACHES** [1] 51:12

**IMPORTANT** [2] 23:18; 43:16

**IMPORTANTLY** [1] 57:20

**IMPOSSIBLE** [1] 58:9

**IMPROPER** [1] 58:1

**IMPUTED** [1] 51:10

**IN-AND-OUT** [1] 23:10

**INCIDENT** [1] 57:19

**INCLINED** [4] 29:23; 31:20; 32:23; 45:16

**INCLUDE** [1] 37:15

**INCLUDED** [1] 60:2

**INCLUDING** [4] 34:8; 49:22; 55:17; 60:8

**INCONSISTENCIES** [1] 56:11

**INCORRECT** [2] 15:22, 24

**INCORRECTLY** [1] 10:20

**INCREDIBLE** [1] 58:23

**INDIA** [1] 29:4

**INDICATE** [2] 8:6; 10:11

**INDICATED** [14] 3:1; 4:18; 6:11; 7:11, 17; 9:8; 20:19; 30:13, 14, 16; 53:12, 18; 56:16, 18

**INDICATES** [1] 12:22

**INDICTMENT** [5] 3:7; 29:17;

49:19, 21; 60:11

**INDIVIDUAL** [3] 21:12; 52:13, 14

**INDIVIDUALS** [2] 51:22; 52:7

**INFLATED** [1] 34:1

**INFORMATION** [18] 5:16, 17; 8:11; 11:2, 13; 36:10; 39:25; 43:18; 51:16, 20; 52:13, 16; 54:9, 14; 56:4, 10, 21

**INITIAL** [2] 3:7; 29:14

**INITIALLY** [1] 52:20

**INNOCENCE** [1] 59:25

**INNOCENT** [1] 61:11

**INQUIRY** [1] 29:9

**INSTEAD** [1] 34:18

**INSTRUCT** [1] 16:15

**INSTRUCTION** [2] 50:18; 57:5

**INSURANCE** [2] 36:5; 51:21

**INTEND** [1] 29:20

**INTENDED** [5] 4:19; 12:21; 48:12; 52:2; 61:14

**INTENT** [8] 50:20; 52:19; 53:3, 11, 17; 56:18; 57:22; 58:4

**INTENTIONAL** [5] 15:25; 16:9; 30:7; 32:20; 43:17

**INTENTIONALLY** [1] 44:10

**INTENTIONS** [1] 46:24

**INTERESTED** [4] 19:12, 13, 16

**INTERNAL** [15] 11:12; 20:12; 22:2, 15; 36:25; 37:6, 9; 40:17; 44:11; 52:8, 17; 54:17; 55:22; 56:8, 15

**INTERRUPT** [1] 36:18

**INTRODUCED** [1] 41:21

**INVADE** [1] 60:4

**INVENTORY** [7] 21:18; 49:2; 52:3; 55:5, 12, 14, 17

**INVESTED** [1] 27:16

**INVESTIGATION** [4] 2:9; 12:18; 25:12; 54:6

**INVESTIGATIVE** [1] 51:10

**INVESTIGATOR** [1] 61:10

**INVITED** [1] 48:15

**INVOLVED** [1] 33:7

**IRONIC** [2] 23:23; 27:11

**IRONICALLY** [4] 12:12; 17:2, 8; 26:9

**IRONY** [2] 16:23; 26:1

**IRRESPONSIBLE** [1] 58:24

**ISN'T** [1] 7:9

**ISSUE** [16] 5:25; 17:2; 20:2; 27:2; 29:22; 31:6, 8,

9, 15; 35:3, 14; 41:9, 25; 46:18; 50:23; 61:21

**ISSUES** [10] 4:5, 9; 20:1; 21:22; 31:22; 33:4; 40:7; 45:12, 24; 59:7

**ITEMS** [11] 3:25; 4:2; 7:15, 18; 53:17, 22; 58:14, 20, 22, 24

**- J -**

**JACQUELINE** [3] 1:24; 62:9, 14

**JAMES** [1] 2:11

**JANUARY** [9] 4:20; 9:13, 15; 10:3; 13:11; 14:2; 24:17; 52:6; 53:14

**JIGAR** [4] 12:4; 30:6; 50:11; 57:3

**JOSHUA** [1] 1:21

**JUDGE** [3] 1:13; 2:4; 28:7

**JUSTIFY** [1] 27:10

**- K -**

**KELLY** [2] 25:9; 26:8

**KELLY'S** [1] 25:15

**KNOWING** [3] 6:8; 34:16; 56:5

**KNOWINGLY** [1] 57:17

**KNOWLEDGE** [2] 41:10; 51:9

**KNOWN** [1] 55:6

**KNOWS** [2] 32:13; 36:23

**- L -**

**LACKING** [1] 42:25

**LACKS** [1] 51:12

**LANGUISHING** [1] 60:25

**LARGER** [1] 34:10

**LATER** [5] 3:19; 40:23; 