**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| DUSTIN HIGGS, | ) | No. 2:20-cv-00665-JPH-DLP |
|  | ) |  |
| Petitioner, | ) |  |
|  | ) | **DEATH PENALTY CASE** |
| v. | ) |  |
|  | ) | *EXECUTION SCHEDULED** |
| T.J. WATSON, Warden, | ) | **FOR JANUARY 15, 2021*** |
| Federal Correctional Complex, Terre Haute, | ) |  |
|  | ) |  |
| Respondent. | ) |  |

**SECOND AMENDED PETITION
FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

Matthew C. Lawry
Federal Community Defender Office
 for the Eastern District of Pennsylvania
The Curtis, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Matthew_Lawry@fd.org

December 23, 2020

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

PROCEDURAL HISTORY....................................................................................................... 3

STATEMENT OF FACTS ........................................................................................................ 6

II.    MR. HIGGS'S CONVICTIONS AND DEATH SENTENCES WERE OBTAINED
       IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW WHERE THE
       GOVERNMENT WITHHELD EVIDENCE THAT IT INTERVENED IN THE
       BALTIMORE MURDER INVESTIGATION. ................................................................ 19

       A.    Mr. Higgs's Due Process Rights Were Violated. ................................................... 20

             1.    The Government Withheld Exculpatory Evidence of Mr. Gloria's
                   Lenient Treatment in Exchange for His Testimony.......................................21

             2.    The Withheld Information Was Material...........................................................25

       B.    Relief Is Appropriate under 28 U.S.C. § 2241........................................................ 27

             1.    Legal Standard. ................................................................................................28

             2.    Aside From Section 2241, Petitioner Has No Remedy for Newly
                   Discovered Evidence of *Brady* Violations........................................................29

III.   THE INDICTMENT DID NOT CHARGE A CAPITAL OFFENSE AND,
       THEREFORE, THE TRIAL COURT LACKED JURISDICTION TO TRY MR.
       HIGGS FOR CAPITAL OFFENSES. ............................................................................. 32

       A.    Statutory Aggravators Are an Element of a Capital Offense under the FDPA
             and Must Be Alleged in the Indictment. .................................................................. 33

       B.    Mr. Higgs Was Not Charged With a Capital Offense Because the Indictment
             Returned Against Him Did Not Adequately Allege a Single Statutory
             Aggravator. ............................................................................................................... 35

             1.    The Multiple Killings Statutory Aggravator Did Not Render the
                   Counts Death-Eligible Because of the Ex Post Facto Clause. ..........................35

             2.    The Grand Jury Was Neither Presented With nor Passed Upon the
                   Death During Commission of a Kidnapping Aggravator. .............................36

             3.    *Alleyne* Makes Clear that Prior Conviction Aggravators are Elements
                   of the Capital Offense and Must Be Alleged in the Indictment.......................39

       C.    The Failure to Allege a Capital Offense is Structural Error and the Indictment
             Did Not Confer Power on the District Court to Try Mr. Higgs for Capital
             Offenses. ................................................................................................................... 43

       D.    Mr. Higgs's Claim Is Appropriately Raised under § 2241 Because § 2255 Is
             an Inadequate Vehicle to Test the Legality of His Detention................................. 44

REQUEST FOR RELIEF ......................................................................................................... 48

## TABLE OF AUTHORITIES

**Federal Cases**

*Alleyne v. United States*, 570 U.S. 99 (2013) .......................................................................... 35, 41

*Almendarez-Torres v. United States* ....................................................................................... 39

*Anderson v. City of Rockford*, 932 F.3d 492 (7th Cir. 2019) ..................................................... 25

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ........................................................................ 33, 40

*Banks v. Dretke*, 540 U.S. 668 (2004) .................................................................................... 20, 26

*Beason v. Marske*, 926 F.3d 932 (7th Cir. 2019) ................................................................... 45

*Bernard v. United States*, No. 20A110 (20–6570), 2020 WL 7258344
(U.S. Dec. 10, 2020) ............................................................................................................. 29

*Bernard v. Watson*, No. 2:20-cv-00616-JRS-DLP, 2020 WL 7230886
(S.D. Ind. Dec. 8, 2020) ....................................................................................................... 30

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................................................. 1, 16, 29

*Chazen v. Marske*, 938 F.3d 851 (7th Cir. 2019) ................................................................... 44, 45

*Dunn v. United States*, 284 U.S. 390 (1932) ........................................................................ 37

*Ex parte Bain*, 121 U.S. 1 (1887) ........................................................................................ 43, 46

*Fontaine v. United States*, 411 U.S. 213 (1973) ................................................................... 24

*Giglio v. United States*, 405 U.S. 150 (1972) ....................................................................... 16, 21, 23

*Gonzalez v. Thaler*, 565 U.S. 134 (2012) ............................................................................ 46

*Hamling v. United States*, 418 U.S. 87 (1974) ..................................................................... 34, 36

*Higgs v. United States*, 138 S. Ct. 2572 (2018) ................................................................... 5

*Higgs v. United States*, 542 U.S. 999 (2004) ....................................................................... 4

*Higgs v. United States*, 543 U.S. 1004 (2004) ..................................................................... 4

*Higgs v. United States Park Police*, 933 F.3d 897 (7th Cir. 2019) ........................................ 6

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998) .................................................................... 28

*Johnson v. United States*, 576 U.S. 591 (2015) .................................................................. 5

*Jones v. United States*, 526 U.S. 227 (1999) ...................................................................... 39

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................................ *passim*

*Lafuente v. United States*, 617 F.3d 944 (7th Cir. 2010) ..................................................... 24

*Lee v. Watson*, 964 F.3d 663 (7th Cir. 2020) ...................................................................... 28, 45

*Machibroda v. United States*, 368 U.S. 487 (1962) ............................................................. 24

*Mathis v. United States*, 136 S. Ct. 2243 (2016) ................................................................ 41

*Purkey v. United States*, 964 F.3d 603 (7th Cir. 2020) ....................................................... 28, 32, 45

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................................................. 33, 40

*Roundtree v. Krueger*, 910 F.3d 312 (7th Cir. 2018) ................................................... 45

*Ruiz-Cortez v. City of Chicago*, 931 F.3d 592 (7th Cir. 2019) ................................... 26

*Sanders v. United States*, 373 U.S. 1 (1963) .............................................................. 24

*Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003) .................................................. 35, 40

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .............................................................. 41

*Shepard v. United States*, 544 U.S. 13, (2005) ...................................................... 41, 42

*Sims v. Hyatte*, 914 F.3d 1078 (7th Cir. 2019) .......................................................... 26

*Smith v. Cain*, 565 U.S. 73 (2012) .............................................................................. 25

*Smith v. United States*, 360 U.S. 1 (1959) .................................................................. 43

*Stirone v. United States*, 361 U.S. 212 (1960) ................................................. 33, 34, 44

*Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002) .......................................................... 29

*United States v. Agurs*, 427 U.S. 97 (1976) ............................................................... 21

*United States v. Allen*, 406 F.3d 940 (8th Cir. 2005) ................................................. 34

*United States v. Bagley*, 473 U.S. 667 (1985) ................................................. 20, 21, 23

*United States v. Bernard*, 820 F. App'x 309 (5th Cir. 2020) ................................. 31, 32

*United States v. Cotton*, 535 U.S. 625 (2002) ............................................................ 43

*United States v. Davis*, 139 S. Ct. 2319 (2019) ............................................................ 5

*United States v. Farr*, 536 F.3d 1174 (10th Cir. 2008) .............................................. 44

*United States v. Fulcher*, 626 F.2d 985 (D.C. Cir. 1980) .......................................... 37

*United States v. Hajecate*, 683 F.2d 894 (5th Cir. 1982) ........................................... 37

*United States v. Haynes*, 26 F. App'x 123 (4th Cir. 2001) ........................................... 6

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992) .......................................... 37

*United States v. Higgs*, 95 F. App'x 37 (4th Cir. 2004) ............................................... 4

*United States v. Higgs*, 193 F. Supp. 3d 495 (D. Md. 2016) ..................... 5, 19, 22, 32

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ....................................... *passim*

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) .............................................. 4, 7

*United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) ............................ 4, 17, 29

*United States v. LeCoe*, 936 F.2d 398 (9th Cir. 1991) ............................................... 37

*United States v. Linder*, 552 F.3d 391 (4th Cir. 2009) ............................................... 45

*United States v. Magini*, 973 F.2d 261 (4th Cir. 1992) .............................................. 25

*United States v. McDowell*, 745 F.3d 115 (4th Cir. 2014) .......................................... 42

*United States v. Morris*, 293 F.3d 1010 (7th Cir. 2002) ............................................. 42

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002) .............................................. 34

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) ............................................... 45

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004) ........................................................ 33

*United States v. Salem*, 578 F.3d 682 (7th Cir. 2009) ......................................................... 26, 27

*United States v. Terry*, 240 F.3d 65 (1st Cir. 2001) ................................................................. 42

*United States v. Williams*, 410 F.3d 397 (7th Cir. 2005) ......................................................... 42

*United States v. Yefsky*, 994 F.2d 885 (1st Cir. 1993) .............................................................. 37

*Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) ............................................................ 28, 45

## Federal Statutes

18 U.S.C. § 924 ....................................................................................................................... 38

18 U.S.C. § 1111 ........................................................................................................ 3, 36, 37, 38

18 U.S.C. § 1201 ........................................................................................................ 3, 36, 37, 38

18 U.S.C. § 3591 ....................................................................................................................... 34

18 U.S.C. § 3592 ................................................................................................................ *passim*

18 U.S.C. § 3593 ....................................................................................................................... 34

28 U.S.C. § 2241 ................................................................................................................ *passim*

28 U.S.C. § 2244 ....................................................................................................................... 29

28 U.S.C. § 2255 ................................................................................................................ *passim*

## State Statutes

Md. Code. § 3-203 .................................................................................................................... 23

## Other

Federal Rule of Civil Procedure 60 .................................................................................. 2, 4, 28

Federal Rule of Criminal Procedure 7 .................................................................................... 37

U.S. Const. amend. V ................................................................................................................ 34

**INTRODUCTION**

Dustin Higgs is incarcerated on federal death row for a capital triple homicide committed on federal land in Maryland. He is scheduled to be executed on January 15, 2021. The critical witness against him was Victor Gloria, a cooperating co-defendant whom one of the trial prosecutors admitted was indispensable to obtaining Mr. Higgs's convictions, let alone his death sentences. Prior to Mr. Higgs's trial, Mr. Gloria became a suspect in an unrelated homicide in Baltimore. The state authorities in Baltimore charged with investigating that homicide were in touch with the federal prosecutors charged with trying Mr. Higgs on the very day that Mr. Gloria became a suspect. Federal authorities later informed state authorities that they believed the witnesses identifying Mr. Gloria as the perpetrator of the Baltimore murder were conspiring to frame him. Adopting that theory, the Baltimore authorities declined to charge Mr. Gloria with any crime and did not even interview him despite his unquestioned presence at the scene of the murder.