42:1, 3; 47:9

**LATEST** [1] 57:25

**LATING** [5] 2:9; 12:12; 16:12; 17:11; 19:7

**LATING'S** [2] 12:14; 26:17

**LAWYER** [5] 4:19; 9:18; 56:5; 60:23; 61:4

**LEARNED** [1] 39:25

**LEAST** [3] 7:5; 57:23; 58:15

**LEAVE** [2] 6:13; 46:23

**LENGTH** [1] 60:24

**LENGTHY** [2] 54:2; 55:14

**LET'S** [1] 30:24

**LETTERS** [1] 61:10

**LEVEL** [1] 36:11

**LIKELY** [1] 56:22

**LIMIT** [1] 39:19

**LIMITED** [2] 49:22; 55:17

**LITERALLY** [1] 8:25

**LITIGATED** [1] 39:23

**LITTLE** [4] 2:24; 3:19; 45:6; 52:24

**LOADED** [3] 15:3; 17:12, 16

**LOCATED** [1] 5:5

**LOCATION** [1] 54:18

**LOOKED** [12] 14:25; 15:12, 15; 16:6, 18; 17:11, 14; 19:5; 21:1; 23:22; 47:21; 51:18

**LOOKING** [10] 14:20; 17:20, 21; 18:5, 9, 10; 23:19; 29:18; 35:16; 47:11

**LOSSES** [9] 20:18; 22:23; 45:3; 51:20; 55:21, 25; 56:1, 5; 59:12

**LOWER** [1] 54:16

**- M -**

**MAINTAIN** [2] 8:24; 28:11

**MAINTAINED** [1] 38:11

**MAINTAINS** [1] 12:18

**MAKES** [3] 57:15, 21; 59:24

**MAKING** [1] 47:10

**MANDATES** [1] 51:8

**MARCH** [4] 10:4; 14:5; 22:23; 53:21

**MARYLAND** [1] 1:2

**MASSIVE** [5] 26:19; 45:3; 48:24

**MASTER** [1] 53:23

**MATERIAL** [10] 22:20; 31:3; 40:7; 50:5, 20; 51:3; 53:2; 55:16; 57:6; 58:2

**MATERIALITY** [1] 51:13

**MATERIALS** [6] 4:9, 10; 6:7; 8:8; 51:13, 15

**MATTER** [5] 2:5; 3:23; 31:21; 60:19; 62:11

**MATTERS** [2] 54:7; 60:14

**MAYBE** [5] 20:7; 35:1, 23; 41:5, 25

**MEDIC** [29] 20:2, 3, 9, 18, 22, 24; 21:24; 22:8, 14, 15, 22; 23:8; 24:3; 26:6; 34:5, 10, 11, 12; 44:24; 47:12; 48:7; 51:23; 54:10, 22; 55:4, 16, 17, 20; 56:13

**MEDICAID** [5] 21:4; 26:7; 27:5; 36:5; 42:7

**MEDICARE** [5] 21:3, 4, 6, 9; 26:6

**MEDICARE'S** [1] 21:1

**MEDICATION** [2] 5:14; 7:3

**MEDICATIONS** [7] 12:7; 31:14;

34:7, 9; 50:13; 53:24; 58:18

**MEETINGS** [1] 61:10

**MENTIONED** [1] 29:19

**MERELY** [1] 51:12

**METHODOLOGIES** [1] 23:4

**METHODOLOGY** [7] 20:25; 21:23; 23:6, 7, 8, 10, 11

**MIGHT** [3] 8:6; 37:24; 48:22

**MILLION** [10] 11:19; 20:17; 23:2; 24:16, 19, 20; 25:12, 18; 52:21, 24

**MINUTE** [1] 28:12

**MINUTES** [1] 57:15

**MISLED** [1] 58:2

**MISREPRESENTATION** [1] 44:3

**MISSED** [1] 42:15

**MISSING** [1] 14:8

**MISTAKE** [6] 36:2, 24; 37:2; 38:4; 40:12; 44:15

**MISTAKES** [6] 6:22; 19:25; 26:19; 28:6, 22; 39:4

**MISUNDERSTANDING** [1] 29:3

**MODIFIED** [1] 43:21

**MOMENT** [2] 36:13; 43:5

**MONEY** [1] 42:23

**MONTH** [10] 24:24, 25; 25:9, 17; 55:12

**MONTHS** [5] 25:21; 28:16; 34:4; 43:25; 49:2

**MORNING** [5] 2:2, 4, 15, 22; 49:12

**MOSELY** [1] 26:18

**MOTION** [39] 3:7, 9, 11, 24; 5:17, 20; 7:9; 9:5; 12:1; 19:19; 29:15; 30:8; 33:16, 22; 34:2; 37:10, 11, 14; 38:2, 3, 15; 39:19, 23; 40:18, 25; 45:16; 49:18, 20; 50:9, 24; 51:1, 2; 53:9; 54:3, 12; 58:11, 25; 60:15; 61:15