Mr. Higgs eventually gleaned some information about Mr. Gloria's involvement in the Baltimore homicide and federal authorities' intervention to protect him as a witness post-conviction. He claimed in his motion under 28 U.S.C. § 2255 that federal authorities' undisclosed actions in shielding Mr. Gloria from a homicide charge violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. He lost this challenge, in large measure because he did not have hard evidence to support it. Although counsel for Mr. Higgs had requested the police and prosecutor's file for the Baltimore murder during § 2255 proceedings, he did not receive either.

It was not until two years after the denial of Mr. Higgs's § 2255 motion that he was able to obtain the Baltimore Police file through a subsequent request. The materials in the file substantiated his § 2255 allegations. One of the federal trial prosecutors was in direct

1

communication with the chief of the Baltimore City State's Attorney's Office homicide unit. The Baltimore homicide chief then instructed the lead detective in the Baltimore case to speak with federal agents to learn "background" on Mr. Gloria, which would inform their decision whether to charge him.

Mr. Higgs sought to litigate this newly available information via a motion to set aside the final judgment denying § 2255 relief under the fraud-on-the-court doctrine of Federal Rule of Civil Procedure 60(d). The Maryland district court denied the motion under the stringent standards of Rule 60(d).

Mr. Higgs is filing this habeas petition pursuant to 28 U.S.C. § 2241 because he will otherwise be without adequate remedy to obtain relief on his *Brady* claim. Section 2255 proceedings proved inadequate to litigate the claim, because the Government withheld the evidence necessary to prove it until after they were over. Obtaining a ruling on the underlying substantive *Brady* claim is now impossible except under § 2241. It is the only forum in which he may receive merits review of his significant *Brady* claim prior to being executed.

In this petition, Mr. Higgs also seeks an opportunity to vindicate his Fifth Amendment right to an indictment by grand jury. When properly analyzed and considered in light of recent Supreme Court decisions, the Second Superseding Indictment failed to allege a single statutory aggravator, a necessary element of a capital offense. As such, Mr. Higgs was convicted of a crime that was not charged by the grand jury. The prohibition on relitigating claims raised on direct appeal bars raising these issues in a § 2255 motion and, thus, § 2241 is also the proper vehicle for reviewing the constitutionality of Mr. Higgs's continued detention in light of intervening law.

2

## PROCEDURAL HISTORY

On December 21, 1998, Mr. Higgs, along with co-defendant Willis Haynes, was indicted on charges connected with the January 27, 1996, shooting deaths of Tanji Jackson, Tamika Black, and Mishann Chinn in the United States District Court for the District of Maryland. On December 20, 1999, a grand jury returned a Second Superseding Indictment charging Mr. Higgs with multiple counts of murder (18 U.S.C. § 1111(a)), three counts of kidnapping resulting in death (18 U.S.C. § 1201(a)), and other related offenses.[1]

The cases against Mr. Haynes and Mr. Higgs were severed for trial. Mr. Haynes was tried first and sentenced to life in prison without release. Mr. Higgs was tried next and on October 11, 2000, was found guilty of three counts each of first-degree premeditated murder, first-degree murder committed during a kidnapping, and kidnapping resulting in death, along with firearms charges. *See United States v. Higgs*, 353 F.3d 281, 289 (4th Cir. 2003) (*Higgs-1*).

With regard to each of the six counts of murder (18 U.S.C. § 1111(a)) and each of the three counts of kidnapping resulting in death (18 U.S.C. § 1201(a)), the petit jury found the existence of three statutory aggravating factors:

(1)    multiple killings in a single criminal episode under 18 U.S.C. § 3592(c)(16);

(2)    previous conviction of a violent felony involving a firearm under 18 U.S.C. § 3592(c)(2); and

(3)    previous conviction for a serious federal drug offense under 18 U.S.C. § 3592(c)(12).

With regard to the six murder counts, the jury found an additional statutory aggravating factor that the deaths occurred during the commission of a kidnapping. *See* 18 U.S.C.

---

[1] The Government proceeded to trial on the Second Superseding Indictment and it is the operative document.

3

§ 3592(c)(1). The jury recommended death sentences on the nine death-eligible counts. *Higgs-1*, 353 F.3d at 289.

The Fourth Circuit upheld the convictions and sentences on direct appeal. It rejected Mr. Higgs's Fifth Amendment challenge alleging that the Superseding Indictment failed to adequately allege a statutory aggravating factor, an element necessary to charge a capital offense under the Federal Death Penalty Act. *Higgs-1*, 353 F.3d at 300-301. While the direct appeal was pending, Mr. Higgs filed a motion for a new trial, alleging that the Government had improperly withheld exculpatory material relating to two witnesses. The district court denied the motion for new trial, and the Fourth Circuit again affirmed. *United States v. Higgs*, 95 F. App'x 37 (4th Cir. 2004). Certiorari was denied with respect to each appeal. *Higgs v. United States*, 542 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

Mr. Higgs then filed a motion for relief under 28 U.S.C. § 2255 in the Maryland district court. On April 7, 2010, the district court denied the § 2255 motion without argument, discovery, or a hearing. *United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) (*Higgs-2*). The court subsequently denied Mr. Higgs's motions for reconsideration and for a certificate of appealability (COA).

Mr. Higgs then sought a COA from the Fourth Circuit on numerous issues. The circuit denied a COA on all but one issue, regarding the Government's withholding of exculpatory material relating to comparative bullet lead analysis and counsel's ineffectiveness in handling the issue, and subsequently denied relief. *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) (*Higgs-3*), *cert. denied,* 568 U.S. 1069 (2012).

Mr. Higgs subsequently filed a motion in the District Court of Maryland seeking to set aside his final judgment under Federal Rule of Civil Procedure 60(d) due to fraud on the court.

4

The 60(d) motion argued that the Government did not disclose all of the benefits received prior to trial by the Government's key witness, cooperating co-defendant Victor Gloria. In particular, the motion alleged Mr. Gloria was a suspect in an unrelated state murder prosecution, but that he was not charged after federal prosecutors and agents intervened on his behalf, and that the Government never disclosed these facts. The motion was denied by the district court, *United States v. Higgs*, 193 F. Supp. 3d 495 (D. Md. 2016) (*Higgs-4*), and a COA was again denied in the Fourth Circuit, *Higgs v. United States*, No. 16-15 (4th Cir. 2017). The Supreme Court denied certiorari. *Higgs v. United States*, 138 S. Ct. 2572 (2018) (Mem.).

Meanwhile, Mr. Higgs sought and was denied permission from the Fourth Circuit to file a successive motion for relief pursuant to 28 U.S.C. § 2255, predicated on the United States Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015). *See* ECF No. 13, *In re Higgs*, No. 16-8 (4th Cir. June 27, 2016). Following the Fourth Circuit's denial of permission to file a successive § 2255 motion, Mr. Higgs filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 in this Court, in a further attempt to litigate his *Johnson* claim.[2] That petition was denied on April 30, 2020, ECF No. 42, *Higgs v. Daniels*, No. 2:16-cv-321-JMS-MJD (S.D. Ind. Apr. 30, 2020), and is currently pending on appeal in the United States Court of Appeals for the Seventh Circuit, *Higgs v. Watson*, No. 20-2129 (7th Cir.).

Mr. Higgs also filed a lawsuit in this Court seeking to obtain documents contained in his police investigative file pursuant to the Freedom of Information Act. The parties' cross-motions for summary judgment were each granted in part and denied in part in this Court. *See* ECF No.

---

[2] Mr. Higgs filed a second motion for permission to file a successive § 2255 petition in the Fourth Circuit following the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). That motion was likewise denied. *See* ECF No. 20, *In re Higgs*, No. 20-2 (4th Cir. Feb. 6, 2020).

73, *Higgs v. United States Park Police*, No. 2:16-cv-96-JMS-MJD (S.D. Ind. June 25, 2018). The

Seventh Circuit granted the Government's cross-appeal and determined that the Government was

not obliged to turn over any additional documents to Mr. Higgs. *Higgs v. United States Park

Police*, 933 F.3d 897, 900 (7th Cir. 2019).

On August 4, 2020, the Government moved in the Maryland district court to amend Mr.

Higgs's final judgment. In so moving, the Government sought to have the district court designate

Indiana as the state in which to implement Mr. Higgs's death sentence. *See* ECF No. 640, *United

States v. Higgs*, No. 98-cr-520-PJM (D. Md. Aug. 4, 2020). As of this filing, the Maryland

district court has yet to rule on the Government's motion. Nonetheless, on November 20, 2020,

the Government informed Mr. Higgs that it had scheduled his execution for January 15, 2021.

On December 14, 2021, Mr. Higgs filed a pro se § 2241 petition raising the second of the

two claims in this counseled amended petition. Dkt. 1. On December 17, 2021, Mr. Higgs filed a

similar but not identical § 2241 petition, which this Court construed as an amended § 2241

petition. Dkt. 8, 11.

## STATEMENT OF FACTS

### 1.    The trial and Victor Gloria's testimony.

During the early morning hours of January 27, 1996, Ms. Jackson, Ms. Black, and Ms.

Chinn were found murdered along Route 197 in the Patuxent National Wildlife Refuge in Prince

George's County, Maryland. Mr. Haynes, Mr. Gloria, and Mr. Higgs were charged in the

killings. Mr. Haynes's and Mr. Higgs's cases were severed for trial; Mr. Gloria pleaded guilty

and was the Government's key witness at both trials. Mr. Haynes was tried first; although the

Government sought the death penalty against him, he received a life sentence. *See United States

v. Haynes*, 26 F. App'x 123 (4th Cir. 2001).

Mr. Higgs was tried next. The case against him was based primarily on the testimony of Mr. Gloria. *See Higgs-1*, 353 F.3d at 289 n.1 ("Most of the facts surrounding the murders of the three women were obtained from [Mr. Gloria's] eyewitness testimony."). Mr. Gloria testified that during an evening of socializing at Mr. Higgs's apartment, an argument took place between Mr. Higgs and Ms. Jackson. *Id.* at 289. According to Mr. Gloria, this argument led Mr. Higgs to want to have the victims killed. *Id.* at 289-90. Mr. Gloria testified that after the three women left the apartment following the fight, Mr. Higgs got a gun and told Mr. Haynes to get the three women into Mr. Higgs's vehicle. *Id.* at 290. Mr. Gloria testified that he then got in the back seat of Mr. Higgs's vehicle and observed Mr. Higgs drive the three women to a secluded location along Route 197 while having whispered conversations with Mr. Haynes, pull over, and hand Mr. Haynes the gun with which to carry out the killings. *Id.*

While other evidence supported Mr. Higgs's presence at the scene, the allegation that Mr. Higgs aided, abetted, or caused Mr. Haynes to commit the killings was unsupported by any evidence other than Mr. Gloria's testimony. According to one of the trial prosecutors, the Government "could not have proceeded and obtain[ed] a conviction against Mr. Higgs" without Mr. Gloria's testimony. *See* Dkt. 13-1 at 4 (Gloria Sentencing Tr. at 4:8-12). The district court concurred in that assessment. *See* Dkt. 13-1 at 16 (Gloria Sentencing Tr. at 16:14-20) (describing Mr. Gloria as "the critical link in the conviction of these two men," and finding that "[t]hat is the most important thing about [Gloria] at this point in the sentencing, and it overrides everything else"); *see also Higgs-3*, 663 F.3d at 730 ("At trial, [Gloria] provided a detailed, eyewitness account of the kidnappings and murders . . . ."); *id.* at 741 ("Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them.").