**MOTIONS** [14] 1:11; 2:13; 3:2; 29:14, 15, 24; 30:5; 45:18; 46:6, 11; 59:8; 60:16, 17

**MOVING** [1] 43:9

**MULTIPLE** [2] 30:21; 33:19

**MYSELF** [1] 46:20

## - N -

**NAMES** [1] 52:7

**NATURAL** [1] 48:9

**NEARLY** [1] 55:7

**NECESSARILY** [1] 11:5

**NECESSARY** [1] 29:6

**NEEDED** [4] 17:24; 33:17; 43:14; 46:19

**NEEDS** [1] 54:23

**NEGATIVE** [1] 19:2

**NEGLIGENT** [1] 57:23

**NEVER** [10] 17:14; 18:19; 31:19; 35:13; 38:11; 41:12; 42:7; 55:3; 57:8; 58:12

**NEVERTHELESS** [3] 52:25; 56:1; 57:18

**NIGHT** [1] 42:17

**NOBODY** [4] 2:25; 14:21; 17:14; 24:7

**NORTHERN** [1] 1:2

**NOTED** [4] 7:20; 24:14; 31:12; 41:3

**NOTES** [4] 6:1; 34:20; 35:4; 47:11

**NOTHING** [4] 14:19; 34:17; 35:15; 38:9

**NOTICE** [8] 10:6; 30:8; 32:21; 48:11; 53:10, 16, 19; 56:11

**NOTION** [1] 38:4

**NUMBER** [17] 2:6; 6:22; 12:13, 14; 13:3, 6, 15, 16, 18, 19, 20; 21:25; 24:22; 25:4; 34:2; 40:19; 50:21

**NUMBERS** [8] 12:23, 25; 13:1; 15:4; 19:1; 24:22; 44:8; 52:25

## - O -

**OBFUSCATED** [1] 44:6

**OBJECT** [1] 53:19

**OBJECTED** [2] 30:18, 19

**OBJECTION** [3] 9:9, 22; 10:20

**OBLIGATED** [1] 59:17

**OBLIGATIONS** [1] 49:24

**OBSERVE** [1] 14:23

**OBVIOUSLY** [5] 6:8, 23; 7:15; 9:3; 28:7

**OCCUPIED** [1] 28:15

**OCTOBER** [9] 24:15, 18; 33:11; 37:12, 15; 38:19; 40:13, 22; 43:25

**OFFICE** [13] 2:7; 5:5, 6; 21:19; 33:10; 35:11; 40:18; 42:19; 43:10; 44:12, 21; 52:9

**OFFICIAL** [3] 1:25; 62:9, 14

**OPENING** [1] 56:19

**OPENLY** [1] 39:24

**OPERATED** [1] 59:12

**OPINION** [2] 55:15; 58:5

OPINIONS [3] 52:13; 55:20; 61:9

OPPORTUNITY [6] 3:6, 9, 15; 5:16; 29:24; 32:18

OPPOSED [3] 24:24, 25; 61:18

OPPOSITE [1] 45:5

ORANGES [1] 20:21

ORDER [3] 4:5; 58:16; 60:10

ORDERED [3] 58:19; 61:17, 19

ORIGINAL [2] 55:13; 59:6

ORIGINALLY [2] 4:11; 20:5

OTHER [19] 3:25; 4:2; 5:6; 7:11, 15; 27:4; 29:16; 35:17, 18; 36:5; 41:3; 48:18; 53:4; 54:6; 55:4; 60:15, 16, 17; 61:8

OTHERS [2] 9:2; 37:11

OTHERWISE [3] 15:25; 20:8; 28:9

OUTCOME [2] 51:7; 56:23

OUTSIDE [1] 27:18

OVERCOME [1] 28:6

OVERSTATE [1] 8:13

OWNERS [1] 7:12

———————————
- P -
———————————

PAMPHLET [1] 41:11

PAPER [3] 32:4, 6, 9

PAPERS [4] 7:12; 41:3; 42:10; 47:17

PARALEGAL [1] 2:18

PARDON [1] 13:17

PARTICULAR [1] 11:25

PARTICULARLY [1] 8:4

PARTIES [3] 54:5; 56:12; 60:25

PARTS [2] 43:9; 46:10

PASCALE [2] 1:17; 2:7

PASCALE'S [1] 26:18

PATEL [9] 12:4, 5; 17:1, 10; 30:6; 50:12, 15; 57:3, 9

PATEL'S [4] 12:24; 13:16; 57:14; 60:23

PATERNITY [1] 46:23

PATIENT [1] 7:3

PATIENTS [3] 6:1; 53:24; 58:19

PAUSE [3] 36:14; 46:2; 47:7

PAYMENT [1] 36:10

PECULIAR [1] 18:23

PENDENCY [4] 7:9; 51:1; 58:11, 25

PENDING [6] 3:24; 30:8;

46:8; 49:17; 59:24; 60:1

PENNSYLVANIA [1] 61:1

PERCENT [1] 38:17

PERFECT [1] 2:22

PERHAPS [1] 25:15

PERIOD [4] 7:25; 41:18; 47:13; 55:14

PERJURED [1] 16:12

PERJURY [2] 16:12; 57:17

PERMITTED [1] 48:15

PERSONAL [1] 19:9

PERSONALLY [5] 6:10; 33:6; 61:11, 13

PERSUASIVE [1] 30:13

PHARMACARE [12] 36:4; 40:16, 23; 41:14, 17; 42:7; 44:13; 47:13, 19; 52:4, 15; 54:18

PHARMACIES [4] 21:8, 10, 12; 51:24

PHARMACIST [1] 45:2

PHARMACY [3] 26:5; 52:15; 55:18

PHONE [24] 10:8; 12:4, 13, 16, 23; 13:16, 21; 14:11; 15:4; 17:8, 9, 11; 18:5, 23, 24; 29:5; 30:5; 31:3, 9; 46:18; 57:9, 10, 14, 15

PICKING [1] 10:8

PICTURE [1] 26:23

PILLS [12] 7:14; 21:11; 34:12; 40:16, 22; 42:10; 43:22; 44:2, 7, 13; 52:3, 4

PLACE [4] 3:5; 25:16; 58:23; 60:22

PLACED [1] 5:18

PLEADINGS [2] 3:4; 61:9

PLEASE [1] 45:17

PLUMTREE [1] 21:15

PODIUM [1] 30:2

POINT [22] 5:23; 7:6, 18; 10:17, 19; 14:14, 22; 18:19; 20:15; 21:1, 25; 24:6; 26:14; 29:2; 31:11; 33:20; 39:10, 18; 46:3; 56:19; 57:21; 61:22

POINTED [4] 16:18; 37:22; 44:23; 50:16

POINTS [1] 3:19

PORTION [1] 28:15

PORTRAYED [1] 55:7

POSITION [1] 59:5

POSSESSED [3] 52:4; 55:16; 59:11

POSSESSION [4] 14:15; 42:9; 50:2; 54:15
POSSIBILITY [6] 7:7, 8; 55:1, 2; 56:23; 59:9
POSSIBLY [1] 5:2
POST-TRIAL [2] 55:9; 59:8
POTENTIALLY [2] 11:2; 34:24
POWER [2] 61:16, 20
POWERFUL [2] 25:7; 28:9
PRACTICES [1] 27:24
PRECISELY [1] 39:3
PREJUDICE [5] 37:16; 39:14; 40:3; 49:19; 60:11
PRELIMINARY [1] 51:20
PREPARATION [2] 33:7, 8
PREPARED [7] 33:9; 34:3; 35:11; 37:6; 40:17; 44:12; 49:13
PRESCRIBED [2] 6:2; 52:4
PRESCRIPTION [4] 4:4; 5:14, 25; 28:2
PRESCRIPTION S [2] 8:23; 53:25
PRESENT [4] 2:16; 26:23; 54:2
PRESENTATION [1] 52:22
PRESENTED [19] 3:12; 11:16, 22; 24:8; 28:3; 36:3, 22;