Mr. Gloria testified pursuant to a plea agreement, under which he pleaded guilty to a single count of accessory after the fact to the homicides. He was eventually sentenced to 84 months' imprisonment and three years' supervised release. Dkt. 13-1 at 6 (Gloria Sentencing Tr. at 6:14-20). At trial, he was impeached on various grounds, including his prior inconsistent statements concerning the homicides and heavy alcohol and drug use on the night of the murders.

### 2.    Victor Gloria and the murder of Martrelle Creighton.

Following the Route 197 murders but prior to Mr. Higgs's trial, Mr. Gloria was present at the scene of, and a suspect in, an unrelated homicide in Baltimore.[3] Although law enforcement suspected the involvement of Mr. Gloria in the Route 197 murders early on in their investigation, Mr. Gloria was not arrested until almost three years after the killings, on October 5, 1998. Thus, on July 18, 1998, when Martrelle Creighton was murdered in Baltimore's Inner Harbor area, Mr. Gloria was not yet in custody.

At approximately 2:00 a.m. on July 18, Mr. Creighton was found by police lying on the sidewalk, suffering from a single stab wound to the neck. Dkt. 13-2 at 1. Mr. Creighton was immediately transported to the University of Maryland Shock Trauma Center for treatment, but was pronounced dead at approximately 2:30 a.m. *Id*.

Baltimore Police soon learned that Mr. Creighton's murder was precipitated by two groups of young men arguing over a group of young women. *Id*. at 3. One of the groups of men

---

[3] As is discussed in greater detail below, most of the information recited herein regarding the Baltimore homicide and all of the information regarding federal authorities' involvement in the Baltimore homicide investigation only became known to Mr. Higgs when he obtained a copy of the Baltimore Police file in 2012 (two years after the district court's final judgment denying § 2255 habeas relief) through his continuing investigative efforts.

was comprised of Mr. Creighton and his friends. *Id.* The other group of men was comprised of Victor Gloria, Kevin Miller, and twin brothers Keith and Kevin Scott. Dkt. 13-3 at 2.

The trouble in the Inner Harbor began when Mr. Creighton's group attempted to strike up a conversation with the group of young women. Dkt. 13-2 at 3. The young women, who did not previously know anyone in Mr. Creighton's group, were not interested. *Id.* Shortly thereafter, the young women began talking with Mr. Gloria's group, whom they also had not known previously. *Id.*

Mr. Creighton apparently became angry that the young women were talking to members of Mr. Gloria's group, given that they had been uninterested in talking with Mr. Creighton's group. *Id.* As a result, Mr. Creighton began yelling at the young women as well as at Mr. Gloria's group. *Id.* With minor variations, every witness interviewed by Baltimore Police, which included members of Mr. Creighton's group, members of the group of young women, and Mr. Miller and the Scott twins (but not Mr. Gloria), gave essentially the same account of the lead up to the stabbing.

At that point, however, the accounts began to differ, with some tending to inculpate Mr. Gloria as the killer and others tending to inculpate Mr. Miller. Clarence White, a friend of Mr. Creighton's, was interviewed by Baltimore Police on the night of the stabbing. Dkt. 13-4 at 1. Handwritten police notes from this unrecorded interview indicate that Mr. White described how once the altercation began, a man with "light skin" – a description consistent with Mr. Gloria – swung at Mr. Creighton, at which point Mr. Creighton "grabbed his neck and was bleeding bad." Dkt. 13-5 at 1-2. Mr. White also stated that there were three or four members of the stabber's group, who all ran away together after the stabbing. *Id.* at 1. Mr. White was re-interviewed nearly a year later, on June 11, 1999, at which point he changed his account to indicate that the

9

stabber was "brown skinned," a description more consistent with Mr. Miller. Dkt. 13-6 at 2-3.

Mr. White also stated in the second interview that he definitely saw three people involved in the

altercation with Mr. Creighton. *Id.* at 2-3. Mr. White identified the three individuals involved as

the Scott twins and Mr. Miller. *Id.* at 4-6.

David Bishop, another friend of Mr. Creighton's, was also interviewed on the night of the

stabbing and said that he saw both a man matching the description of Mr. Miller and a "light skin

dude" (consistent with Mr. Gloria's appearance) punch Mr. Creighton. Dkt. 13-7 at 2. Mr.

Bishop did not initially realize that Mr. Creighton had been stabbed, although Mr. Bishop

assumed – once he realized that Mr. Creighton had been stabbed – that it was the man matching

Mr. Miller's description who did the stabbing. *Id.* at 3-4.

Sisters Barbara and Charnetta Bailey, who were in the group of young women, were

initially interviewed by police on July 29th, 1998, and August 12th, 1998, respectively. Dkt. 13-

8, 13-9. Both women said that around the time the confrontation between the two groups of men

started, they started to walk away and had their backs turned when it began. *Id.* Both women also

stated that at the beginning of the altercation they turned around to see Mr. Gloria run away and

Mr. Creighton and Mr. Miller engage in a brief fistfight in which Mr. Miller punched Mr.

Creighton. *Id.* Like Mr. White and Mr. Bishop, neither Bailey sister realized that Mr. Creighton

had been stabbed. *Id.*

The Scott twins were first interviewed by police on February 2, 1999, when they were

arrested in connection with the stabbing. The Scott twins each said that it was Mr. Gloria who

stabbed Mr. Creighton, although they, too, did not initially realize that Mr. Creighton had been

stabbed. Dkt. 13-10, 13-11. The Scott twins both said that Mr. Gloria punched Mr. Creighton and

then ran away, and that they did not see Mr. Miller fighting with Mr. Creighton at all. *Id.*

10

Mr. Miller was arrested and interviewed by police on April 7, 1999. Mr. Miller also said that Mr. Gloria punched Mr. Creighton and then ran away. Dkt. 13-12. Mr. Miller said that he himself then threw a punch at one of Mr. Creighton's friends, but never hit Mr. Creighton. *Id.* Mr. Miller denied stabbing Mr. Creighton and stated that he did not realize when he began fighting that Mr. Creighton had been stabbed. *Id.*

Baltimore Police were thus left with conflicting accounts of who stabbed Mr. Creighton. Some of the accounts tended to suggest that it was Mr. Gloria, and some tended to suggest it was Mr. Miller. All of the accounts described a chaotic atmosphere, with almost no one initially having realized that Mr. Creighton had been stabbed.

### 3. Federal authorities and the Creighton murder investigation.

Although this fact was unknown to Mr. Higgs until he received a copy of the Creighton homicide file in 2012, Federal authorities became aware of Mr. Gloria's involvement in the Creighton murder on February 2, 1999 – the same day the Scott twins identified Mr. Gloria as the killer. Dkt. 13-14. A handwritten note with that date in the Baltimore Police file lists the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. *Id.* It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers is the following notation: "JAN '96 – 3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Mr. Haynes, Mr. Higgs, and Mr. Gloria, along with certain other identifying information. *Id.* In other words, the very day that Mr. Gloria was first named as the killer of Mr. Creighton, Baltimore authorities were in contact with the federal authorities responsible for Mr. Higgs's capital prosecution.

11

Detective Green had further contact with Baltimore Police the following day, February 3, 1999. On that date, Detective Green retrieved a photographic lineup previously created by the Park Police, which included Mr. Gloria, and provided it to the Baltimore Police. Dkt. 13-15.

The Baltimore Police file also contains a handwritten note dated one week later, February 10, 1999, which includes the notation: "Case Agent for Victor Gloria S/A Brad Sheafe FBI Calverton Office." Dkt. 13-16. Under this notation are two different telephone numbers. *Id.* Several additional, undated, handwritten notes also contain the names of Detective Green and Detective Abt, along with telephone numbers and information relating to the murders on Route 197. Dkt. 13-17, 13-18, 13-19.

At some point, a member of the Baltimore Police Department traveled, or at least made plans to travel, to the office of the United States Park Police, presumably in order to meet with a Park Police officer regarding Mr. Gloria. *See* Dkt. 13-20 (undated handwritten note with the words "Directions to U.S. Park Police" written across the top, underneath which are directions from Baltimore to the Park Police office).

The Creighton file further reveals that not only were members of the Baltimore Police Department in contact with federal law enforcement agents, but the chief homicide prosecutor in the Baltimore City State's Attorney's Office, Mark Cohen, was in direct communication with Assistant United States Attorney Deborah Johnston, who prosecuted Mr. Higgs at trial and represented the Government during Mr. Higgs's § 2255 proceedings. Dkt. 13-21. The note recounting the Johnston-Cohen conversation, authored by Mr. Cohen on April 12, 1999, indicates that Ms. Johnston suggested to Mr. Cohen that Mr. Miller and the Scott twins might be

12

falsely implicating Mr. Gloria.[4] *Id.* The note also shows that Mr. Cohen, the person with the authority to bring charges against Mr. Gloria for the Baltimore homicide, was inclined to charge Mr. Gloria, but deferred his decision until after he received "background" information from federal agents regarding the unrelated investigation into the Route 197 homicides. *Id.* Mr. Cohen's note states in full:

> Bobby
>
> Re Victor Gloria
>
> 1   I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed. The two Co-Δ's Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt. Co-Δ.
>
> 2   AUSA Johnston stated that it is possible that Co-Δ's - Scott, Scott + Miller are blaming Gloria because they are friends of Δ's in her case especially Haynes. She suggested we talk to
>
> ①   Joe Green Park Police
>
> B - [phone number]
>
> ②   Brad Sheafe - FBI
>
> B - [phone number]
>
> -they could give us background on case
>
> 3   After we talk to these officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case.
>
> 4   Please call me
>
> Mark Cohen

*Id.*

---

[4] The note is addressed to "Bobby," presumably Baltimore Homicide Detective Robert Patton, who authored a number of reports relating to the investigation.

13

While Mr. Cohen reported that the United States Attorney's Office could not disclose whether Mr. Gloria was going to testify against Mr. Higgs and Mr. Haynes because Mr. Gloria's plea agreement was sealed, the federal prosecutors' reluctance to share this information was short-lived. In a report dated April 21, 1999, Baltimore Police Detective Robert Patton noted that "[p]er the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller." Dkt. 13-22 at 1 (text reproduced as it appears in original). Detective Patton's report continues by noting that the United States Attorney's Office conveyed to Baltimore authorities its belief, ostensibly based on the unrelated federal investigation, that all three eyewitnesses who identified Mr. Gloria as the murderer were falsely implicating him as a form of retaliation due to their friendship with Mr. Haynes and Mr. Higgs:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

Dkt. 13-22 at 2 (text reproduced as it appears in original).