37:8, 20; 39:15; 50:10; 52:18, 25; 54:16; 56:2; 58:7; 60:2, 3
PRESENTING [3] 33:13; 38:21; 40:6
PRESERVED [2] 7:9; 58:17
PRESSURES [1] 49:2
PRETRIAL [3] 13:24; 54:15; 59:10
PRETTY [1] 46:20
PREVAILED [1] 58:17
PREVIOUS [3] 20:4; 52:10; 53:18
PREVIOUSLY [1] 58:1
PRIMARY [1] 18:13
PRINTOUT [1] 12:22
PRIOR [5] 12:11; 18:24; 47:16, 18, 21
PRISON [5] 19:20, 21, 22, 23; 61:1
PROBABILITY [3] 51:4, 6
PROBABLY [1] 42:5
PROBLEM [9] 6:21; 8:14; 9:19; 14:6; 24:12; 34:24; 35:1, 2; 43:15
PROBLEMS [2] 24:1; 39:21
PROCEDURAL [1] 3:23
PROCEDURE [1] 49:25

PROCEDURES [1] 51:25
PROCEED [1] 32:25
PROCEEDING [2] 3:20; 56:14
PROCEEDINGS [4] 2:1; 51:5; 62:6, 10
PROCESS [5] 9:9; 19:24; 28:13; 40:9; 60:7
PRODUCE [1] 29:6
PRODUCED [15] 33:11; 37:3, 9, 11, 13, 14, 23; 38:2, 18; 40:12, 23; 41:14; 43:22, 24; 51:19
PRODUCING [2] 36:25; 43:20
PRODUCTION [1] 53:6
PROFIT [2] 39:15; 40:5
PROGRAM [3] 42:9, 15, 20
PROGRAMS [3] 36:5; 51:21; 54:12
PROJECTED [1] 52:21
PROMOTED [5] 20:16; 22:1; 56:24; 57:2, 19
PROMOTION [2] 57:25; 59:20
PROOF [1] 28:11
PROPER [1] 58:6
PROPOSED [2] 11:15; 58:14
PROSECUTION [3] 35:5; 46:7; 57:18

PROSECUTOR [3] 28:13; 34:18; 51:10
PROSECUTOR'S [4] 36:6; 39:22; 51:9, 11
PROSECUTORS [24] 33:6, 12, 17, 24; 34:11, 17; 36:3, 11, 25; 37:5, 9; 38:1, 20; 39:17, 19, 24; 40:2, 6, 8, 14, 21, 23; 44:11, 20
PROVE [3] 17:5, 6; 40:2
PROVEN [1] 58:18
PROVIDE [1] 52:16
PROVIDED [7] 6:7; 20:13; 29:5; 53:10, 16; 56:11, 12
PROVIDER [3] 14:7, 10; 18:20
PROVINCE [1] 60:5
PUNCH [1] 27:14
PURCHASED [1] 11:20
PURPOSE [1] 47:20
PURPOSES [1] 3:1
PUTTING [1] 24:13

---

**- Q -**

QUASH [1] 54:12
QUESTION [8] 20:3; 21:23; 29:1; 32:2; 41:1; 43:14; 46:17; 48:20

QUESTIONED [1] 50:23
QUESTIONS [4] 45:12; 48:17; 60:18; 61:5
QUITE [1] 26:9

- R -

RAISE [1] 62:2
RAISED [5] 13:3; 31:22; 35:14; 41:9; 46:18
RATHER [1] 31:23
READING [1] 38:24
REALIZED [2] 5:21; 59:3
REALLY [1] 23:25
REAMS [1] 32:9
REASON [4] 4:3; 20:7; 25:1; 61:14
REASONABLE [4] 51:3, 6, 18; 56:4
REASONABLY [1] 4:21
REBUTTAL [2] 16:18; 56:20
RECALL [5] 10:10, 14; 23:1; 32:12; 41:7
RECEIPT [3] 5:14; 7:3
RECEIVE [2] 12:2; 44:14
RECEIVED [8] 17:5; 18:17; 44:14; 50:18; 53:24; 54:14; 58:16, 18
RECENTLY [2] 57:1, 13
RECESS [1] 49:15

RECKLESS [4] 33:12; 35:16; 38:20; 39:10
RECKLESSLY [1] 40:6
RECOGNIZES [2] 59:2; 60:1
RECOLLECTION [2] 22:12; 43:4
RECONCILED [1] 38:3
RECORD [10] 12:9, 18; 16:24; 19:15; 29:13, 25; 35:10; 38:13; 60:12; 62:10
RECORDS [39] 12:4, 13, 16, 23; 13:10, 23; 14:15, 19, 21, 25; 15:7, 10, 13, 16, 17; 16:6; 17:8, 12, 19, 21; 18:5, 10, 16, 24; 27:5, 9; 29:5, 6; 41:13, 16, 23; 42:6, 13, 22, 25; 43:1; 55:5; 57:9, 12
REDDY [3] 1:7; 2:5; 49:17
REDUCED [1] 52:23
REFILL [1] 31:12
REFLECTED [1] 47:25
REGARD [3] 7:14; 20:2; 45:21
REGARDING [7] 3:22; 7:6; 25:6; 29:13; 30:5; 52:13; 56:8
REGARDLESS [1] 51:10
REIMBURSED [2] 21:3

REIMBURSEMEN T [1] 51:25
RELATED [16] 12:3, 15; 20:3, 4; 50:3, 10; 51:20, 25; 53:6; 54:6, 9; 57:2, 22, 24; 59:12; 60:1
RELATING [1] 31:3
RELATIONSHIP [1] 26:22
RELEVANCE [1] 51:13
RELEVANT [4] 8:5; 56:12; 57:11; 58:2
REMEMBER [6] 8:7; 22:9, 10; 23:19; 42:4, 5
REMOVE [2] 33:18; 34:17
REMOVED [1] 61:3
REPEATEDLY [1] 50:16
REPLACED [1] 52:8
REPLENISHED [4] 41:24; 42:13; 44:2, 7
REPLENISHMEN T [3] 42:1, 9, 20
REPLIES [2] 30:5, 9
REPLY [4] 29:21; 30:12, 20; 45:23
REPORTED [1] 1:23
REPORTER [3] 1:25; 62:10, 14
REPRESENT [1] 61:23
REPRESENTATI ON [2] 41:2; 44:1