The report then notes that:

> Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

> In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

14

*Id.* (text reproduced as it appears in original).

### 4. The resolution of the Creighton murder case.

The Baltimore authorities charged Mr. Miller and each of the Scott twins with first degree murder. Dkt. 13-23, 13-24. Mr. Gloria was the only member of the group not charged with first degree murder; he received no charges at all arising from this incident and was never interviewed by Baltimore authorities.[5]

The Scott twins both entered pleas to second degree assault and were sentenced to time served. Dkt. 13-25, 13-26. They were released from custody on August 30, 1999, having served approximately seven months in jail. *Id.* Mr. Miller pleaded guilty to second degree murder, but pursuant to a negotiated plea agreement he received an extraordinarily low sentence, given that he supposedly killed a man in the middle of downtown by stabbing him in the neck: twenty years, with all but five years suspended. Dkt. 13-27. This five-year sentence was made concurrent to any other sentence, with credit for time already served. Dkt. 13-29. Mr. Miller also received three years of probation upon release. *Id.* The sentencing judge justified his extreme downward departure from the guidelines range as follows: "muddled factual statement leaves few things clear: someone died and the Def. was involved." Dkt. 13-28.

Mr. Miller did not serve his full five-year term; he was released from prison in July 2002, three years and three months after he was first arrested. Dkt. 13-30.

---

[5] The fact that Mr. Gloria was never interviewed is even more remarkable given that he had previously pleaded guilty to threatening another individual with a knife during a fight. Dkt. 13-13 (Application for Statement of Charges, 9/28/96).

## 5.    The first § 2255 proceedings.

During the course of their investigation for the § 2255 proceedings, Mr. Higgs's counsel

learned that Mr. Gloria had been a suspect in a Baltimore murder, and that he may not have been

prosecuted in that case because he was to be the star witness in federal capital cases against Mr.

Higgs and Mr. Haynes. Because Mr. Gloria's role in the Baltimore homicide and federal

authorities' intervention into the state authorities' investigation was not disclosed to trial counsel,

Mr. Higgs alleged that the Government had not turned over all of the material relating to Mr.

Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United*

*States*, 405 U.S. 150 (1972), and their progeny. Specifically, Mr. Higgs alleged that Mr. Gloria

was a suspect, but was never charged, in an unrelated homicide in Baltimore. ECF No. 492,

*United States v. Higgs*, No. 98-cr-520-PJM, Motion to Vacate 33 (D. Md. Nov. 28, 2005). Mr.

Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the

Government, "in an effort to preserve his status as a testifying witness in this federal capital

triple homicide case," and that the Government's failure to disclose this consideration violated

Mr. Higgs's due process rights. *Id.*[6]

In the § 2255 proceedings, Mr. Higgs moved for discovery, including *Brady* material.

ECF No. 509, *United States v. Higgs*, No. 98-cr-520-PJM, Motion for Discovery 1 (D. Md. July

1, 2006). In that motion, Mr. Higgs specifically referenced Mr. Gloria's involvement in the

Baltimore homicide. *Id.* at 12-13. Mr. Higgs requested any information in the possession of the

Baltimore City State's Attorney's Office "regarding Mr. Gloria's participation in and/or non-

---

[6] Pretrial, the defense and the Government had entered into a discovery agreement, under which the Government agreed to provide *Jencks* and *Giglio* material no later than one week prior to trial, and other *Brady* material "if and when discovered." Dkt. 13-31.

prosecution for the above described homicide." *Id.* at 13. Mr. Higgs also made a more general request for "all relevant and exculpatory witness and law enforcement statements" not previously provided. *Id.* at 15.

The Government did not disclose the facts that Mr. Gloria had been identified by multiple eyewitnesses as the killer of Mr. Creighton; that federal authorities had been in contact with state authorities responsible for the Baltimore murder investigation; or that Mr. Gloria was not charged in the Baltimore homicide, following the federal authorities' intervention.

In its response to Mr. Higgs's § 2255 motion, the Government argued that Mr. Higgs's "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials." ECF No. 519, *United States v. Higgs*, No. 98-cr-520-PJM, Motion to Strike 88 (D. Md. Nov. 8, 2006). The Government described Mr. Higgs's allegations regarding the undisclosed leniency afforded to Mr. Gloria as mere "speculation about the Government's knowledge or actions." *Id.* The Government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial." *Id.* at 86. The Government also resisted Mr. Higgs's discovery and *Brady*/*Giglio* requests pertaining to Mr. Gloria, arguing that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." *Id.* at 72.

Relying in part on the Government's representations, the Maryland district court denied the *Brady* claim relating to Mr. Gloria, as well as Mr. Higgs's request for discovery. *Higgs-2*, 711 F. Supp. 2d at 507-09, 557.

17

**6.      Mr. Higgs's attempts to obtain the Baltimore Police and Park Police files.**

During the original § 2255 proceedings, Mr. Higgs sought, through investigative efforts and discovery requests, to obtain documentary evidence about Mr. Gloria's involvement in the Creighton homicide and the Federal Government's intervention in that case. Mr. Higgs sent a written request for the complete investigation file to the Baltimore Police and filed a discovery motion in the § 2255 litigation. Mr. Higgs was unsuccessful, however, as the Baltimore Police only turned over a one-page summary report and the Government opposed Mr. Higgs's § 2255 discovery requests, which the district court denied.

In the spring of 2012, Mr. Higgs attempted, a second time, to obtain the Baltimore Police file via written request. Whereas the Baltimore Police responded to Mr. Higgs's first written request by turning over a one-page summary report, they responded to his second written request by turning over their 640-page investigative file, with some information redacted.[7] Mr. Higgs came into possession of the file in September 2012.

**7.      Mr. Higgs's motion to set aside the district court's final judgment.**

On December 4, 2014, Mr. Higgs filed his Rule 60(d) Motion and a renewed motion for production of exculpatory evidence and for discovery. ECF No. 579, *United States v. Higgs*, No. 98-cr-520-PJM, Motion for Relief 1 (D. Md. Dec. 4, 2014) (hereinafter "Rule 60(d) Motion"); ECF No. 580, Renewed Motion for Production 1. The Rule 60(d) Motion argued that, in light of the information that had thus far come to light regarding the Creighton murder investigation and federal authorities' involvement therein, the Government's representations made during the original § 2255 litigation in response to Mr. Higgs's *Brady* claim were materially false. Rule

---

[7] There is no apparent reason why the two requests were handled so differently by the Baltimore Police.

60(d) Motion 1-28. The motion further argued that because all aspects of the district court's original ruling on the *Brady* claim were affected by the Government's misrepresentations, the original judgment denying habeas relief should be set aside under Rule 60(d), pursuant to the fraud on the court doctrine. *Id.* The motion argued that while the district court should grant relief on the existing record, at a minimum it should hold a hearing on the motion, given that as-yet undisclosed evidence and testimony would likely provide further support for Mr. Higgs's allegation that Baltimore authorities were influenced in their charging decision by the intervention of federal authorities. *Id.*

The district court denied the Rule 60(d) Motion without granting an evidentiary hearing because it determined that Mr. Higgs was not entitled to relief under the stringent fraud-on-the-court standard; it likewise denied Mr. Higgs's renewed discovery request. *Higgs*-4, 193 F. Supp. 3d at 513-15.

Two months after the denial of Rule 60(d) motion, one of the trial prosecutors in Mr. Higgs's case was founded to have committed extensive *Brady* violations in another case, resulting in the dismissal of the indictment with prejudice. *See* Dkt. 15-35 at 59 (Tr. at 59:19-22) ("The failure to disclosure [sic] is in violation of *Brady*, the history of late disclosures and the promotion of false significant testimony in this case does shock the conscience of this Court."); Dkt. 13-34.

I.    **MR. HIGGS'S CONVICTIONS AND DEATH SENTENCES WERE OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW WHERE THE GOVERNMENT WITHHELD EVIDENCE THAT IT INTERVENED IN THE BALTIMORE MURDER INVESTIGATION.**

The Government withheld from the defense the facts that (a) Mr. Gloria was a suspect in the Baltimore murder, and (b) the Government intervened with Baltimore authorities to suggest a theory for why the evidence implicating Mr. Gloria for that murder was flawed. Those facts

19

constitute exculpatory impeachment evidence within the meaning of *Brady*. Mr. Gloria's knowledge that the Government was aware of his vulnerability to first-degree murder charges in Baltimore gave him a powerful interest in making himself as indispensable as possible to the Government in the hopes that he might be shielded from accountability in Baltimore. This evidence was material, given that Mr. Gloria was the central witness against Mr. Higgs at trial, without whose testimony the Government would not have been able to procure a conviction, let alone a death sentence. Moreover, there are unquestionably additional unknown details about what precisely the Government told Mr. Gloria, and what precisely the Government told the state authorities considering whether to prosecute Mr. Gloria for murder. Therefore, this Court should hold a hearing on this claim.

Mr. Higgs's *Brady* claim is properly brought under § 2241 because the Government withheld evidence supporting the claim until after Mr. Higgs's § 2255 proceedings had concluded. It was thus impossible for Mr. Higgs to present this evidence during the original § 2255 proceedings, and he is precluded from attempting to use § 2255 to do so again now, due to the strict barriers to raising successive § 2255 petitions. As a result, Mr. Higgs is entitled to review under § 2241 because § 2255 is "inadequate or ineffective to test the legality of [Mr. Higgs's] detention" or sentence. 28 U.S.C. § 2255(e).

### A.    Mr. Higgs's Due Process Rights Were Violated.

A *Brady* violation has three elements: (1) suppression by the prosecution of evidence that is both (2) favorable to the accused and (3) material to guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). The duty to disclose material exculpatory evidence extends to evidence in the possession of the police, regardless whether prosecutors are aware of it. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The Supreme Court has made clear that "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667,

20

676 (1985); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.") (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

A prosecutor's failure to disclose *Brady* evidence is material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Because the Government has the burden of proving its case beyond a reasonable doubt, "[i]t necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *United States v. Agurs*, 427 U.S. 97, 112 (1976). A court must assess not whether the defendant "would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

### 1.    The Government Withheld Exculpatory Evidence of Mr. Gloria's Lenient Treatment in Exchange for His Testimony.

Evidence that the Government actively intervened to protect Mr. Gloria from being prosecuted for murder to preserve his credibility in this case constitutes impeachment evidence that must be disclosed pursuant to *Brady.* And the Government has never disputed that it did not inform counsel for Mr. Higgs prior to trial that it was aware Mr. Gloria was a suspect in Mr. Creighton's murder and had multiple contacts on Mr. Gloria's behalf with the state authorities who were deciding whether to prosecute him. *See also* Dkt. 13-32 (Trainor Dec.).