REPRESENTATI ONS [3] 25:6; 41:3; 43:19
REPRESENTED [5] 40:21; 42:10; 52:10, 18; 57:7
REQUEST [3] 45:18; 51:14; 54:4
REQUESTED [5] 16:15; 47:12; 51:14; 52:12; 54:2
REQUIRE [1] 60:9
REQUIRES [1] 43:9
RESERVE [1] 11:24
RESISTANCE [2] 19:19, 20
RESISTED [2] 36:25; 54:4
RESOURCES [1] 30:15
RESPECT [2] 36:4; 38:17
RESPECTFULLY [3] 33:4; 45:17; 46:5
RESPOND [4] 3:15; 31:21; 32:18; 38:10
RESPONDED [5] 35:15; 46:11, 24; 51:2; 57:8
RESPONSE [14] 3:13; 12:2, 21; 16:16; 17:7, 25; 29:8, 9; 30:22, 25; 31:23; 39:19; 40:25; 50:17
RESPONSES [1] 32:19
RESULT [4] 3:10; 37:24; 40:10; 51:5

RETRIEVE [1]
58:14
REVEAL [4]
48:22; 54:25;
57:13; 59:8
REVEALED [4]
54:18, 22; 55:5,
8
REVEALING [1]
37:1
REVERSALS [1]
7:6
REVERSE [1]
12:6
REVERSED [1]
50:13
REVIEW [8] 3:6,
9; 5:16; 12:3;
47:12, 20, 21;
49:3
REVIEWED [3]
15:21; 48:5;
57:9
REWARD [1]
40:7
RIDOLFI [2]
45:6; 48:2
RIDOLFI'S [1]
47:16
RIGHT [39] 2:2,
14, 25; 5:10;
6:13; 8:6; 9:7;
11:18; 12:1;
13:4, 23; 14:10,
16; 15:11;
16:1; 17:5, 18;
18:1, 16; 19:21;
20:23; 22:5, 6;
23:20; 27:15;
28:8, 24; 31:16;
33:2; 34:4;
35:25; 43:4, 7;
47:5; 49:16;
60:7; 62:5
RIGHTS [1]
19:24
ROLLOVER [1]
43:12
RULES [1]
49:25

RULING [1]
11:24
RUNNING [1]
8:21
RUSSELL [2]
1:12; 2:4
RUTHLESS [2]
49:6, 7

- S -

SANDRA [2]
1:16; 2:6
SATISFIED [1]
25:23
SAYING [11]
5:8; 16:8, 11,
12, 13; 35:5,
17, 18; 39:1, 4;
42:8
SCANNED [1]
44:15
SCENES [1] 6:9
SCHAMEL [15]
1:20; 2:15, 20,
23; 28:25;
29:1, 10, 20;
32:10; 46:16;
60:19, 22;
61:24; 62:1
SCHEDULE [1]
49:3
SCHEDULED [1]
46:21
SCHEDULING
[1] 46:16
SCRIPT [1]
38:24
SCRUB [4]
34:20, 23; 35:6,
12
SEARCH [3]
17:15; 49:1;
53:18
SEARCHES [1]
19:1
SEATED [2]
2:21; 49:16
SECOND [13]
20:2; 29:17;

33:22; 39:13,
20; 40:2, 4;
43:24; 46:15;
47:6; 49:18;
57:19; 60:10
SECONDARY [2]
18:9; 19:5
SEEING [2]
19:6; 24:6
SEEKING [2]
14:16; 30:20
SEEKS [1]
49:21
SEIZED [3]
3:24; 4:1;
53:17
SELECTIVE [1]
32:20
SENTENCED [1]
19:22
SEPTEMBER [5]
1:9; 24:17;
44:11, 16;
51:19
SERVICE [3]
14:7, 10; 18:20
SEVEN [4] 34:8;
36:2, 21, 24
SEVERAL [4]
49:22; 50:1;
57:14; 59:14
SHE'LL [1]
48:19
SHE'S [10]
17:21, 23; 18:5,
6, 9, 10; 19:1,
8; 24:22
SHEER [1]
26:21
SHOCK [1]
59:21
SHORT [2] 26:8
SHORTAGE [3]
24:7; 26:11;
47:23
SHORTAGES [7]
24:12, 13;
25:10; 34:8, 9;
47:16, 17

SHORTLY [1]
3:20
SHOULD [13]
9:18; 16:16;
18:4; 25:16;
35:23; 40:9;
50:15; 55:11,
22; 56:2;
58:15, 16, 21
SHOULDN'T [2]
19:23; 39:5
SHOWED [3]
25:14; 38:8;
48:2
SHOWING [11]
37:15; 38:7, 20;
40:15; 41:16,
23; 42:13;
43:21; 44:21;
45:5; 51:11
SHOWS [8]
13:15; 26:9;
34:7; 35:10;
36:11; 40:13;
43:16; 44:6
SIDES [1] 32:8
SIGNATURE [3]
5:13; 31:12;
53:23
SIGNIFICANT
[17] 5:22;
16:19; 19:17;
22:23; 25:1;
31:4; 39:21;
44:10; 50:5, 21;
52:19; 53:2;
56:17; 57:5;
58:2; 59:3, 21
SIGNIFICANTLY
[1] 58:6
SILENCE [3]
9:21; 50:18;
57:4
SIMPLY [1] 6:6
SINCE [3]
14:11; 40:24;
59:24
SINGLE [1]
38:6