The essence of the Government's argument when this claim was raised during the § 2255 proceedings and again during the 60(d) proceedings in the District of Maryland was instead that Baltimore authorities declined to prosecute Mr. Gloria entirely of their own accord, and thus Mr.

21

Gloria received no benefit from federal authorities that they were required to disclose. It was a mere happy coincidence for the Government that the critical witness in a case they had been investigating for over three years did not become irredeemably tainted when Baltimore authorities exercised their purportedly independent judgment to decline to charge Mr. Gloria.

The position taken by the Government throughout this litigation is meritless. It is beyond question that Mr. Gloria was a suspect in Mr. Creighton's murder, having been either directly or indirectly implicated by several witnesses. And it is highly likely that Mr. Gloria knew that the federal authorities responsible for making a downward departure motion and a sentencing recommendation in the federal case were aware of his involvement in the Baltimore case. As the Maryland district court found during the 60(d) litigation:

> It seems highly doubtful that AUSA Johnston would have known through the course of the *Higgs/Haynes* investigation that Haynes and Higgs knew the Scott twins and Miller and therefore was able to deduce the Scotts and Miller were conspiring against Gloria on behalf of Haynes/Higgs. . . . As Higgs suggests, then, it seems plausible that the AUSA's knowledge of the friendship and theory of the conspiracy came from her questioning Gloria himself about the Creighton murder.

*Higgs-4*, 193 F. Supp. 3d at 511 n.12.

In other words, Mr. Gloria knew that the federal prosecutors knew that he was a suspect in Mr. Creighton's killing, because the federal prosecutors questioned him about it. The federal prosecutors knew that they were shielding him from the state prosecutors, and that they were turning around and feeding information he gave them to the state authorities. Moreover, the federal prosecutors likely told Mr. Gloria during these conversations that they would be speaking to state authorities further. Regardless, mere knowledge that federal prosecutors were aware of the Baltimore investigation created a powerful incentive on Mr. Gloria's part to ingratiate himself to the maximum possible extent with the Government. This information was thus exculpatory within the meaning of *Brady*, as it constitutes "evidence that the defense might have

22

used to impeach the Government's witnesses by showing bias or interest." *Bagley*, 473 U.S. at 676. *See also Giglio*, 405 U.S. at 154 (*Brady* rule encompasses "evidence affecting credibility").

Moreover, critical questions remain about exactly what the federal authorities told the state authorities investigating Mr. Creighton's murder and how that information influenced state authorities' decision-making. The records reveal that the chief Baltimore homicide prosecutor was considering charging Mr. Gloria but deferred his decision until after he received additional "background" information from federal agents. *See* Dkt. 13-21 (Cohen note) ("After we talk to these officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case."). And it is a virtual certainty that there were additional state-federal conversations, in light of the handwritten names, phone numbers, and driving directions present in the Baltimore homicide file.

If federal authorities informed Baltimore authorities that Mr. Gloria was the key witness in the federal capital case and Baltimore authorities declined to charge Mr. Gloria as a result, there can be no question that this constitutes a benefit that the Government was required to disclose. This is *most likely* what happened, even if the influence exerted by federal authorities' communication that Mr. Gloria was the star witness in a capital triple homicide was subtle and implicit. Baltimore authorities charged each of the Scott twins with first-degree murder even though there was little if any evidence that they were guilty of such a crime. Indeed, both Scott brothers were eventually permitted to plead to second-degree assault, a misdemeanor, and received time served sentences. *See* Dkt. 13-25, 26; *see also* Md. Code. § 3-203. In the absence of knowledge that Mr. Gloria was a key witness in a high-profile federal murder prosecution, it is highly unlikely that Baltimore authorities would have declined to charge Mr. Gloria—who was

23

implicated far more directly by several witnesses, including disinterested witnesses—without even interviewing him.

But the prospect of state authorities' charging decision having been influenced by information received from federal authorities is, at a bare minimum, *plausible*. Had the Government revealed to trial counsel that Gloria was a suspect, and that there had been discussions between federal and state authorities concerning his involvement, counsel could have used this information to show that Gloria had strong motivation to cooperate with and testify favorably for the Government. And had the Government not successfully concealed this information until after Mr. Higgs's initial § 2255 proceedings concluded, this would have been all that would have been required to entitle him to an evidentiary hearing to answer these questions on the basis of a developed record.

The standard for granting an evidentiary hearing in § 2255 proceedings is that "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court . . . shall grant a prompt hearing thereon."  28 U.S.C. § 2255(b). The Supreme Court, Fourth Circuit, and Seventh Circuit have consistently applied this clear standard. *See*, *e.g.*, *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (reversing and remanding for a hearing where "we cannot conclude with the assurance required by the statutory standard . . . that under no circumstances could the petitioner establish facts warranting relief under § 2255); *Sanders v. United States*, 373 U.S. 1, 19-21 (1963) (same); *Machibroda v. United States*, 368 U.S. 487, 494 (1962) ("We think the District Court did not proceed in conformity with the provisions of 28 U.S.C. § 2255 when it made findings on controverted issues of fact without notice to the petitioner and without a hearing."); *Lafuente v. United States*, 617 F.3d 944, 946 (7th Cir. 2010) (if a petitioner "alleges facts that, if true, would entitle him to relief, then an

24

evidentiary hearing is necessary."); *United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) (a federal court "must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle [him] to relief.").

While the existing record provides strong evidence that the Government improperly withheld impeachment evidence regarding Mr. Gloria, this Court should at a minimum grant a hearing so that the critical disputed facts at the heart of this claim that have never been tested in an adversarial setting may finally be resolved once and for all.

### 2.      The Withheld Information Was Material.

It is impossible to overstate the importance of Mr. Gloria to the Government's case. As the Fourth Circuit noted on direct appeal, "Most of the facts surrounding the murders of the three women were obtained from [Mr. Gloria's] eyewitness testimony." *Higgs-1*, 353 F.3d at 289 n.1; *see also id.* at 313-14 (evidence of kidnapping, felony and premeditated murder is all derived from Mr. Gloria's testimony). While the court stated that Mr. Gloria's testimony was "partially corroborated," *id.* at 289 n.1, by evidence associating the decedents with a car of the type driven by Mr. Higgs, that evidence by itself would have been insufficient to charge Mr. Higgs with any crime, let alone prove his guilt of kidnapping and murder, as the Government has admitted. Dkt. 13-1 at 4 (Gloria Sentencing Tr. at 4:10-12) (argument of AUSA Johnston at Mr. Gloria's sentencing hearing that "the government could not have proceeded and obtain[ed] a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria."). *See also Smith v. Cain*, 565 U.S. 73, 76 (2012) (where eyewitness's "testimony was the *only* evidence linking [the defendant] to the crime," impeaching statements "were plainly material") (emphasis in original); *Kyles v. Whitley*, 514 U.S. 419, 444 (1995) ("The likely damage is best understood by taking the word of the prosecutor, who contended during closing arguments that Smallwood and Williams were the State's two best witnesses."); *Anderson v. City of Rockford*, 932 F.3d 492, 506 (7th Cir. 2019)

25

(suppressed evidence is "'plainly material' . . . where the prosecution's case rests solely on the credibility of an eyewitness") (quoting *Smith*).

Second, given that Mr. Gloria's testimony served as the central pillar for the Government's case against Mr. Higgs, it is evident that the jury credited that testimony, regardless of trial counsel's attempts to impeach his credibility.

Third, the assertion that additional impeachment of Mr. Gloria would not have made any difference is both legally and factually erroneous. As a legal matter, courts have frequently rejected such arguments when reviewing *Brady* claims. *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 702 (2004) (rejecting argument that because witness "was heavily impeached" at trial, his status as an informant would have been "merely cumulative"); *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 604 (7th Cir. 2019) ("Where, as here, the impeachment evidence is about the government's star witness, it is often material."); *Sims v. Hyatte*, 914 F.3d 1078, 1087 (7th Cir. 2019) (Supreme Court decisions clearly establish that "strong and non-cumulative impeachment evidence related to an important trial witness is material under *Brady*"); *United States v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009) (additional impeachment of witness could be material, even where there was some corroboration of witness, where witness was the "government's *star* witness—without him, there simply is no case at all on these charges"), *after remand*, 643 F.3d 221 (7th Cir. 2011).

Here, the suppressed impeachment evidence was different in force and in kind from the impeachment developed at trial. Although Mr. Gloria was revealed at trial to have an "extensive criminal history" and to be thoroughly self-serving, the suppressed evidence gave him an additional motivation—of which the jury was not aware—to curry favor with the Government.

26

That motivation was to escape being charged with first degree murder, the most serious charge one can face.

It does not matter whether there was a formal agreement in place not to prosecute Mr. Gloria in Baltimore exchange for his testimony. The mere fact that he knew he was under investigation, and that the federal authorities with whom he was cooperating were in contact with state authorities, constituted powerful impeachment evidence. The Seventh Circuit made clear in *Salem* that the fact that a witness was potentially facing murder charges is particularly powerful impeachment:

> This is not just evidence of another drug or gun crime. Murder is fundamentally different from other offenses. As the Supreme Court recently acknowledged, "there is a distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individual persons, even including child rape, on the other." All other crimes against individuals "cannot be compared to murder in their 'severity and irrevocability.'" Indeed, first-degree murder holds a unique position in our society's notion of criminality. That first-degree murder is the only crime against the person that commands the death penalty, the Justices have observed, "is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." So to say that there is no reasonable probability that the jury could reach a different result, even if the evidence showed that the government's star witness was never charged for his direct involvement in a violent gang murder, ignores the differences between the drug and gun crimes about which Lopez was questioned and first-degree homicide.

*Salem*, 578 F.3d at 689 (citations omitted).

That additional, powerful motivation is not merely cumulative of any existing impeachment material, including the knowledge that Mr. Gloria was motivated to avoid more serious punishment in the instant case. Therefore, the suppression of the Baltimore homicide evidence was material.

### B.    Relief Is Appropriate under 28 U.S.C. § 2241.

Mr. Higgs's access to the writ is foreclosed in the District of Maryland, where he was convicted, through the operation of 28 U.S.C. § 2255(h). His attempt to litigate a related claim

27

under the highly demanding standard provided under Federal Rule of Civil Procedure 60(d)—

requiring a showing of fraud on the court—was dismissed by the District of Maryland and the

Fourth Circuit. Absent § 2255's limitations, Mr. Higgs's constitutionally assured access to the

writ of habeas corpus would entitle him to petition the federal courts to grant relief from his

convictions and death sentences, and to seek review from the Supreme Court of any erroneous

lower court decisions denying relief. Mr. Higgs's claims are appropriately brought under § 2241.

He satisfies the § 2255(e) savings clause because it is impossible for him to obtain review of his

claims under § 2255.