SITTING [1] 60:25

SIZED [1] 4:23

SLOPPY [3] 27:22, 24; 57:22

SOLELY [1] 47:18

SOMEBODY [2] 32:13; 41:2

SOMETHING [2] 22:25; 29:2

SOMETIMES [2] 21:19; 48:21

SOMEWHAT [1] 16:23

SORRY [4] 36:15, 18; 43:13; 45:9

SOUGHT [4] 30:19; 53:11; 54:8

SOUNDS [2] 23:22; 27:11

SOURCE [4] 18:9, 13; 19:5; 51:17

SOVICH [3] 1:24; 62:9, 14

SPACE [5] 4:5, 9; 5:4, 6; 58:22

SPECIAL [3] 2:9, 11; 50:18

SPECIALIZE [1] 51:23

SPECIFIC [3] 35:4; 37:17; 52:12

SPECIFICALLY [5] 17:21; 29:18; 35:12; 49:25; 57:8

SPECIFICITY [1] 51:15

SPRINT [1] 14:10

STAGE [1] 35:25

STAND [2] 14:24; 38:21

STARTED [2] 4:8; 42:16

STATE [1] 48:5

STATED [1] 39:24

STATEMENTS [4] 30:9, 22; 31:23; 32:18

STATES [5] 1:1, 4, 13, 15; 2:5

STENOGRAPHIC [1] 62:10

STEPS [1] 20:12

STILL [16] 22:20; 24:6, 12; 25:8; 26:3, 7, 9; 27:9; 28:10; 29:20, 22; 42:11, 22; 43:1; 44:8

STOOD [1] 44:17

STOPPED [2] 24:16; 27:15

STOPPING [1] 10:7

STORE [9] 7:20; 10:23; 44:13, 18, 22; 55:18; 58:22, 24

STORED [1] 21:19

STORES [3] 34:12; 36:8, 9

STORING [1] 8:13

STRANGE [1] 60:22

STRATEGY [3] 39:25; 48:12, 22

STRENGTH [1] 36:10

STRIKE [1] 24:17

STRONG [1] 56:22

STRONGLY [2] 6:23; 54:4

STUFF [7] 7:15, 16; 8:14, 17, 18; 46:11; 47:9

STUNNING [1] 34:6

SUBMISSIONS [1] 49:12

SUBMITS [1] 28:10

SUBMITTED [3] 27:3; 36:4; 38:10

SUBORNED [1] 16:11

SUBPOENA [6] 13:10; 14:3, 4, 5; 54:8, 12

SUBPOENAED [7] 12:13, 16; 13:11, 23; 14:1; 18:19; 57:13

SUBPOENAING [1] 56:12

SUBSEQUENT [3] 12:5; 50:11; 53:7

SUBSEQUENTLY [1] 54:1

SUBSTANTIAL [4] 5:21; 22:20; 26:9; 33:24

SUBSTANTIALLY [3] 20:17; 39:14; 40:3

SUFFERED [1] 54:11

SUFFICIENT [3] 51:7, 15; 60:9

SUGGESTING [1] 28:20

SUGGESTS [1] 55:11

SUMMARIES [1] 12:14

SUMMARIZE [1] 52:11

SUMMER [1] 44:14

SUPERSEDING [4] 3:7; 29:17; 49:18; 60:11

SUPERVISED [1] 33:8

SUPPLEMENT [3] 29:15; 50:8; 54:3

SUPPLEMENTAL [1] 29:14

SUPPLEMENTS [1] 3:8

SUPPLIED [2] 40:15, 22

SUPPORT [2] 30:5; 50:20

SUPPORTING [4] 52:19; 56:17; 58:3; 60:15

SUPPOSED [3] 3:10; 5:18; 35:1

SUPPRESSING [1] 44:20

SUPPRESSION [1] 43:17

SUPREME [1] 6:19

SURPLUS [5] 5:24; 44:13, 22; 54:21; 55:4

SURPLUSES [1] 52:14

SWITCHING [1] 34:6

SYSTEM [6] 12:17, 18; 15:3, 15; 17:11; 56:15

---

- T -

---

TABLE [1] 2:8

TAINTED [1] 60:3

TAKEN [1] 3:5

TAKING [1] 46:10

**TALKED** [1] 26:16

**TALKING** [6] 4:22; 21:11; 24:14; 26:21; 60:23

**TECHNICAL** [1] 14:19

**TECHNICALLY** [2] 14:17, 18

**TERMS** [3] 6:7; 16:6; 23:17

**TERRIBLY** [1] 23:10

**TESTIFIED** [6] 12:3; 21:19; 22:1; 23:3; 55:21; 57:9

**TESTIFIES** [1] 14:25

**TESTIFY** [5] 40:1; 51:12; 52:3; 54:11; 56:13

**TESTIMONY** [17] 3:12; 12:12; 15:21; 16:13, 14; 24:18; 50:10; 57:2, 4, 5, 12, 16, 17, 19, 25; 58:5; 59:21

**THANK** [4] 2:23; 45:14; 49:14; 62:5

**THAT'S** [33] 2:19, 22; 3:17; 4:7, 8; 5:5; 7:14; 9:13; 13:13, 20; 14:3; 18:18; 19:3; 21:8, 22; 23:9; 24:3; 25:4; 28:6; 29:6; 31:1; 34:3; 35:16; 39:3; 41:15, 17; 42:15, 24; 43:3, 4; 44:4, 17

**THEIR** [23] 20:25; 21:14, 25; 27:19; 33:13; 36:12; 37:6; 39:19, 21, 24; 40:14, 20; 44:1, 21; 48:9, 22; 50:17; 53:11, 17, 24; 55:16; 59:10

**THEMSELVES** [1] 34:20

**THEORY** [7] 7:5; 11:15, 16; 47:15; 55:9; 56:24; 58:7

**THERE** [57] 3:23; 4:20; 5:24; 7:7, 10, 19; 8:4, 18, 19, 21, 23; 9:23; 12:1, 21; 15:6; 16:16; 17:14, 24; 18:4, 23; 21:21, 23; 24:2, 12; 27:14; 29:16; 30:16, 21; 31:24; 32:6; 34:19; 35:3, 4; 36:21; 41:4, 5, 12, 13, 21, 22; 42:11, 24; 45:3; 46:11; 47:15, 17, 18, 22; 51:3, 11; 53:3; 56:22; 57:13; 59:16; 60:2; 61:18