### 1.    Legal Standard.

A federal habeas petitioner is entitled to review under § 2241 when § 2255 is "inadequate

or ineffective to test the legality of his detention" or sentence. 28 U.S.C. § 2255(e). This standard

is met when there is "a compelling showing that, as a practical matter, it would be impossible to

use section 2255 to cure a fundamental problem." *Purkey v. United States*, 964 F.3d 603, 615

(7th Cir. 2020), *stay vacated*, No. 20A4, 2020 WL 3988688 (U.S. July 15, 2020).

"The essential function [of § 2241] is to give a prisoner a reasonable opportunity to

obtain a reliable judicial determination of the fundamental legality of his conviction and

sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (internal quotations omitted);

*Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc) (same). Cognizable claims

under § 2241 include those that rely on a new legal or factual basis not available at the time of

the petitioner's trial or original § 2255 proceedings. Thus, "§ 2255 may be inadequate or

ineffective if the provision for successive collateral attacks in § 2255(h) does not permit a

prisoner to present newly discovered evidence that 'existed *before* the time of the trial' but was

unavailable 'despite diligence on the part of the defense.'" *Lee v. Watson*, 964 F.3d 663, 665 (7th

Cir. 2020) (quoting *Webster*, 784 F.3d at 1140 (emphasis in *Webster*)).

28

**2.     Aside From Section 2241, Petitioner Has No Remedy for Newly Discovered Evidence of *Brady* Violations.**

In this Petition, Mr. Higgs presents newly discovered evidence of violations of *Brady v. Maryland*, 373 U.S. 83 (1963). Mr. Higgs presented a related *Brady* claim in the original § 2255 proceedings. ECF No. 492, *United States v. Higgs*, No. 98-cr-520-PJM, Motion to Vacate 33 (D. Md. Nov. 28, 2005). That claim suggested that the Government had suppressed evidence that it aided Mr. Gloria to avoid prosecution for an unrelated Baltimore homicide in which he was present at the scene, likely a participant, and possibly the actual killer. The claim was denied because at that time Mr. Higgs lacked any supporting evidence. *Higgs-2*, 711 F. Supp. 2d at 508.

The evidence is newly discovered in the sense that all of it became available to Mr. Higgs after he had completed proceedings relating to his initial motion for relief under 28 U.S.C. § 2255. Once proceedings on such a motion have completed, 28 U.S.C. § 2244, which is incorporated into § 2255(h), likely erects a complete bar to relitigation of a claim that has previously been raised. *Taylor v. Gilkey*, 314 F.3d 832, 836 (7th Cir. 2002) (§ 2255(h) incorporates § 2244(b), including bar on relitigation of claims).

Moreover, even if a successor is not completely barred, a federal prisoner can only obtain relief based on new facts by presenting evidence that "would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1). This is an extremely high bar.

Under *Brady*, there is a due process violation when the Government fails to disclose evidence that is favorable to the defense and reasonably likely to change the outcome at either the guilt phase of trial or capital sentencing. *See Kyles*, 514 U.S. at 434 (1995) (discussing reasonable probability of different outcome standard for *Brady* claims). The section 2255(h)(1) standard is obviously far higher than the *Brady* standard. *See Bernard v. United States*, No.

29

20A110 (20–6570), 2020 WL 7258344 at *2 (U.S. Dec. 10, 2020) (Sotomayor, J., dissenting from denial of certiorari). As Justice Sotomayor points out, this results in an anomaly—if the Government withholds the evidence long enough, i.e., until the first section 2255 proceedings are completed, its misconduct and the resulting due process violation are insulated from review by the stringent § 2255(h)(1) standard. *See id.* (such a result "rewards prosecutors who successfully conceal their *Brady* and *Napue* violations until after an inmate has sought relief from his convictions on other grounds").

Under *Lee* and *Webster*, section 2255 is inadequate because it allows the Government to violate *Brady* but still render relief impossible where the claim involves newly discovered evidence that was unavailable during the initial § 2255 proceeding. In *Bernard*, Judge Sweeney ruled that a petitioner could satisfy the savings clause with respect to such a claim, *Bernard v. Watson*, No. 2:20-cv-00616-JRS-DLP, 2020 WL 7230886, at *4 (S.D. Ind. Dec. 8, 2020), *stay denied*, No. 20-3379 (7th Cir. Dec. 10, 2020), but only by making a clear and convincing showing of innocence of the death penalty. *Id.* at *5. For the reasons explained by Justice Sotomayor, such a requirement is inappropriate. Assuming arguendo that the requirement applies, Petitioner satisfies it.

Mr. Higgs's eligibility for the death sentence was premised on Mr. Gloria's testimony that Mr. Higgs handed Mr. Haynes the murder weapon and ordered him to shoot the three women. The evidence discussed above, together with the impeachment of Mr. Gloria at trial, thoroughly impeaches his credibility. Moreover, Mr. Haynes has attested that Mr. Higgs did not order him to do anything. Dkt. 13-33 (Haynes Dec.). This constitutes convincing evidence that Mr. Haynes acted on his own. There is now convincing evidence that Mr. Higgs is ineligible for the death sentence.

Because the Government suppressed the relevant evidence until the completion of the original § 2255 proceedings, and for the reasons set forth above, a successive § 2255 motion is not an adequate remedy for Mr. Higgs. Nor is there any other available remedy besides a habeas petition under § 2241. A Rule 60(b) motion would be treated as an attempt to file a successive petition. *See United States v. Bernard*, 820 F. App'x 309, 311 (5th Cir. 2020).

Mr. Higgs previously attempted to litigate his claim under Rule 60(d), alleging fraud on the court. While a Rule 60(d) motion is not treated as a successive petition, it is viable only in extremely limited circumstances. In order to establish fraud on the court the movant must show more than "your garden-variety fraud." *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014). It applies only in "the most egregious cases," such as "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982). It also requires an "intentional plot to deceive the judiciary," and must "touch on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136. The movant must also prove the fraud on the court by "clear and convincing evidence." *See United States v. MacDonald*, No. 97–7297, 1998 WL 637184, at *2 (4th Cir. Sept. 8, 1998).

None of these requirements has anything to do with the merits of a *Brady* claim, which requires only proof of suppression of favorable, material evidence. *See Kyles*, 514 U.S. at 434. In particular, *Brady* does not require any proof of intentional Government misconduct. *See id.* at 437-38 (existence of *Brady* violation does not turn on good or bad faith of the prosecution).

In Mr. Higgs's Rule 60(d) motion, he argued that the Government committed fraud on the court during the original § 2255 proceedings, when it falsely denied the existence of any

31

consideration flowing to Gloria in the unrelated Baltimore homicide in exchange for Gloria's cooperation in the Higgs and Haynes trials. The district court denied relief because it found that Mr. Higgs could not prove by clear and convincing evidence the existence of an egregious intentional plot to deceive the court, the "high burden of proof required to grant a Rule 60(d) motion." *Higgs-4,* 193 F. Supp. 3d at 513. Because the Rule 60(d) burden is so high, Rule 60(d) is an inadequate remedy for the situation here, as described by Justice Sotomayor—a *Brady* violation that remains concealed through the original § 2255 proceedings.

Finally, there is no path for Mr. Higgs to argue that he should be able to file a new § 2255 motion, but have it treated as in effect a first § 2255 motion. That remedy was attempted in *Bernard*, but rejected by the Fifth Circuit and the majority of the Supreme Court. *Bernard*, 820 F. App'x at 310-11, *cert. denied*, 2020 WL 7258344 at *1 (U.S. Dec. 10, 2020). That ruling dooms any attempt to repeat such an effort.

As indicated by Judge Sweeney in *Bernard*, a habeas petition under § 2241 is the only available remedy for a *Brady* claim based on evidence that was not available during the original § 2255 proceedings. Thus, like the petitioner in *Webster*, "as a practical matter, it would be impossible [for Mr. Higgs] to use section 2255" to test his current claims. *Purkey*, 964 F.3d at 615.

## II.    THE INDICTMENT DID NOT CHARGE A CAPITAL OFFENSE AND, THEREFORE, THE TRIAL COURT LACKED JURISDICTION TO TRY MR. HIGGS FOR CAPITAL OFFENSES.

Mr. Higgs received a sentence of death on six counts of first-degree murder and three counts of kidnapping resulting in death. Under the Federal Death Penalty Act, each of these offenses is not death-eligible absent a finding of at least one enumerated statutory aggravator and gateway intent factor. These statutory aggravators are elements of the capital offense and, therefore, must be charged by a grand jury, sufficiently alleged in the indictment, submitted to

32

the petit jury, and proven beyond a reasonable doubt. However, the Second Superseding Indictment returned against Mr. Higgs did not contain even a passing reference to a single statutory aggravator, a necessary element of each capital offense. In short, Mr. Higgs was convicted of charges the grand jury never made against him; this deprivation of his basic Fifth Amendment rights "is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Stirone v. United States*, 361 U.S. 212, 217 (1960). Therefore, Mr. Higgs's convictions for six counts of first-degree murder and three counts of kidnapping resulting in death must be vacated.

Because relief under § 2255 is structurally unavailable, and because Mr. Higgs challenges the constitutionality of the continued implementation of his death sentence and confinement on death row in light of recent developments in the applicable law, proceeding under § 2241 is appropriate.

### A. Statutory Aggravators Are an Element of a Capital Offense under the FDPA and Must Be Alleged in the Indictment.

"[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Drawing on *Apprendi*, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Court held that aggravating circumstances that make a defendant eligible for the death penalty are an element of a greater offense and, under the Sixth Amendment, must be submitted to a jury and proven beyond a reasonable doubt. *Id.* at 609.

The same principles apply to the Fifth Amendment context and require that such aggravating factors be submitted to a grand jury and alleged in the indictment. *Higgs-1*, 353 F.3d at 297 ("principles of *Apprendi* and *Ring* dictate that any factor required to be submitted to the jury must be included in the indictment"); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir.

2004) ("*Ring*'s Sixth Amendment holding applies with equal force in the context of a Fifth Amendment Indictment Clause challenge, even though the Supreme Court has yet to hold as much in a capital case."); *United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005) ("We therefore conclude that the Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment"); *United States v. Quinones*, 313 F.3d 49, 53 n.1 (2d Cir. 2002) (same).

The grand jury clause of the Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The purpose of the grand jury clause "is to limit [a defendant's] jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone*, 361 U.S. at 218. The "basic protection the grand jury was designed to afford is defeated" when a defendant is subject to prosecution for an offense that the grand jury did not charge. *Id.* "An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).

Under the Federal Death Penalty Act, a death sentence cannot be imposed without the jury finding at least one of the aggravating factors enumerated in 18 U.S.C. § 3592(c), and at least one of the intent factors in 18 U.S.C. § 3591(a)(2). Absent a finding of at least one enumerated aggravator and one intent factor, the court must impose a sentence other than death. *See* 18 U.S.C. § 3593(d) ("If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law."). Because the finding of an aggravating circumstance is required to make a defendant eligible for a death sentence under the

34

FDPA, it is a part of a new offense (capital murder) and not merely a sentencing factor relating to the lesser offense (murder). *See Alleyne v. United States*, 570 U.S. 99, 115-16 (2013) ("The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime."); *Sattazahn v. Pennsylvania,* 537 U.S. 101, 112 (2003) (murder plus one or more aggravating circumstances is a separate offense from murder *simpliciter*). For the reasons that follow, the Second Superseding Indictment failed to allege any statutory aggravators and, therefore, did not charge Mr. Higgs with a capital offense.