**THERE'S** [9] 3:2; 17:19; 19:16; 23:19; 29:22; 34:23; 35:4; 44:9; 46:10

**THEREFORE** [1] 56:2

**THESE** [22] 5:25; 6:16; 9:1; 10:21; 21:21;

26:7, 14; 28:4, 6; 29:24; 36:11, 12, 24; 39:4; 41:22; 42:16; 45:23; 51:22; 52:7, 13; 58:20; 60:14

**THEY'RE** [8] 11:3; 32:7, 10; 39:4, 5, 7; 46:9, 10

**THING** [4] 16:21; 22:21; 26:20; 48:11

**THINGS** [9] 4:20; 8:22; 11:9; 27:4; 33:15; 34:17; 39:6, 7; 42:14

**THINK** [16] 10:9, 16; 13:2; 16:4; 20:1; 22:25; 31:6; 32:5, 10; 34:25; 35:4, 9, 20; 43:15; 44:10; 48:13

**THIRD** [1] 34:2

**THIRD-PARTY** [3] 27:8; 42:6, 21

**THOROUGHLY** [1] 3:6

**THOSE** [40] 3:19; 4:2, 20; 8:5, 8; 12:16; 13:23; 14:21; 17:20; 18:16; 20:1; 21:15, 16; 25:2, 18; 27:10; 29:20; 30:9; 33:8, 14, 16, 23; 34:10, 16; 37:3, 9, 16, 18, 19; 39:12; 47:21; 49:9; 51:12; 52:5, 23; 54:16; 55:21; 56:2; 59:17

**THOUGH** [1] 17:13

**THOUGHT** [8] 7:11, 22; 18:23; 25:25; 26:1; 46:25; 48:7, 10

**THOUSAND** [2] 23:2; 26:8

**THOUSANDS** [2] 8:23

**THREE** [2] 33:15; 34:16

**THROUGH** [16] 4:14; 6:16; 7:17, 24; 8:1, 3; 14:2, 4, 25; 22:20; 24:13; 26:20; 36:20; 38:25; 47:13; 57:7

**TIME-CONSUMI NG** [1] 60:14

**TIMEFRAME** [10] 9:24; 12:24; 14:4, 9, 16, 20; 15:8, 14; 42:4; 57:11

**TIMELINE** [1] 43:16

**TIMELY** [1] 53:9

**TIMES** [3] 6:17; 8:1; 12:15

**TIMING** [1] 6:9

**TODAY** [6] 2:12; 12:20; 30:10; 32:23; 45:20; 49:13

**TODAY'S** [1] 50:23

**TOGETHER** [2] 22:9; 25:10

**TOLLS** [1] 18:20

**TOTAL** [2] 22:9; 24:22

**TRANSCRIPT** [2] 1:11; 62:10

**TRANSFER** [2] 21:11; 47:10

**TRANSFERRED** [1] 34:12

**TRANSFERRING** [1] 21:18

**TRANSFERS** [1] 34:15

**TRANSITIONING** [1] 48:6

**TRAVEL** [1] 29:6

**TRIAL** [54] 3:24; 5:18, 19, 20; 7:8, 9; 8:7; 9:6; 11:4, 9, 16; 12:8, 11; 13:5; 19:19; 20:17; 24:18; 27:6; 30:8; 31:19; 34:4; 37:4, 24; 39:13, 20, 23, 25; 40:1, 2, 3, 4, 7, 14; 43:23; 44:16; 46:21, 22; 48:22; 49:3; 51:1; 52:2, 18; 53:5, 7, 9; 54:3, 17; 56:4, 25; 58:8, 12, 25; 59:6; 60:9