> **B.      Mr. Higgs Was Not Charged With a Capital Offense Because the Indictment Returned Against Him Did Not Adequately Allege a Single Statutory Aggravator.**

As described in the Procedural History above, the Second Superseding Indictment failed to adequately allege any of the four statutory aggravators ultimately found by the petit jury. In the absence of a single properly alleged aggravator, the indictment failed to charge a capital offense and, under the Fifth Amendment, Mr. Higgs should have not been prosecuted for a capital offense.

> **1.      The Multiple Killings Statutory Aggravator Did Not Render the Counts Death-Eligible Because of the Ex Post Facto Clause.**

The multiple killings aggravator, 18 U.S.C. § 3592(c)(16), was found by the petit jury but was not added to the Federal Death Penalty Act as a statutory aggravator until April 1996, three months after the murders occurred. Given this, the Government cannot rely upon the multiple killings as a statutory eligibility aggravator because doing so would violate the Ex Post Facto Clause. *Higgs-1*, 353 F.3d at 300-301 ("we hold that the 'multiple killings' aggravator cannot act as the sole statutory aggravator which rendered these murders death-eligible."). As such, the petit jury's finding of this aggravator did not render any of the charges death-eligible.

### 2.     The Grand Jury Was Neither Presented With nor Passed Upon the Death During Commission of a Kidnapping Aggravator.

In connection with the six § 1111(a) murder counts, the petit jury was presented with and found an additional statutory aggravator: that the deaths occurred during the commission of another crime, specifically kidnapping, as set forth in 18 U.S.C. § 3592(c)(1).[8] However, the Second Superseding Indictment contains no direct reference to that statutory aggravator or any other indication that the § 1111(a) charges presented were intended to be capital in nature. Presented with the Second Superseding Indictment, the grand jury had no reason to know that the document they returned purportedly charged Mr. Higgs with capital offenses or, more specifically, that they were being asked to assess any particular statutory aggravator. At a bare minimum, the Fifth Amendment requires that the grand jury have knowledge that they are being asked to make a decision as to a particular element and, more fundamentally, that the defendant be able to ascertain the offenses charged from the face of the indictment. *See Hamling*, 418 U.S. at 117 (an indictment must contain "the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend").

Despite the undisputed absence of any actual reference to § 3592(c)(1) in particular or statutory aggravators in general, the Fourth Circuit nonetheless held that the Second Superseding Indictment "sufficiently alleged" the death during a kidnapping aggravator with respect to each of the six murder counts because:

> the indictment specifically alleges that the Higgs killed the three women "in the perpetration of, and attempted perpetration of a felony, to wit, kidnapping," J.A. 136, 141, 146, and charges further that Higgs "did knowingly, willfully and

---

[8] The Fourth Circuit correctly recognized that "[e]ven if we assume that the statutory aggravator could have been submitted in support of the kidnapping counts, it was only submitted to the jury in connection with the § 1111(a) first-degree murder counts." *Higgs-1*, 353 F.3d at 301. Therefore, even if sufficiently alleged in the indictment, this statutory aggravator does not "suffice to render the indictment sufficient for purposes of the three capital counts for kidnapping resulting in death charged under § 1201(a)." *Id.*

unlawfully seize, confine, inveigle, decoy, kidnap, abduct, carry away and hold [the women] for a reason which was of benefit to [him]." J.A. 138, 143, 148.

*Higgs-1*, 353 F.3d at 301 (alterations in original). The first quoted portion appears in Counts Two, Seven, and Twelve, which charge felony murder under § 1111(a). The second quoted portion appears in Counts Four, Nine, and Fourteen, which charge kidnapping under § 1201(a)(2). Dkt. 13-36 at 4, 9, 14). The other three § 1111(a) murder counts (Counts One, Six, and Eleven) do not contain the word kidnapping or any factual allegations conceivably related to kidnapping. *Id.* at 1, 6, 11.

"Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States*, 284 U.S. 390, 393 (1932). Federal Rule of Criminal Procedure 7 provides that a "count may incorporate by reference an allegation made in another count." Fed. R. Crim. P. 7(c)(1). Incorporation, however, must be explicit and cannot be assumed. *United States v. Hajecate*, 683 F.2d 894, 901 (5th Cir. 1982) ("the specificity required in an indictment can be achieved by incorporation of another count, this incorporation must be express, not implicit").

As such, "each count in an indictment must stand on its own, and cannot base its validity on the allegations of any other count not specifically incorporated." *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991); *see also United States v. Yefsky*, 994 F.2d 885, 894 (1st Cir. 1993) ("Thus, each count must be sufficient without reference to other counts unless the allegations of those counts expressly are incorporated"); *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992) ("the validity of a count cannot depend upon the allegations contained in any other count not expressly incorporated"). In other words, counts "cannot absorb by osmosis the allegations of" other counts unless specifically incorporated therein. *United States v. Fulcher*, 626 F.2d 985, 988 (D.C. Cir. 1980).

37

In the Second Superseding Indictment, Counts Five, Ten, and Fifteen, charging the use of a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c), incorporate other counts by reference. In contrast, the other twelve counts, including the six murder counts, do *not* incorporate any of the other counts by reference. Therefore, each murder count must be analyzed as if it were a separate indictment and no murder count can depend on allegations contained in the other counts.

Therefore, the allegations in the § 1201(a)(2) kidnapping counts are irrelevant to whether the six murder counts sufficiently alleged the § 3592(c)(1) statutory aggravator. Because the § 1201(a)(2) counts were not incorporated into any of the six murder counts, the validity of the six murder counts cannot depend on the allegations contained in the § 1201(a)(2) counts.

What is left is a single reference to the word "kidnapping" in the three felony murder counts. The use of the word kidnapping in the felony murder counts closely tracks the statutory language setting forth the elements of felony murder in 18 U.S.C. § 1111(a). *Compare* 18 U.S.C. § 1111(a) (providing that "murder . . . committed in the perpetration of, or attempt to perpetrate, any kidnaping . . ." is murder in the first degree), *with* Second Superseding Indictment, Counts 2, 7 and 12, Dkt. 13-36 at 2, 7, 12 ("in perpetration of, and attempted perpetration of a felony, to wit, kidnapping"). Absent inclusion of a statutory aggravator, a simple recitation of the elements of the felony murder statute charges murder, not capital murder.

In sum, the statutory aggravator based on a death during a kidnapping was not adequately alleged in any of the six murder counts and, therefore, did not transform any of the murder charges into capital murder charges.

38

### 3. *Alleyne* Makes Clear that Prior Conviction Aggravators are Elements of the Capital Offense and Must Be Alleged in the Indictment.

The only remaining statutory aggravators found by the jury were based on Mr. Higgs's prior conviction for a violent felony involving a firearm under § 3592(c)(2) and prior conviction for a serious federal drug offense under § 3592(c)(12). As with the other statutory aggravators ultimately found by the petit jury, the indictment made no reference to either of the statutory aggravator based on Mr. Higgs's prior convictions. Citing *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the Fourth Circuit held, on direct appeal, that the prior conviction statutory aggravators are not elements of the capital offense and, therefore, need not be alleged in the indictment. *Higgs-1*, 353 F.3d at 303-04.

In *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the Supreme Court held that the fact of a prior conviction which increases the maximum permissible sentence is not an element of a separate offense but merely a "penalty provision, which simply authorizes a court to increase the sentence for a recidivist." *Id.* at 226. The Court, therefore, concluded that the fact of a prior conviction which operates as a penalty provision need not be alleged in an indictment. *Id.* The holding in *Almendarez-Torres* "rested in substantial part on the tradition of regarding recidivism as a sentencing factor, not as an element to be set out in the indictment." *Jones v. United States*, 526 U.S. 227, 249 (1999).

*Almendarez-Torres* was a non-capital case, where consideration of a defendant's prior record is a historic and regular feature of the sentencing process. In the capital context, designated prior convictions play a different role. As statutory aggravators, they become elements of a different offense and distinguish capital murder from non-capital murder. *Almendarez-Torres* does not apply in this context in which a statutory aggravating factor— including those based on prior convictions—converts the offense from murder *simpliciter* to

39

murder plus one or more aggravating circumstances. *See Sattazahn*, 537 U.S. at 112. In the years since Mr. Higgs's direct appeal was decided, intervening Supreme Court decisions have demonstrated the necessity of revisiting *Almendarez-Torres*, particularly with respect to capital cases.

Just two years after *Almendarez-Torres* was decided, the Supreme Court decided *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and called into question the holding in *Almendarez-Torres*. In *Apprendi*, the Supreme Court announced that facts that increase the maximum statutory sentence must be proved to a jury beyond a reasonable doubt. *Id.* at 490. The Supreme Court recognized that the general rule set forth in *Apprendi* was difficult to square with the particular holding in *Almendarez-Torres*. *Id.* at 489-90. Although the *Apprendi* Court recognized that *"it is arguable that Almendarez-Torres* was incorrectly decided" and that a "logical application" of its holding should extend to prior convictions as well, the Court declined pass on the continued to validity of *Almendarez-Torres* because *Apprendi* did not involve a prior conviction. *Id.* at 489-90.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Court considered the import of *Apprendi* on Arizona's capital sentencing scheme, which authorized a judge to determine the existence of statutory death eligibility factors. The *Ring* Court held that such a scheme violated the Sixth Amendment because the eligibility factors operated as "the functional equivalent of an element of a greater offense," and, thus, must be submitted to a jury. *Id.* at 609. The Court, however, again declined to answer the question of whether statutory eligibility factors based on prior convictions must also be treated as elements of capital murder. *See id.* at 597 n.4 ("No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez-Torres v. United States*").

40

Since *Ring*, the continued viability of *Almendarez-Torres* has been repeatedly questioned, with Justice Thomas serving as perhaps the most vocal advocate for overturning the decision. *See Sessions v. Dimaya,* 138 S. Ct. 1204, 1253 (2018) (Thomas, J., dissenting) ("The exception recognized in *Almendarez-Torres* for prior convictions is an aberration, has been seriously undermined by subsequent precedents, and should be reconsidered"); *Mathis v. United States*, 136 S. Ct. 2243, 2258–59 (2016) (Thomas, J., concurring) ("*Apprendi* recognized an exception for the "fact of a prior conviction," instead of overruling *Almendarez-Torres*. I continue to believe that the exception in *Apprendi* was wrong, and I have urged that *Almendarez-Torres* be reconsidered") (citation omitted); *Shepard v. United States*, 544 U.S. 13, 27, (2005) (Thomas, J., concurring) ("*Almendarez-Torres* . . . has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided.").