**TRIED** [4] 26:20; 34:23; 42:2; 44:7

**TROUBLE** [2] 21:9; 48:8

**TROUBLED** [2] 57:18; 58:10

**TRULY** [2] 23:23; 26:25

**TRYING** [4] 23:23; 43:8; 49:3, 7

**TURNED** [3] 55:22; 56:3, 21

**TURNS** [1] 41:4

─────────────
- U -
─────────────

**UNABLE** [2] 8:8; 52:10

**UNCLEAR** [1] 29:13

**UNCOMFORTAB LE** [1] 46:20

**UNCONTESTED** [3] 38:22; 39:3, 12

**UNCOVERED** [1] 16:24

**UNDER** [7] 11:14; 19:18; 22:14; 29:18; 40:4; 49:24; 52:5

**UNDERLYING** [2] 38:3, 15

**UNDERMINE** [1] 51:7

**UNDERSTAND** [14] 7:8; 8:12; 9:1; 11:7; 23:6, 7; 25:18; 27:12, 15, 23; 29:16; 43:8; 62:1

**UNDERSTANDIN G** [6] 4:3; 5:13; 20:5; 22:22; 48:1, 8

**UNDERSTOOD** [2] 6:12; 26:25

**UNDISPUTED** [5] 33:6; 34:16; 37:18; 38:13; 39:13

**UNFAIRLY** [1] 39:14

**UNFORTUNATE** [1] 6:9

**UNITED** [5] 1:1, 13, 15; 2:5

**UNJUSTIFIED** [1] 33:24

**UNLESS** [1] 32:23

**UNNOTICED** [1] 24:11

**UNORTHODOXE D** [1] 61:7

**UNRELATED** [1] 60:19

**UNTIL** [9] 27:8, 16; 38:1; 42:4, 21; 44:3, 14; 61:2, 20

**UPLOADED** [5] 12:17, 22; 15:12, 16; 19:3

**USEFUL** [1] 11:2

**USING** [3] 21:24; 23:8; 55:25

─────────────
- V -
─────────────

**VACANT** [1] 5:5

**VALUE** [2] 58:20, 21

**VARIETY** [2] 2:12; 12:15

**VENDOR** [1] 44:15

**VERSUS** [2] 2:5; 52:4

**VIJAY** [1] 1:7

**VIOLATED** [2] 19:24, 25

**VIOLATION** [5] 40:8; 49:24; 51:16; 55:18; 59:19

**VIOLATIONS** [2] 50:2; 60:6

**VIRGINIA** [1] 46:21

**VOLUME** [1] 26:21

**VOLUNTARILY** [1] 37:3

**VOUCHING** [6] 19:9, 10, 11, 12; 26:21

─────────────
- W -
─────────────

**WAITED** [1] 38:1

**WAIVER** [1] 9:22

**WANTED** [10] 3:21; 8:11; 10:19; 17:8; 18:3; 20:11; 34:20; 36:11; 47:17; 48:17

**WANTS** [3] 9:14, 17; 46:4

**WAREHOUSE** [3] 10:22; 27:5; 41:16

**WARRANT** [1] 49:1

**WARRANTED** [1] 37:16

**WARRANTS** [1] 53:18

**WASHINGTON** [4] 4:12; 7:17; 8:14; 48:25

**WASN'T** [11] 9:22; 14:20; 21:2, 3; 27:8, 25; 42:21; 43:5, 22; 48:6; 59:15

**WATER** [1] 8:21

**WE'LL** [1] 31:7

**WE'RE** [8] 2:12; 5:17; 9:20; 17:7; 21:11, 14; 24:6, 14

**WE'VE** [10] 5:25; 8:3; 26:16, 18; 27:16; 31:24; 38:25; 45:20, 21

**WEAKENED** [1] 58:6

**WEEKS** [1] 10:1

**WEREN'T** [4] 9:2; 15:6; 17:13; 19:18

**WHAT'S** [1] 10:7

**WHATEVER** [4] 5:17; 20:7; 26:8, 10

**WHATSOEVER** [1] 43:15

**WHERE** [13] 4:13; 5:23, 25; 7:17; 8:4, 18; 14:7; 15:3, 16; 26:7; 41:15; 51:18; 59:16

**WHETHER** [16] 6:13; 8:8; 12:2; 15:25; 17:24; 22:13; 28:5; 29:8; 31:8, 9; 38:24; 39:10; 46:19; 57:16, 17; 61:2

**WHICH** [33] 5:13; 6:1; 7:12; 10:21; 13:6, 15, 16, 18; 14:5; 21:4; 23:2; 24:2; 25:15, 25; 26:5, 9; 33:16, 23; 34:7; 40:17; 42:22; 44:6, 25; 47:18; 48:13, 24; 49:1; 54:13, 19; 55:21; 59:17; 60:16; 61:6

**WHO'S** [1] 28:25

**WHOLE** [6] 7:5; 11:8; 22:21; 26:14, 20; 27:2

**WILKINSON** [110] 1:16; 2:4, 6, 11; 3:17; 4:6, 7, 16, 24; 5:2, 8, 11; 6:4, 6, 22, 25; 7:14, 23; 9:13, 15, 24; 10:2, 4, 9, 14, 18, 24; 11:7, 16, 19, 22; 12:8; 13:2, 5, 9, 13, 17, 20, 25;

14:3, 13, 17, 23; 15:2, 9, 12, 15, 19, 22; 16:2, 4, 6, 10, 20, 23; 17:16, 19, 22; 18:1, 3, 7, 9, 12, 15, 18; 19:1, 10, 14; 20:20, 24; 21:13, 17, 21; 22:3, 5, 7, 17, 19; 23:4, 14, 16; 24:5, 25; 25:8; 27:21, 23, 25; 28:3, 9, 17, 20; 29:2; 32:5, 7, 12, 14; 41:7; 42:12; 43:3, 12; 45:23, 25; 46:14, 15, 24; 47:5, 6, 8; 49:14; 62:4

**WILKINSON'S** [1] 46:17

**WILLFULNESS** [1] 57:22

**WITHDRAW** [1] 61:15

**WITHHELD** [5] 37:5, 19; 40:24; 44:10; 45:4

**WITHIN** [3] 34:20; 52:15; 57:15

**WITHOUT** [3] 30:8; 31:17; 32:21

**WITNESS** [3] 31:3; 50:9; 55:20

**WITNESSES** [6] 40:1; 50:4; 52:10, 14; 54:10; 60:9

**WON'T** [1] 36:20

**WORDS** [2] 40:2; 41:3

**WORKING** [3] 19:7; 48:8; 52:5

**WORTH** [5] 24:16, 19, 20; 25:13, 18

**WOULD** [56] 5:13; 6:19; 8:5, 22; 10:24, 25; 11:4, 14; 19:21; 23:12; 26:5, 10; 27:20; 28:10; 29:7, 23; 30:12; 31:7, 8, 21; 32:9, 17; 33:3; 35:17, 18; 36:25; 37:2; 39:6, 13, 20; 40:3, 5, 7; 45:15; 47:1; 48:10, 14; 49:9, 19; 51:5, 18; 52:8; 53:13; 54:11; 55:6, 8; 56:5, 10, 21, 22; 58:6, 9; 61:16, 19; 62:2

**WOULDN'T** [2] 11:10; 45:4

**WRITING** [3] 3:18; 32:18; 50:23

**WRITTEN** [3] 9:19; 12:21; 49:12

**WRONG** [7] 6:13; 14:7; 18:19; 19:3; 24:7; 26:3; 55:10

**WROTE** [1] 53:25

- Y -

**YEARS** [2] 31:18; 32:25

**YESTERDAY** [3] 29:21; 30:22; 46:12

**YOU'RE** [5] 15:19; 30:12, 14, 20; 38:24

**YOU'VE** [2] 30:13; 46:8

- Z -

**ZEALOUS** [1] 26:15