In *Alleyne*, the Supreme Court sought to dispel any lingering confusion as to the difference between sentencing factors and elements when it offered the following unambiguous definition: "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." 570 U.S. at 114-15. The Court again recognized that *Almendarez-Torres* was the "narrow exception" to the otherwise "general rule" that any fact that increases the legally permissible punishment must be proven to a jury beyond a reasonable doubt. *Id.* at 111 n.1. However, the Court yet again declined to revisit *Almendarez-Torres* because, as in *Apprendi* and *Ring,* the parties did not contest the decision's vitality. *Id.*

The lower courts have recognized the mounting tension between *Almendarez-Torres*'s holding and subsequent decisions, namely *Apprendi* and *Alleyne*, but have persisted in applying

41

the precedent because its continued validity can only be resolved by the Supreme Court. *See, e.g.*, *United States v. Williams*, 410 F.3d 397, 402 (7th Cir. 2005) ("however much in tension the holding of *Almendarez-Torres* may be with the holdings of *Apprendi*, *Blakely*, and *Booker*. . . the Supreme Court has yet to overrule *Almendarez-Torres*") (internal citations omitted); *United States v. McDowell*, 745 F.3d 115, 124 (4th Cir. 2014) (noting that "recent characterizations of the Sixth Amendment are difficult, if not impossible, to reconcile with *Almendarez-Torres*'s lonely exception to Sixth Amendment protections," but recognizing that "we may not disregard it unless and until the Supreme Court holds to the contrary"); *United States v. Morris*, 293 F.3d 1010, 1012 (7th Cir. 2002) ("Unless and until the Court chooses to overrule *Almendarez-Torres*, we are bound by it"); *United States v. Terry*, 240 F.3d 65, 73-74 (1st Cir. 2001) ("until *Almendarez-Torres* is overruled, we are bound by it").

Under *Apprendi* and *Alleyne*, a prior conviction that serves as a statutory death eligibility aggravator is an element of a new offense, capital murder, and, therefore, must be set forth in the indictment. Mr. Higgs's indictment did not set forth the prior conviction statutory aggravators which the Government contends rendered the counts death eligible. Thus, Mr. Higgs was "unconstitutionally sentenced under the flawed rule of *Almendarez-Torres*, despite the fundamental 'imperative that the Court maintain absolute fidelity to the protections of the individual afforded by the notice, trial by jury, and beyond-a-reasonable-doubt requirements.'" *Shepard v. United States*, 544 U.S. 13, 28 (2005) (Thomas, J., concurring in part and concurring in the judgment) (quoting *Harris v. United States*, 536 U.S. 545, 581-582 (2002) (Thomas, J., dissenting)). Before Mr. Higgs's execution is carried out, it is time to decide whether *Almendarez-Torres* applies to capital cases.

42

**C.** **The Failure to Allege a Capital Offense is Structural Error and the Indictment Did Not Confer Power on the District Court to Try Mr. Higgs for Capital Offenses.**

The Supreme Court has long recognized that a federal court has no jurisdiction or power to try or sentence a defendant for an infamous or capital crime that was not charged in an indictment. *Ex parte Bain*, 121 U.S. 1, 12-13 (1887) ("an indictment found by a grand jury [is] indispensable to the power of the court to try the petitioner for the crime with which he was charged"). For the reasons discussed above, the Second Superseding Indictment failed to allege any statutory aggravators and, therefore, did not charge Mr. Higgs with a capital offense. Thus, "[t]here was nothing before the court on which it could hear evidence or pronounce [a death] sentence." *Id.* at 13-14.

The Supreme Court partially overruled *Bain*'s unqualified jurisdictional pronouncement in *United States v. Cotton,* 535 U.S. 625 (2002)*.* In *Cotton*, the defendant argued that the court lacked jurisdiction to impose an enhanced sentence triggered by the amount of drugs at issue because the indictment failed to allege the drug quantity. *Id.* at 627. The Court rejected the jurisdictional framing, holding that "defects in an indictment do not deprive a court of its power to adjudicate a case." *Id.* at 630. In *Cotton*, the Court reasoned that jurisdictional defects "require correction regardless of whether the error was raised in district court," and, by contrast, "the grand jury right can be waived." *Id*. at 630 (citing *Smith v. United States*, 360 U.S. 1 (1959)). However, *Smith* made clear that an indictment is not waivable in the capital context. *See Smith*, 360 U.S. at 9 (an indictment "may be waived, but only in those proceedings which are noncapital").[9]

---

[9] In *Cotton*, the Court also stated that "[p]ost-*Bain* cases confirm that defects in an indictment do not deprive a court of its power to adjudicate a case." *Cotton,* 535 U.S. at 630-31 (citing

43

As such, *Cotton* did not undermine the continued vitality of *Bain*'s broad jurisdictional rule in the capital context. This reading of *Bain* and *Cotton* is consistent with the long-held understanding that the deprivation of the Fifth Amendment's right to an indictment by the grand jury is "far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Stirone v. United States*, 361 U.S. 212, 217-18 (1960); *see also United States v. Farr*, 536 F.3d 1174, 1184-85 (10th Cir. 2008) (Gorsuch, J.) (Fifth Amendment violation resulting from a constructive amendment of the indictment was reversible error *per se* without any further showing of prejudice).

Mr. Higgs's indictment did not allege a single statutory aggravator and, therefore, did not charge Mr. Higgs with a capital offense. The charges on which the grand jury did indict Mr. Higgs could only be punished by a life sentence or a term of years. As Mr. Higgs was never indicted for a capital offense, *Bain* teaches that the trial court had no jurisdiction to impose, implement, or execute a death sentence. *Cotton* does not hold otherwise.

The indictment did not and should not have exposed Mr. Higgs to be confined on death row and threatened with execution.

### D.    Mr. Higgs's Claim Is Appropriately Raised under § 2241 Because § 2255 Is an Inadequate Vehicle to Test the Legality of His Detention.

"As a general rule, a federal prisoner wishing to collaterally attack his conviction or sentence must do so under § 2255." *Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019). However, if it "appears that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention," a federal petitioner may seek relief under § 2241. 28 U.S.C. §

---

*Lamar v. United States*, 240 U.S. 60 (1916); *United States v. Williams*, 341 U.S. 58 (1951)). However, like *Cotton, Lamar* and *Williams* were also non-capital cases.

2255(e). This provision is called the "savings clause," *Beason v. Marske*, 926 F.3d 932, 935 (7th Cir. 2019), or "safety valve," *Webster,* 784 F.3d at 1125.

Under the savings clause, federal prisoners can seek a writ of habeas corpus under § 2241 if they demonstrate "that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). This standard is met when there is "a compelling showing that, as a practical matter, it would be impossible to use section 2255 to cure a fundamental problem." *Purkey*, 964 F.3d at 615; *Lee*, 964 F.3d at 666 (same, citing *Purkey*).

The Seventh Circuit has held that section 2255 is "inadequate or ineffective" "when it cannot be used to address novel developments in either statutory or constitutional law, whether those developments concern the conviction or the sentence." *Roundtree v. Krueger*, 910 F.3d 312, 313 (7th Cir. 2018); *see also Chazen*, 938 F.3d at 861 ("a petitioner seeking relief under § 2241 need only show that the case on which he relies had not yet been decided at the time of his § 2255 petition."). In the Fourth Circuit, it is well settled that a petitioner cannot "circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." *United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009); *see also United States v. Roane*, 378 F.3d 382, 397 (4th Cir. 2004) (same).

As a practical matter, these principles make it impossible for Mr. Higgs to obtain review of this claim under § 2255. In *Beason*, the Seventh Circuit held that a petitioner had been foreclosed from raising an argument in a § 2255 motion, where the argument had been rejected on direct appeal and the law of the case doctrine precluded him from relitigating the same issue in a collateral proceeding. 926 F.3d at 937. The court reasoned that a petitioner in this situation, "[a]s a practical and legal matter, . . . needed a superseding development," such as a relevant

45

intervening judicial decision, to receive renewed consideration of the argument through a § 2241 petition. *Id.* at 937-38.

Mr. Higgs's defective indictment claim easily fits the reasoning set forth in *Beason.* On direct appeal, Mr. Higgs argued that the indictment failed to sufficiently allege any statutory aggravators and, therefore, did not charge him with a capital offense. The Fourth Circuit rejected his claim based on *Almendarez-Torres* and a faulty analysis of language in the indictment and concluded that any purported error was harmless. However, recent Supreme Court decisions—in particular, *Alleyne*—make clear that *Almendarez-Torres* is inconsistent with the Sixth and Fifth Amendments, the Second Superseding Indictment did not charge Mr. Higgs with a capital offense, and that the error is not subject to harmless error analysis. Nonetheless, Fourth Circuit precedent bars Mr. Higgs from raising these issues in a § 2255 motion. Thus, Mr. Higgs has met the requirements of the savings clause, and is entitled to review under § 2241.

In addition, § 2241 review is available because Mr. Higgs challenges the jurisdiction of the trial court to impose a death sentence. As discussed above, the grand jury's failure to charge Mr. Higgs with a capital crime deprived the trial court of jurisdiction to sentence him to death. *See Bain*, 121 U.S. at 13-14. Section 2241 is an appropriate vehicle to challenge the trial court's jurisdiction to impose a death sentence because Mr. Higgs is foreclosed from raising these claims in a § 2255 motion and objections to jurisdiction can be raised at any point. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation[.]").

Mr. Higgs is foreclosed from seeking relief through § 2255 because the relitigation bar precludes him from raising issues that have been addressed on direct appeal. As discussed above, the failure to charge Mr. Higgs with a capital offense deprived the court of power to convict him

46

of a capital offense. Because relief under § 2255 is structurally unavailable, and because Mr.

Higgs's habeas petition challenges the constitutionality of the imposition and continued

implementation of his death sentence and confinement on death row in light of recent

developments in the law, proceeding under § 2241 is appropriate.

## REQUEST FOR RELIEF

For all of the above reasons, Petitioner Dustin Higgs respectfully requests that the Court:

A.    Direct the government to file an answer;

B.    Permit Petitioner to file a reply;

C.    Hold oral argument and such other proceedings as the Court deems appropriate;

D.    Hold an evidentiary hearing and grant all necessary discovery;

E.    Vacate Petitioner's convictions;

F.    Vacate Petitioner's death sentences; and

G.    Grant such other relief as is proper.

                              Respectfully submitted,


                              /s/ Matthew C. Lawry
                              Matthew C. Lawry
                              Federal Community Defender Office
                              for the Eastern District of Pennsylvania
                              The Curtis, Suite 545-West
                              601 Walnut Street
                              Philadelphia, PA 19106
                              215-928-0520
                              Matthew_Lawry@fd.org


December 23, 2020

**CERTIFICATE OF SERVICE**

I, Matthew Lawry, hereby certify that on this 23rd day of December, 2020, the foregoing was filed electronically through ECF/CM. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

Ellen Nazmy
Sandra Wilkinson
Assistant United States Attorneys
Office of the United States Attorney
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

/s/ Matthew C. Lawry
Matthew C. Lawry